# EXHIBIT "A"

# Supreme Court of Pennsylvania

## Court of Common Pleas
## Civil Cover Sheet

_____ CHESTER _____ County

| For Prothonotary Use Only: | TIME STAMP |
|---|---|
| Docket No: | |

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

## SECTION A

**Commencement of Action:**
- ☑ Complaint
- ☐ Writ of Summons
- ☐ Petition
- ☐ Transfer from Another Jurisdiction
- ☐ Declaration of Taking

| Lead Plaintiff's Name: | Lead Defendant's Name: |
|---|---|
| Assata Acey | InductEV |

**Are money damages requested?** ☑ Yes ☐ No

Dollar Amount Requested:  ☐ within arbitration limits
(check one)  ☑ outside arbitration limits

**Is this a *Class Action Suit*?** ☐ Yes ☑ No    **Is this an *MDJ Appeal*?** ☐ Yes ☑ No

Name of Plaintiff/Appellant's Attorney: _____

☑ **Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)**

## SECTION B

**Nature of the Case**: Place an "X" to the left of the **ONE** case category that most accurately describes your **PRIMARY CASE.** If you are making more than one type of claim, check the one that you consider most important.

**TORT** (do not include Mass Tort)
- ☐ Intentional
- ☐ Malicious Prosecution
- ☐ Motor Vehicle
- ☐ Nuisance
- ☐ Premises Liability
- ☐ Product Liability (does not include mass tort)
- ☐ Slander/Libel/ Defamation
- ☐ Other: _____

**MASS TORT**
- ☐ Asbestos
- ☐ Tobacco
- ☐ Toxic Tort - DES
- ☐ Toxic Tort - Implant
- ☐ Toxic Waste
- ☐ Other: _____

**PROFESSIONAL LIABLITY**
- ☐ Dental
- ☐ Legal
- ☐ Medical
- ☐ Other Professional: _____

**CONTRACT** (do not include Judgments)
- ☐ Buyer Plaintiff
- ☐ Debt Collection: Credit Card
- ☐ Debt Collection: Other _____

- ☑ Employment Dispute: Discrimination
- ☐ Employment Dispute: Other _____

- ☐ Other: _____

**REAL PROPERTY**
- ☐ Ejectment
- ☐ Eminent Domain/Condemnation
- ☐ Ground Rent
- ☐ Landlord/Tenant Dispute
- ☐ Mortgage Foreclosure: Residential
- ☐ Mortgage Foreclosure: Commercial
- ☐ Partition
- ☐ Quiet Title
- ☐ Other: _____

**CIVIL APPEALS**
Administrative Agencies
- ☐ Board of Assessment
- ☐ Board of Elections
- ☐ Dept. of Transportation
- ☐ Statutory Appeal: Other _____

- ☐ Zoning Board
- ☐ Other: _____

**MISCELLANEOUS**
- ☐ Common Law/Statutory Arbitration
- ☐ Declaratory Judgment
- ☐ Mandamus
- ☐ Non-Domestic Relations Restraining Order
- ☐ Quo Warranto
- ☐ Replevin
- ☐ Other: _____

*Updated 1/1/2011*

# Chester County
## Court of Common Pleas
## Cover Sheet

| | Docket No: |
|---|---|

| Plaintiff(s): (Name, Address) | Plaintiff's/Appellant's Attorney (circle one) |
|---|---|
| Assata Acey, 5121 Brown St, Philadelphia, PA 19139 | (Name, firm, address, telephone and attorney ID#) |

| Defendant(s): (Name, Address) | Are there any related cases? Please provide case nos. |
|---|---|
| InductEV 660 Allendale Road, King of Prussia, PA 19406 | |

**Defendants who are proceeding without counsel are strongly urged to file with the Prothonotary a written statement of an address AND a telephone number at which they can be reached.**

If this is an appeal from a Magisterial District Judgment, was appellant ◯ Plaintiff or ◯ Defendant in the original action?

Jury Trial Demanded ◯ Yes ⬤ No

Nature of case if not on previous cover sheet – Please choose the most applicable

| | |
|---|---|
| ☐ Annulment | ☐ Writ of Certiorari |
| ☐ Custody · Conciliation Required | ☐ Injunctive Relief |
| ☐ Custody· Foreign Order | ☐ Mechanics Lien Claim |
| ☐ Custody - No Conciliation Required | ☐ Issuance of Foreign Subpoena |
| ☐ Divorce - Ancillary Relief Request | ☐ Name Change |
| ☐ Divorce - No Ancillary Relief Requested | ☐ Petition for Structured Settlement |
| ☐ Foreign Divorce | |
| ☐ Foreign Protection from Abuse | |
| ☐ Paternity | |
| ☐ Protection from Abuse | |
| ☐ Standby Guardianship | |

**Arbitration Cases Only**

Arbitration Date [ ]
Arbitration Time [ ]

Defendants are cautioned that the scheduling of an arbitration date does not alter the duty of the defendant to respond to the complaint and does not prevent summary disposition from occurring prior to the arbitration date.

This matter will be heard by a Board of Arbitrators at the time and date specified but, if one or more of the parties is not present at the hearing, the matter may be heard at the same time and date before a judge of the court without the absent party or parties.  There is no right to a trial *de novo* on appeal from a decision entered by a judge.

**Notice of Trial Listing Date**

Pursuant to C.C.R.C.P. 249.3, if this case is not subject to compulsory arbitration it will be presumed ready for trial twelve (12) months from the date of the initiation of the suit and will be placed on the trial list one (1) year from the date the suit was filed unless otherwise ordered by the Court.

To obtain relief from automatic trial listing a party must proceed pursuant to C.C.R.C.P. 249.3(b), request an administrative conference and obtain a court order deferring the placement of the case on the trial list until a later date.

**File with:**  Chester County Justice Center,  Prothonotary Office, 201 W. Market St., Ste. 1425, PO Box 2746, West Chester, PA 19380-0989

These cover sheets must be served upon all other parties to the action immediately after filing.
Submit enough copies for service.                    Form 1

**CHESTER COUNTY**
**COURT OF COMMON PLEAS**

ASSATA ACEY                              :
                                         :
                                         :        CIVIL ACTION
                                         :
    Plaintiff,                               :
                                         :
v.                                       :
                                         :
INDUCTEV                                 :
660 Allendale Rd.                        :
King of Prussia, PA 19406                :
                                         :
    Defendant.                               :
                                         :
                                         :

## COMPLAINT

I, Assata Acey, file this complaint, alleging that my rights pursuant to Title VII of the Civil Rights Act of 1964;

42 U.S.C. § 2000e, Section 1981 of the Civil Rights Act of 1990; 42 U.S.C. § 1981, The Americans with

Disabilities Act of 1990; 42 U.S.C. § 12101 et. seq., Pennsylvania Human Relations Act; 43 P.S. § 951 - 963,

and Pennsylvania tort law regarding IIED, have been violated and aver as follows:

### I. PARTIES AND JURISDICTION

1. Plaintiff, Assata Acey, is an adult individual residing in Philadelphia, Pennsylvania with a mailing
   address of 5121 Brown Street, Philadelphia, PA 19139.

2. Defendant, InductEV, formerly known as Momentum Dynamics Corporation (hereinafter "Defendant")
   is a company, owned and existing under the laws of the Commonwealth of Pennsylvania, with a
   principal place of business at 660 Allendale Road, King of Prussia, PA 19406.

3. Defendant was Plaintiff's employer for all relevant times herein.

4. Plaintiff worked for the Defendant's facility, formerly located at 3 Pennsylvania Ave, Malvern, PA
   19355.

5. At all times material hereto, Defendant qualifies as Plaintiff's employer.

6.  At all times material hereto, Defendant acted by and through its agents, servants, and employees, former and current, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendant.

7.  I have exhausted my administrative remedies pursuant to the Equal Employment Opportunity Act and the Pennsylvania Human Relations Act. (See Exhibit "A," a true and correct copy of a "right-to-sue" issued by the Equal Employment Opportunity Commission).

8.  This action is instituted pursuant to Title VII of the Civil Rights Act of 1964; 42 U.S.C. § 2000e, Section 1981 of the Civil Rights Act of 1990; 42 U.S.C. § 1981, The Americans with Disabilities Act of 1990; 42 U.S.C. § 12101 et. seq., Pennsylvania Human Relations Act; 43 P.S. § 951 - 963, and Pennsylvania tort law regarding IIED, and applicable federal and state law.

9.  Jurisdiction is conferred by 42 Pa.C.S.A. § 931.

10. Supplemental jurisdiction over my federal law claims is conferred pursuant to 42 Pa.C.S.A. § 5301.

11. The venue is properly laid in this district because the Defendant conducted business in this district and because a substantial part of the acts and omissions giving rise to the claims set forth herein occurred in this judicial district. 42 Pa.C.S.A. § 5301 (1)(i) and (2)(iii). Plaintiff was working in Chester County, Pennsylvania at the time of the illegal conduct by the Defendant, as set forth herein.

## II. HISTORY OF THE CASE

1.  I am an African American Woman.

2.  I accepted an employment offer from Defendant for the role of Product Introduction Technician on 31, May 2021.

3.   I did not see the employment offer as fair, because Defendant requested the same tasks were communicated during the Senior Technician interview process, for lower title and negotiating power. Despite this and, as a company outsider, I did not have reason to suspect the hiring decision of being rooted in racial or gender bias.

4.  After beginning employment on June 14, 2021, I became aware of my being the only Black woman out of more than 80 employees.

5. Several colleagues, including then team member Rob Rosenberg, made comments about the nature and scope of my work.

6. I continued to bring these to my manager, providing direct quotes when possible and requesting clarification over my job duties to ensure good performance.

7. Eventually, I was informed by my supervisor of additional anonymous work complaints made to him regarding my bathroom break frequency, attendance, and time I spent working vs talking.

8. I came to view these complaints as biased, due to their contradiction of:

   a) Communications of collaborative workplace culture

   b) My working regular overtime as often the last to leave.

   c) Comparative time that colleagues of greater esteem spent talking.

9. I resolved to discuss my reflections and concerns of being racially stereotyped to my supervisor, including stereotypical depiction of Black people as lazy or untrustworthy and how those receiving comparatively less criticism and most coworkers, thus eligible complainers, were both White men.

10. As criticisms continued, I felt so concerned about my role that I requested and attended another meeting with my supervisor to confirm that I was performing the expected duties.

11. The scrutiny over my work increased to the point that my supervisor and I planned and implemented use of Teamwork software to document my tasks for the team to see, to reduce tension, and assist team members in the documentation of their work.

12. I faced experiences where I felt targeted for my gender. Team meetings routinely divulged into tension between myself and former team member Rob-I noticed he would more regularly butt heads with myself and fellow blk team member that the only other regular conflict appeared to be female mech engineer woman, led me to conclude that my being a woman and Black had intensified his conflict towards me.

13. This suspicion grew the first time he muttered "bitch" under his breath. At the time it sounded to be directed to Maria because he was acting on Maria's request (to stretch one of the larger cabinet unit's tubing to remove the kinks) because he did not trust me to do it. I was skeptical of what I had heard because I did not think Rob cursed. Later observations, such as Rob calling a test bay jig a "bitch" after

struggling with it, dispelled my skepticism. This is why when he referred to me as "that bitch" it no longer seemed surprising that he would:

a)    Curse

b)    Curse about a woman.

This was supported by circumstantial evidence such as:

a) Removing tools from my workstation whenever a tool from the main set went missing regardless of my culpability

b) Complaining profusely about my use of the test bay lifts and, when a dedicated lift was bought to prevent others (including me) from using his lift, constantly and aggressively confiscating the lift from my building area.

14.   A close colleague of Rosenberg (Rob R)'s was Rob Sweirzawski (Rob S), and he exhibited the same behavior mostly towards myself and Maria. During early weeks, he was reported by his supervisor and reprimanded by Judy Talis (Defendant's former Chief Administrative Officer (CAO) and head of Human resources (HR)) for racially joking in front of colleagues about me being from "the wrong side of the tracks". In contrast, his subsequent actions were either unnoticed, unreported, or unreprimanded by HR or his manager, even while my supervisor worked with me to mitigate his behavior.

15.   My builds had to pass QA dept to enter Rob S's station- and Sweirzawski would often, on a whim, and regardless of priority, insist on waiting until a whole or half day had passed from completion, before reviewing a build. And, when he did conduct these inspections, he refrained from disclosing the time of the checks until after they were done, essentially assuring my absence during many of them.

16.   At one point I went out to company's smoking dock to beg Rob S to do a check on the same day he had indicated in his email. I was accosted with silent hostility before he responded that he was smoking.

17.   In contrast, Rob S and Rob R were kind to one another and Quality checks relating to the test bay seemed to schedule and meet approval without a hitch.

18.   Rob S also often eschewed the assembly documents, choosing to determine major points irrespective of design intent or documented tolerances,  resisted writing reasons for failing a unit and would find new

issues in subsequent checks that were either minor to the assembly intent (a speck of dust/details unspecified by the SOP) , inconsistent with his previous rejection reasons (something he saw before but did not mention), or inconsistent with my build notes and memory( an unplugged cable when all connections had been tightened and torque painted).

19. His purposeful negative impact on my work became so unreasonable that I:

   a)  Coordinated with my supervisor to have same attend all "pop-up" inspections.

   b)  Advocated and adopted the use of signed seals to prevent pre-inspection tampering.

20. There was little else I could do about Rob S' behavior but his bias towards women became as apparent as his bias towards Black people when, having been included in a time-consuming effort to investigate and correct a deviation in expensive PAI product, he disclosed to my face that he had purposefully ignored Maria's design stipulation when approving these products for my in house use or for compliance at PAI warehouses.

21. The investigation had started when he raised a complaint about my installation of an assembly, thus rejecting the build, AND spurring further review that exposed the cause of error to be the assembly itself instead of its installation.

22. The malice behind his actions was clarified in his statement, because it proved he was the only one to know or be best positioned to know his actions to be the true cause of his complaint- yet he remained committed to, withholding information, shifting blame and risking further issue in the field for the chief purposes(or known outcomes), obstructing my work, and exerting authority over Maria's documents.

23. At that point I was able to connect his behavior towards my work and constant recklessness towards cabinet assembly procedures to his:

   a)   Racial opposition towards myself

   b)   Sexually biased opposition towards following Maria's documents (especially since she was one of two female engineers on the male-dominated lab floor-and the only one with a senior designation).

24. At one point, during my 90-day check in, I expressed concern about sexual harassment at work and how I appreciated having my supervisor's support.

25. After CAO admonished me for relying on my supervisor instead of her, I described an experience with a senior member of the electrical engineering team, Bogdan Proca, who had:

   a) Stared me down in orientation before commenting on relationships between subordinates and superiors being "natural".

   b) Compared me to dark chocolate in front of another colleague during a company ice cream day.

   c)  Pursued me from across the lab while asking if we were the only employees left in the building.

26. In response to the fear and discomfort I described, CAO launched into an anecdote about a male worker staring at a female worker's breast; how they became close friends after the female worker learned that the male's "unconscious staring" was caused by autism.

27. CAO's response stuck with me throughout my time at Defendant.

28. As I continued to hear sexist comments by Electrical Engineer John Wolgemuth and experience discomforting stares from Proca, no level of sexual harassment, even an "accidental" grazing by PCB designer Mike Russel felt significant enough to be taken seriously by HR

29. At one time, the company's history of not hiring African Americans was expressed by a Black philanthropy coordinator, stating Defendant had "come a long way" by having more than three Black employees, as he had "told [acting CEO] Andy [that if he did not see more Black employees at his next visit] the money [is] off".

30. His statements, made within earshot of coordinator, Diana Wilmes, added to my concern over the company's possible bias against Black workers, being that there were 6 Black employees including me at the time.

31. Concurrently I received enhanced scrutiny and harassment from HR, including instances where:

   a) After trying to make light of a recruiter's misspelling of my name, I was told that my name's spelling "did not matter", and I was making myself look "unprofessional" for responding to an RSVP 10 minutes before the same recruiter chose to complain.

b)   I was informed that I would be the only employee disallowed to carry my cellphone in the lab space—despite previous complaints of my being late for meetings and most of my job duties taking place in the lab.

32.   Before the end of 2021, it became clear that the nature of my job duties was objectively more advanced than the formal designation of my role.

33.   After tasks of organizing meetings to formalize the relationship between Quality and Mechanical departments, providing theoretical chemical consultation to maximize product use, and drafting circuitry for an upcoming high stakes project, it became clear that my task types were not aligned with my job classification- and as the one of the lower-ranking members of my team, I felt that this was due to race and gender.

34.   I made sure to document these contributions in my performance review while hinting my desire to be properly compensated for future advanced duties.

35.   I also took the time to communicate the concerns of being misclassified to my supervisor- even going so far as to send potential job titles and descriptions in line with current duties.

36.   Despite this I continued to find myself completing advanced tasks such as, providing ANSI compliant calculations, documentation, and PPE procurement for laser usage—all without any change in role.

37.   This continued until my leave of absence.

38.   Between January and April of 2022, lack of cooperation from colleagues who had criticized me grew to be so great that my supervisor had to have me submit emails to him so that he could forward them to others with his stamp of approval—instead of the teamwide procedure of emailing others directly and cc-ing him as needed.

39.   On February 7, 2022, in a meeting held by CAO to explain why we couldn't share my curated movie list for Black History Month-- I discussed recent experiences and why I saw the need for an ongoing diversity initiative.

40.   These experiences included:

a) Witnessing a White employee complaining to two other non-Black employees, that Julian needed to "get off his lazy ass" to close a garage door sooner.

b) An event where one of those same witnessing employees had unrelentingly questioned me to regarding my job tasks and how I was "spending my time" while supporting a project at a location where they had been unable to surveil me.

c) Various acts of hostility towards me by a White team member including:

   i) Snatching my notes from my hands to prevent me from describing our joint project to supervising engineer.

   ii) Slamming a door in my face, after holding open the door for a White woman

   iii) Criticizing me in our shared team group chat with disproportionate and inappropriate fierceness.

41. Immediately following our meeting, I summarized its content to my supervisor in a Teams message.

42. In the days following, HR chose to call me again to confirm details, before emailing that I had not reported any events and was invited to recount details in writing along with suggestions for the annual diversity training.

43. Upon hearing I was working from home with nausea during one of the confirmation calls, CAO asked if I was pregnant and doubled down in suggesting that I see her daughter's gynecologist.

44. Around April 18, 2022, I experienced an onset of symptoms that would later become a chronic condition.

45. On April 18 I emailed CAO to request access to unpaid time off and complained that the current PTO policy placed ill people on a short track for probation and encouraged employees to prioritize attendance over safe execution of tasks.

46. During CAO's insisted in-person meeting to discuss these concerns off record, I again shared my impression about a safety infraction where I:

a) Sought and received permission from Test Bay employees to view a model on behalf of a mechanical engineering employee.

b) Briefly approached the model while keeping my hands raised and exaggerated standing as far away as possible.

c) Responded to another employee's assertion of the dangerous voltage level in stating, "I know".

47. The safety report made about me had suggested that I was combative towards the Rob member when he tried to keep me from "touching" the high voltage model.

48. In my review, I expressed frustration that the accusations:

a) Were patently false.

b) Contrasted verbal or visual cues before and while viewing the model.

49. I also expressed concern that bias had motivated the misconception, since:

a) My perceived noncompliance contrasted with the electrical safety etiquette I had demonstrated over my time at the company.

b) Those who were accusing me routinely ignored the safety rules and each other's noncompliance.

c) My experience in high voltage testing, which I discussed with Rob when he interviewed me, contrasted the reckless behavior others had expected of me, as I was trained to operate with voltages more than 30x of what the Test department was using.

50. HR responded to my concern about the bias behind the dismissed report and the stress it had caused me by stating that no one would have seen my resume to know my qualifications.

51. I was also reassured, during our 04/18/2022 meeting, that I would be allowed to take unpaid time following the communication of my conditions and, that there was an option to modify my role or tasks in a way that fit me and the company.

52. I immediately recounted these reassurances to my supervisor in hopes that it would be of use to another chronically ill team member.

53. Despite this, I was informed only 2 days before close of the pay period that my accommodations would only take place in the next pay period.

54. This caused me to immediately stay after hours while symptomatic to make up time taken to go to two doctor's appointments that day.

55. HR continued to affirm that I was denied unpaid time by emailing before the weekend and calling after I asked my supervisor to inform them of my abnormal MRI results—to request that I submit a PTO request for "missing time".

56. The trauma of being harassed by HR while simultaneously coming to terms with my sudden regard as having a serious illness was so jarring, that I resolved to evaluate my experiences in totality.

57. Finding several instances where I was treated below the legal standard, and holding no faith that these issues would cease to occur without further action, I filed a complaint to the PHRC office.

58. Due to the implications of medical results, I was placed on medical leave effective May 16, 2022.

59. On 06/07/2022, I was presented with an FMLA form and directed to sign it if my leave would be extended beyond 06/16/2022.

60. When reviewing the form to sign, and thus, confirm elections and understanding of all notices, I realized all sections, including the one indicating my job security during the leave were left blank.

61. When I enquired after why I was given a blank form to sign off on and requested a filled one instead, I was told only that I would receive a filled form after my leave had been extended.

62. The actions and explanation created a fear of being set up for firing while my illness was being investigated; this feeling was reasonably distressing.

63. On 06/22/2022, the company was served notice of my complaint from PHRC.

64. The pace and effects of medical treatment caused me to worry that I would not be able to attend EEOC-scheduled mediation, so, I coordinated with private mediation provider, Cora services to mediate with Defendant on 09/19/2022.

65. In order to attend, Defendant and I each signed separate agreements to mediate that detailed any binding agreement would be typed up and signed during mediation—with the sole exception of technological limitations.

66. There had been no final, drafted agreement reached between myself and respondent at the end of mediation.

67. Respondent forwent a partial agreement, instead opting to write up a final agreement after mediation.

68. Instead, respondent and I had tentatively agreed that so long as I presented a return-to-work letter by September 26th, Defendant would present me with a contract contractual agreement to resign and drop my claims in exchange for $50,000, and so long as long as other terms seemed reasonable, I would consider this agreement.

69. Regarding a more formal medical disclosure on my disability and qualifying limitations, Defendant stated traditional accommodations forms "would not be necessary" and they just needed it documented that I was cleared to return to work "with or without" limitations.

70. My grandmother is witness to the events described in mediation, as she was brought on virtually, as nonparticipating emotional support.

71. I had largely assumed that additional terms, such as resignation date, opportunity to complete employee training, would continue to be negotiated.

72. This was affirmed in the mediators' parting statements and assurances that:

   a) Discussed terms were not final, no one was pressuring me to sign anything that day

   b) Remaining terms would continue to be negotiated as one agreement: leaving open the risk of settlement negotiations falling apart.

   c) They [the mediators] recommended bring any written contract from the respondent to a lawyer for review before signing.

73. On 09/21/2022 I provided the required return to work letter from my doctor.

74. I received no response from the respondent.

75. On 09/22/2022, instead of receiving the promised contract for review, I was copied in an email to the EEOC mediator requesting that the case be closed due to us reaching "settlement".

76. Seeing my case be recommended for closure without my receipt or review of any promised contract caused me to question the respondent's initial designs for obtaining my return-to-work letter.

77. In order to act in good faith while protecting my interests, I maintained business as usual professional communications, including a PTO request to extending my leave 2 days beyond that allowed in FMLA, for the purposes of:

   a) Giving the respondent more time to produce a contract in case a settlement could be reached before returning to work.

   b) Maintain good standing so that I could return to work if negotiations fell through.

78. On Friday 09/23/2022, the respondent had not sent any contract to review, instead choosing to assert that I was not permitted to use previously assured PTO, that I had resigned or would be soon, and that I would be paid sooner if I resigned sooner.

79. I became shocked, scared, and angry at the realization that the Respondent might intend to exploit my legal inexperience good faith efforts by:

   a) Disqualifying me for the disability that I used to pay bills.

   b) Blocking me from the ability to remain in good standing and earn income through an accommodated return to work.

80. With those emotions, I emailed them to reemphasize my position, confront the previous false assertion of our having "settled", present conditions that I would be interested in as well as my intent to return to work until or unless negotiations worked out.

81. I also made sure to request PTO within the system that I gained access to through tech support and report to work on 09/27/2022.

82. That same evening, I was presented with a settlement agreement that requested my resignation effective sept 19 while asserting that I would have 11 days from signing to recant my agreement.

83. The agreement was attached to an email stating that I had "verbally agreed to resign" and sent concurrently with my being locked out of company databases.

84. I rejected this offer on the principle that its terms were already being coercively enforced by my wrongful termination.

85. I also explained to respondent on several occasions why I did not see any legal obligation to accept and sign the proposed contract.

86. Reasons included:

   a) Lack of any signed agreement

b) Lack of any verbal, non-contingent agreement to sign the presented contract.

c) Non-discussion of all monetary terms (resignation date and access to then offered company training)

d) Impression that all discussed terms had only been tentatively discussed.

e) There having been no meeting of minds regarding whether we had been finalizing terms **in part** or tentatively negotiating partial terms before reviewing and approving all terms together as **one agreement**.

87. That respondent's asserted deadline for my return-to-work letter did not match the deadline I or my grandmother had noted was further assurance that we were not on the same page during mediation.

88. Despite my reasonings, respondent continued to argue the finality of tentative settlement terms, and on 10/27/2022 asserted that they would pursue me for any and all legal damages if I did not halt the EEOC investigation that had been reinitiated by our assigned EEOC mediator.

89. These threats caused me to feel reasonable distress, in addition to any PTSD I was facing from recounting my workplace experiences.

### III. LEGAL ARGUMENT

### COUNT I:

### DISCRIMINATORY INTIMIDATION FOR OPPOSING UNLAWFUL RACIAL HARASSMENT IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e-3 (a)

90. Racial tension is a common and expected workplace issue, to the extent that Employers have been encouraged to proactively empower employees to minimize illegal discrimination.

91. Generally, all of Defendant's employee education and communication regarding civil rights compliant behavior, policy and practices were relegated to an annual 3–6-hour training period and state regulated posters in the breakroom. Defendant abstained from perennial company-wide events or communications to advise employees of civil rights compliant behavior, or of any open-door policy or complaints process.

92. While the annual meetings satisfy state requirements in frequency and duration, the spirit of the law, and its intent of limiting harassment on bases that included race, was recklessly discarded by the refusal proactively assess and regulate the understanding of employees, even when concerning ideas had been brought in training.

93. Before my 02/14/2022 meeting, I had described my experiences with racial bias with CAOon two occasions:

    a) I had described previous racial experiences during new employee orientation, to help colleagues around a compliance concept.

    b) I had described concerns brought to me in an offsite lunch with colleagues-where they raised questions around what constituted racial bias.

94. On both occasions there was no acknowledgement for the need for more company-led education; I was instead encouraged that contributions that I could give to employee understanding were welcome-on a volunteer basis.

95. Because I had been explicitly informed by CAO that any input that I volunteered towards employee education would be welcome, I set aside my time over the weekend to detail a voluntary diversity exercise for staff and presented it to CAO via email, and with reference to perceived business advantages and it being Black History Month.

96. On 02/07/2022, I relayed specific instances of racial harassment detailed instances of harassment I experienced from coworkers and why I felt the current diversity training was not effective. This was in the same 73-minute meeting CAO had initiated to inform me that neither my emailed activity nor any mention of Black History Month would be communicated on the company list serv.

97. On 02/11/2022 CAO called me, for 16 minutes, to "clarify details" of recounted experiences.

98. On 02/14/2022, I received an email claiming that I had not provided specific instances and requesting "brief notes" for use in training. This claim directly contradicted the duration and content of my meetings with CAO and enhanced then chronic, symptoms of anxiety and demoralization.

99. The person emailing had to be aware of the contradiction because they had been present for our meetings, knew first-hand the number of examples I had given, and had acknowledged the degree of detail through their reasoning for follow up in paragraph 97.

100. There would be no logical purpose to knowingly present false information except to convey to me that they were purposefully ignoring my allegations.

101. Such a conveyance was successful in making me feel like my suggestions, motivating complaints, and the trauma and trepidation involved in recounting them were being cast aside on purpose.

102. I aver the communication of paragraph 98 was sent with the intent and effect of intimidating me for opposing racial discrimination, and aiding administration in maintaining false images of both taking racial discrimination seriously and welcoming employee feedback.

103. By diligently and purposefully intimidating me in discrimination to my having opposed racial harassment, Defendant intentionally violated 42 U.S.C. §2000e-3(a) and is therefore liable for all applicable affirmative action, compensatory and punitive damages as granted under 42 U.S.C §2000e–7, and 42 U.S.C. §1981a(a)(1), as well as any other relief designated by the court.

## COUNT II:

## AIDING AND ABETING UNLAWFUL EMPLOYMENT DISCRIMINATION

## IN VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS

## ACT, 43 P.S. § 955 (e)

104. As stated in 43 P.S. §955(e), it is unlawful:

"For any person, employer, employment agency, labor organization or employee, to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice, or to obstruct or prevent any person from complying with the provisions of this act or any order issued thereunder, or to attempt, directly or indirectly, to commit any act declared by this section to be an unlawful discriminatory practice".

105. Bringing forth the allegations in Count I, I assert that CAO, acted on behalf of Defendant to aid the continuation of racial harassment within their provided work environment. This action caused me

sufficient injury, as several memories I had to block out to complete my work for Defendant under the duress of racial discrimination—these memories have continued to resurface, and require the support of my therapist, even 10 months after my first day of medical leave.

106. Racial harassment, as a discriminant condition of employment, is declared unlawful by section 955 (a) of that same act, 43 P.S.§955(a).

107. By intimidating me in aid of workplace racial discrimination, Defendant intentionally violated 43 P.S. § 955 (e) and is therefore liable for all applicable affirmative action, as granted under 43 P.S.§ 962, as well as any other relief designated by the court.

## COUNT III:

## DISCRIMINATORY INTIMIDATION ON THE BASIS OF OPPOSING FORBIDDEN RACIAL DISCRIMINATION, IN VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT, 43 P.S. § 955 (d)

108. I invoke the allegations from counts I and II.

109. Corrective action can take various form including employee discipline, education, and training.

110. When I sent my movie list on 02/07/2022, I made clear my intent of training Defendant employees to view Black people, thereby Black colleagues beyond the scope of harmful racial stereotypes.

111. It became clear that I was advocating employee training as a corrective and or preventative action when I contextualized my suggestion with racial harassment I had witnessed and experienced at work.

112. A reasonable person would have understood that I was opposing unlawful racial harassment once it became clear that I was advocating what I saw as corrective action to prevent further racial harassment.

113. Workplace racial harassment is a condition of employment that operates with discrimination on the basis of race and is accordingly declared unlawful in 43 P.S. § 955 (a).

114. Incorporating paragraphs 108-113 with the arguments for counts I and II, I allege that Defendant willfully engaged in the adverse action of intimidation, AND that this action was done with discriminatory basis of my having opposed workplace racial discrimination, which is declared unlawful by 43 P.S.§ 955 (a).

115. By diligently and purposefully intimidating me in discrimination to my having opposed racial harassment, Defendant intentionally violated 43 P.S. § 955 (d) and is therefore liable for all applicable affirmative action, as granted under 43 P.S.§ 962, as well as any other relief designated by the court.

## COUNT IV:

## INTENTIONAL UNEQUAL PAINS-INTIMIDATION IN VIOLATION OF THE CIVIL RIGHTS ACT OF 1866; 42 U.S.C. § 1981

116. Calling forth the allegations of counts I-III, I suffered discrimination for opposing unlawful practices when Defendant purposefully intimidated me via email in response to my complaints of workplace racial harassment.

117. Discrimination for opposing a racial harassment is an unequal pain compared to White citizens because had I not been Black, I would not be engaged in the behavior that Defendant's discrimination was predicated upon; had I not been Black I would not have had to oppose racial harassment.

118. Therefore, by extension, the pain of intimidation was unequal to that which White citizens are subjected to because but for my being Black I would not have suffered it.

119. By diligently and purposefully intimidating me in discrimination to my having opposed racial harassment towards me, Defendant subjected me to pains I would not have faced had I been White; Defendant has intentionally violated 42 U.S.C. § 1981, and is therefore liable for all applicable equitable relief, compensatory and punitive damages, as well as any other relief designated by the court.

## COUNT V:

## RACIAL HARASSMENT AS A DISCRIMINATORY CONDITION OF EMPLOYMENT IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e-2 (a)(1)

120. As a Black employee, I experienced ongoing and pervasive racial harassment as a condition of my employment at Defendant.

121.  This harassment included:

a)  Enhanced scrutiny from HR and their false accusations me of stealing time and purposefully missing meetings.

b)  Anonymous and direct coworker criticisms of my work attendance, work ethic, bathroom breaks frequency.

c)  Hostile sabotage from coworkers where my access to work tools and equipment, or my ability to get completed build approved were greatly affected.

d)  Written and verbal jokes- including a comic posted on my cubicle about a hypothetical "phizzics" degree, and one employee's joke about me being on the wrong side of the tracks.

122.  Because of the race-specific element to my harassment, my White coworkers did not have to endure it as a condition of employment; it is a discriminant condition and an "unequal pain" that is explicitly written in the purpose of the Civil Rights Act of 1866, 42 U.S.C. §1981 (a).

123.  The racial basis of these experience is informed by circumstantial evidence and prevailing racial stereotypes:

a)  Harassment described in paragraph 121 was based on adopted racial stereotypes of Black people being lazy or untrustworthy.

b)  Black employees such as me, Omar Jackson, and Julian Jackson were each criticized as lazy on occasions where the reasoning or veracity was inaccurate or disproportionate.

124.  HR did not act in good faith to investigate or prevent further instances of harassment.

125.  The only person who acted in good faith to alleviate harassment was my supervisor and unfortunately his actions were not sufficient nor was his role designed to alleviate and prevent ongoing racial harassment.

126.  Drawing forth the allegations of my previous counts, the company knowingly and recklessly enabled an environment of racial discrimination by:

a)  Failing to proactively address workplace culture and attitudes before it produced further harassment.

b)  Choosing not to maintain a reasonably nonhostile communication channel to communicate and address ongoing issues.

c) Knowingly acting to intimidate me from bringing further complaints.

127. This harassment was significant to prompt my having to plan how to document my work and progress for my teammates to view (on the teamwork site, before the company ever transitioned to JIRA), having to send emails to the supply chain through my manager instead of just copying him to the email like my other teammates.

128. The additional labor required for me to perform my role under the condition of enduring racial harassment and caused me sufficient exhaustion in addition to various physical manifestations of anxiety, including nausea, sudden urge to defecate, and fear. This physical and emotional exhaustion also affected my home life: as I started placing my all into preforming under racial pressures, chronic stress caused me to lose interest in things I previously cared about; my previous enjoyment of and capacity to cook dwindled, requiring me to order take out more often (especially for work lunch), if I remembered to eat at all.

129. By intentionally subjecting me to an environment of racial discrimination as a condition of my employment, Defendant violated 42 U.S.C. §2000e-2(a)(1) and is therefore liable for all applicable affirmative action, compensatory and punitive damages as granted under 42 U.S.C §2000e–7, and 42 U.S.C. §1981a(a)(1), as well as any other relief designated by the court.

## COUNT VI:

## RACIAL HARASSMENT AS A DISCRIMINATORY CONDITION OF EMPLOYMENT IN VIOLATION OF IN VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT, 43 P.S. § 955 (a)

130. 43 P.S.§ 955 (a) forbids employers from discriminating on the basis of race with conditions of employment.

131. Drawing forth all previously stated allegations, as a Black employee, I experienced racial harassment as a race-based discriminatory condition of my employment.

132. By knowingly subjecting me to an environment of racial discrimination as a condition of my employment, Defendant violated 43 P.S. § 955 (a) and is therefore liable for all applicable affirmative action, as granted under 43 P.S. § 962, as well as any other relief designated by the court.

## COUNT VII:

## DISCRIMINATORILY LIMITED OPPORTUNITY ON

## THE BASIS OF RACE IN VIOLATION OF TITLE VII OF THE CIVIL

## RIGHTS ACT OF 1964, 42 U.S.C. § 2000e-2 (a)(2)

133. Bringing forth the allegations of Count V, I endured continuous harassment based on my race as a condition of my employment at InductEV.

134. While working for the Defendant, I completed tasks that were formally incorporated into other roles through internal job descriptions sent to internal interviewers during relevant hiring processes.

135. Such duties included:

   a. Review assembly documents, find/report defects, and recommend/document preventative actions (senior quality technician).

   b. Engage conflict resolution, intradepartmental structure, create procedure/implementation plans (project manager).

   c. Provide theoretical and design background to various products, calculate safety threshold and test concepts, (R&D or electrical engineer).

136. I believe there is significant overlap between my duties and the duties described in the job descriptions emailed to internal interviewers (including recruiters Ryan Mackenzie and Jennifer Orloski) for each of those roles.

137. Informally, the role of Product Introduction Technician mainly consisted of assembly with or without supporting documentation, provision of verbal feedback, and occasional document redlining.

138. During the time of my employment, I created documentation for build progress, feedback for both assembly process and documentation, in addition to creating procedures for projects including laser,

Oztek integration. Due to the level of detail in my documentation, I was chosen instead of PAI (Defendant's product manufacturing partner) to carry out fit checks for a new vendor evaluation.

139. The only other Product Introduction Team member who had authored documentation or procedures was, White male, Rob Rosenburg, and he was not only designated as a Senior Technician but reclassified into the Test department.

140. Similarly, tasks involving comparative research, material/test design, or compliance calculations were generally given to engineers.

141. Despite this, I completed comparative research and mathematical calculations on several projects under the designation of "Product Introduction Technician":

    a) laser classification calculations

    b) laser lens requirement calculations

    c) cabinet hole compliance calculations

    d) ANSI laser compliance research

    e) substrate chemical consult comparative research

    f) emergency Stop-Circuit schematic design

    g) environmental testing and diagnostics procedure design

142. The Human Resources Department (HR) was aware of my job tasks and received detailed description of several of them when I submitted my performance review on 12/04/2022.

143. Around 01/07/2022, my performance review was discussed and signed by both my manager and HR.

144. Despite this, I was not among the four employees reclassified between 12/20/2022 and 03/20/2022, with attention to company needs, and preexisting qualifications, and job tasks:  Diana Wilmes (White, female), Taylor Johnson (White, male), Harry Nask (White, male), and Andrea Neff (White, female).

145. Within 4 years before and sometime after my employment, Bill Gallagher (White, male) was reclassified from his role of Principal Electrical Engineer to Principal Test Engineer, and Senior Technician, Rob Rosenberger (White, male) reclassified from Product Introduction to the Testing Team and Daniel Schwartz (White male) was promoted to vice president of Supply Chain.

146. Similarly on May 31, 2021, I was:

    a)    Presented an offer for a lesser role despite communications given to me and the role description provided to company interviewers to evaluate and approve me through 5 interview rounds.

    b)    Told that the lower role was the basis for limiting my starting compensation.

    c)    Presented an offer for a role with a description identical to Senior Technician description in every way but its titular "Senior" designation.

    d)    Assured that despite the lower title, I would be expected to perform the same duties discussed in interviews for the Senior Technician Role.

147. At the time, I held no contextual knowledge to ascertain race as a cause of the decision, but hindsight of my previous racial experiences suggests an interconnection.

148. Omar Jackson is a former Black male coworker who, at the time held 20 years of experience and held roles beyond the requirements of the formal role yet was only promoted after controversy surrounding hiring process for a senior technician.

149. Such a controversy involved an hiring decision stalemate, when, after heated debate and split votes within my team, supervisors Joren Wendschuh and Mark Smith both refrained from giving any collaborative endorsement for selected external Senior Product Introduction Technician finalists.

150. This controversy was significant enough for CAO to interview product introduction team members individually to determine the cause of stalemate, at which point I disclosed Omar's non-promotion as a part of the conflict.

151. To my knowledge, Omar has been the only internally promoted/reclassified Black employee in the company's 12-year history.

152. It should not take a bachelor's degree, 2.5 times the minimum formal experience requirement AND controversy for Defendant to promote a Black employee for the first time, particularly where such a role also stipulates exchangeable requirements of an associate degree OR technical certification OR equivalent experience.

153. Contrastingly, our other White male colleague who was also simultaneously promoted to Senior Technician, held, at the time of promotion, 8.25 year of experience but no education or active certification beyond a high school diploma.

154. Even if the equivalent experience clause were applied on a year-for year basis, with an associate degree measured at two years, that would leave the employee below the "formal requirements" with a diploma plus two years supplementary experience, and 6.25 total years of additional experience.

155. The comparison between Omar's promotion and that of our teammate proves, Defendant's' willing practice of evaluating education and experience on a whole and general basis as opposed to strict adherence to formal requirements-the former being especial common among modern employers.

156. Further, Omar's initial classification as a product introduction technician instead of a senior technician lends additional circumstantial evidence to:

    a) Defendant's ongoing practice of limiting employees on the basis of their race.

    b) The relative insignificance of years of experience when hiring for the Senior Product Introduction Technician; Defendant would not have hired me for the role even if I had additional experience because I still would be Black.

157. Comparing further, the highest-ranked Black employee at InductEV, titled, Manager of Project Engineering (hired for the role after possessing 23+ years of experience, an electrical engineering bachelor's degree, Pennsylvania professional engineer certification, master's degree in business and Project Management Professional certification) has also never been promoted in his 3+ years at the company.

158. HRs indifference towards and participation in racially based harassment provides additional circumstantial evidence to their holding of racial bias and likelihood of practicing intentional discrimination.

159. I do believe that engineers, as a class of employee at InductEV, enjoy higher salary averages than general technicians.

160. Just as my non-senior designation was used in my hiring negotiation to deny my request of $40 per hour (in favor of the final rate of $35 per hour), my improper designation has broadly limited my negotiating power, thus effecting my overtime pay, and my ability to benefit from annual employee raises (I received a 3.5% raise effective 03/14/2022 for satisfying my role)

161. In closing, I allege that:

    a)    My job classification was incongruent to the formal and or informal associations of my tasks.

    b)    Defendant has an established willingness and ability to reclassify White employees of varied seniority, with and without strict adherence to formal role requirements.

    c)    Defendant has an established pattern of not promoting Black employees and setting exceeding high standards for Black candidates (compared to other candidates) when hiring above the general technician level.

162. These allegations support my overarching allegation that Defendant chose not to properly classify me due to their intentional enactment of racial bias against African American employees.

163. As a result of this I have sustained damages of self-doubt, lost dignity, performance anxiety, strained relationship with and emboldened racial scrutiny of coworkers, as well as loss of any salary benefits that would have been actualizable under appropriate classification.

164. By limiting my employment opportunities in discrimination to my race, Defendant intentionally violated 42 U.S.C. §2000e-2(a)(2) and is therefore liable for all applicable affirmative action, compensatory and punitive damages as granted under 42 U.S.C §2000e–7, and 42 U.S.C. §1981a(a)(1), as well as any other relief designated by the court.

**COUNT VIII:**

**INTENTIONALL UNEQUAL CONTRACTS IN VIOLATION OF THE CIVIL RIGHTS ACT OF 1866, 42 U.S.C. §1981**

165. As stated in 42 U.S.C. §1981 (b), the equal right to make and enforce contracts as conferred in 42 U.S.C. §1981 (a) is made to include rights to contract modification.

166. Calling forth previous allegations of Count VII, I was denied the privilege of contract modification on the basis of my race when Defendant, through its human resources department (HR), chose not to reclassify my role, despite choosing to do so for several White employees.

167. I further allege that my designation as outside of Engineer classification would not be but for my race; in support of which I call forth all previously made allegations in addition to my possessing a bachelor's degree in physics, relevant experience, nature, and performance of tasks during employment.

168. As a result of Defendant's actions, I have sustained damages of self-doubt, lost dignity, performance anxiety, strained relationship with and emboldened racial scrutiny of coworkers, as well as loss of any salary benefits that would have been actualizable under appropriate classification.

169. By following an unwritten policy of intentional racial bias, Defendant limited my contract benefits and privileges with discrimination to my race; Defendant has violated 42 U.S.C. § 1981, and is therefore liable for all applicable equitable relief, compensatory and punitive damages, as well as any other relief designated by the court.

## <u>COUNT IX:</u>

## **INTENTIONAL UNEQUAL PAINS- RACIAL HARASSMENT IN VIOLATION OF THE CIVIL RIGHTS ACT OF 1866; 42 U.S.C. §1981**

170. 42 U.S.C. §1981 (a) states that all persons within U.S. jurisdiction shall be subject to like pains as White citizens.

171. Calling forth previous allegations, I experienced harassment that was based in racial bias and stereotypes that would not have applied to me had I been White.

172. This harassment was an unequal pain; and when formally made aware, Defendant intentionally and willfully chose to aid these practices and discriminate against me for reporting them.

173. The actions have perpetuated undue emotional turmoil, including anger, depreciating self-image, self-doubt, and general trauma that has:

a) Physically manifested in headaches, panic attacks

b) Contributed to my major depressive episode of June 2022.

c) Contributed to my need for and attendance of therapy since June 2022.

174. By knowingly subjecting me to an environment of racial harassment as a condition of my employment, Defendant has violated 42 U.S.C. § 1981, and is therefore liable for all applicable equitable relief, compensatory and punitive damages, as well as any other relief designated by the court.

## COUNT X:

## DISCRIMINATORY CONDITIONS-SEXUAL HARASSMENT

## IN VIOLATION OF TITLE VII OF THE CIVIL

## RIGHTS ACT OF 1964, 42 U.S.C. § 2000e-2 (a)(1)

175. As a woman employee, I was subjected to a workplace culture and harassment on the basis of my gender.

176. This harassment included targeted opposition, inappropriate office jokes, and unwanted touching from my colleagues.

177. Generally, all of Defendant's employee education and communication regarding civil right compliant behavior, policy and practices were relegated to annual 3–6-hour training period and state regulated posters in the breakroom. Defendant abstained from perennial events or communications to advise employees of civil rights compliant behavior, or of any open-door policy or complaints process.

178. New employees received an identical separate training in lieu of general annual training.

179. While the annual meetings satisfy state requirements in frequency and duration, the spirit of the law, and its intent of limiting harassment on bases that included race, was recklessly discarded by the refusal proactively assess and regulate the understanding of employees, even when concerning ideas had been brought in training.

180. During my new member orientation, Bogdan Proca stated, within a related question (the question was how Defendant dealt with families and couples operating within the company), that romantic involvement between bosses and subordinates was natural.

181. CAO, as the acting facilitator of company training, gave an impression of condonement to Proca's reasoning when, instead of addressing the inherent bias in same, she affirmed the question with examples of the company spouses and family members.

182. In further failure to discourage sexual harassment, and during training section covering sexual harassment, CAO gave an unclear anecdote: A female employee who complained of a male employee staring at her breasts during meetings; after complaining to CAO, the man disclosed his having autism and embarrassment and both parties became the best of friends.

183. CAO's anecdote:

   a)  Conveniently left out considerations of employee retaliation, or any other reason why a complaining employee would feel pressure to act as though they forgave a harasser who was aware of their complaints and whom they could not prove was purposefully harassing them.

   b)  Suggested to myself and others that her first method of investigation was to directly confront the person accused.

   c)  Encouraged harassment through its suggestion that the impact and determination of harassment could be constrained to the expressed intent of the person accused.

184. Later, during my 90-day check in, I complained of this same employee comparing me to dark chocolate ice cream in front of a colleague, continuously staring, commenting on my physical activity, and even pursuing me from across the lab after hours while asking if we were "the only employees left".

185. My complaint was given after being admonished to bring sexual harassment concerns to CAO instead of relying on my supervisor.

186. CAO's response to my complaint was to dismiss my concerns and experiences with the same anecdote from orientation.

187. As a human resources professional who had conducted employee training, they were aware of the seriousness of my claims, my protected right to work without the discriminatory condition of sexual harassment and the related laws.

188. A reasonable person could expect that unchecked unlawful behavior could continue or become worse.

189. With conclusion to paragraphs 184-188, CAO acted with reckless and intentional indifference to my rights by choosing:

   a) To discourage further relay of details concerning sexual harassment

   b) To refrain from investigating or thus addressing my complaints of harassment

190. Being warned not to go to my manager, and having my claims directly dismissed, I had no certain channel to communicate various consequential events of sexual harassment, including when:

   a) Mike Russel went out of his way in a n open corridor to brush against me.

   b) Sam G. behaved lewdly towards me in front of another colleague and started lying to other colleagues to pressure me into to attending group lunches with him.

191. CAO did not act in good faith to investigate or prevent further instances of harassment.

192. The only person who acted in good faith to alleviate harassment was my supervisor, who went out of his way to redirect Bogdan when he stared at my backside instead of observing a team member's demonstration and spoke to Sam's supervisor to get him to stop pressuring me. Unfortunately, his actions were not sufficient nor was his role designed to alleviate and prevent ongoing sexual harassment and the warning from CAO made asking him for hep very trepidatious.

193. Calling forth paragraph 6, CAO was Defendant's upper management, HR executive; Defendant acted through CAO, whom, at all times, acted within the scope of her role, with and for Defendant.

194. By knowingly subjecting me to the discriminatory work condition of sexual harassment, Defendant has intentionally and recklessly violated 42 U.S.C. §2000e-2(a)(1) and is therefore liable for all applicable affirmative action, compensatory and punitive damages as granted under 42 U.S.C §2000e–7, and 42 U.S.C. §1981a(a)(1), as well as any other relief designated by the court.

## COUNT XI:

## DISCRIMINATORY CONDITIONS- SEXUAL HARASSMENT

## IN VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT, 43 P.S. 955(a)

195. 43 P.S.§ 955 (a) forbids employers from discriminating with conditions of employment on the basis of sex.

196. Drawing forth all previously stated allegations, as a female employee, I experienced sexual harassment as a sex-based discriminatory condition of my employment and, despite my complaints, my employer intentionally and recklessly aided in this condition.

197. By knowingly subjecting me to the discriminatory work condition of sexual harassment, Defendant has violated 43 P.S. § 955 (a) and is therefore liable for all applicable affirmative action as granted under 43 P.S.§ 962, as well as any other relief designated by the court. Pleading.

## <u>COUNT XII:</u>

### AIDING UNLAWFUL DISCRIMINATION-SEXUAL HARRASSMENT

### IN VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT, 43 P.S. 955(e)

198. CAO knew or should have known the seriousness of my allegations.

199. CAO knew or should have known that uncorrected employee behavior bears risks of continued or escalated behavior.

200. With reasonable knowledge of the risks, they chose to:

    a)    Dismiss any claims I brought about behavior escalating from the previous behavior that they chose to ignore.

    b)    Admonish me not to share issues with the second most reasonable choice-my manager with the intent of dismissing the majority of my allegations without prejudice.

201. It is pertinent to note that, per the company handbook, any complaints about the CAO, had to be raised to the CEO, and because the HR department consisted of two people, the next most diplomatically favorable option for employees to escalate concerns dismissed by HR, was to continue bringing them directly to HR or have them voiced by their manager.

202. The choice to limit my opposition to harassment was made with knowledge that it would aid my being harassed further.

203. CAO was Defendant's upper management, HR executive; Defendant acted through CAO, whom, at all times, acted within the scope of her role, with and for Defendant.

204. By intimidating me and choosing not to investigate my claims, Defendant knowingly aided the discriminatory condition of workplace sexual harassment; Defendant intentionally violated 43 P.S. § 955 (e) and is therefore liable for all applicable affirmative action, as granted under 43 P.S.§ 962, as well as any other relief designated by the court.

## COUNT XIII:

## PERPETUATING DISABILITY DISCRIMINATION THROUGH ADMINISTRATIVE METHODS IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT OF 1990;

## 42 U.S.C. § 12112 (b)(3)(B)

205. On 06/07/2022, Defendant emailed me with explicit instruction to sign an attached FMLA notice "on or before 06/29/2022", should my leave extend past 06/17/2022.

206. On the notice, all sections, including employer designations of whether my job was essential or not was left blank; signing the document would have suggested my acceptance of various unknown terms.

207. To be clear in what I was acknowledging being informed of, I requested that the blank sections be filled, and enquired as to why they were unfilled.

208. In response, Defendant gave no explanation of the blank section and instead asserted that I would receive a filled form to sign after my leave had been extended.

209. Employers are obligated to hold jobs during FMLA, except for "key employee" roles, the holding of which would cause undue hardship.

210. Since they are not obligated to hold an opening for essential role, the employer is free to terminate the "key" disabled employee's employment at any point during or after leave.

211. However, while the employer may designate a role as "key", that decision is open to dispute.

212. Additionally, room to dispute is greatly reduced where it is demonstrated that the employee was formally informed and accepting of employer's designation of their role.

213. Such an informed acceptance could have been fraudulently recorded had I signed the form while blank.

214. Because this documentation would ultimately and severely hinder any attempt to question Defendant's designation and consequent right to terminate my employment, any administrative methods resulting in

the receipt of such documentation would provide fraudulent aid to my being terminated on the basis of my disability.

215. Because my leave would not have occurred without my having held a disability, such status is an critical factor in my having received this form, and a basis for the discriminate effect of these actions on persons with disability.

216. It is for all of these reasons that I affirm that Defendant's administrative method of sending me a blank FMLA form perpetuated the progeny of discrimination on the basis of disability.

217. To date, Defendant has provided neither acknowledgement of these actions or addressed the emotional harm caused by them.

218. This act caused me to feel the unending necessity of questioning everything momentum sent to me, bringing on a damagingly evocative paranoia and distress that, in adding to my cumulation of previous experiences, brought on my first major depressive episode, experienced 06/11/2022, diagnosed by my primary doctor on 06/17/2022 and treated in therapy since 06/22/2022.

219. By deploying administrative methods that perpetuate disability discrimination, Defendant violated 42 U.S.C. § 12112 (3)(B), and is therefore liable for all applicable affirmative action, compensatory and punitive damages as granted under 42 U.S.C §2000e–7, and 42 U.S.C. §1981a(a)(2), as well as any other relief designated by the court.

## COUNT XIV:

### ABETTING OR ATTEMPTING DISABILITY DISCRIMINATION

### IN VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT, 43 P.S. § 955 (e)

220. Bringing forth the allegations of count XIII, the actions taken by Defendant regarding my leave of absence would have provided fraudulent aid to the company's election to terminate my employment on the basis of my disability.

221. Certain circumstances support that this act was intentional, including:

a) At no point during the 6-day period, from before the form was sent to after I mentioned its blankness, did the CAO correctively fill the form, recognize the error, inform me and fill the form.

b) After being confronted with the error CAO eschewed explanations of administrative purpose nor an accident to explain, choosing instead to not respond.

c) After being asked to fill out the form CAO insisted on a delay and stated, "[a filled form would be sent] if leave was extended beyond 06/17/2022.

222. These actions are not expected for an honest mistake, when viewed cumulatively, there is little support for a simple mistake in the multiplied odds that someone would:

a) Edit a form's name to include the name of the intended employee.

b) Miss that the labeled form was blank.

c) Within 6 days of not getting a response from a subordinate, never check the sent email, and

d) Never notice that the from was mistakenly blank or reach out to correct it.

e) Once informed of the error, offer no assertion of it being a mistake.

f) Once requested to fix the error, refuse to provide a corrected version (if one existed) or update the form with predetermined answers.

g) Present an irrelevant cause to delay information that had been critical to the execution of their previous and explicit instruction.

223. As an executive officer who presided over the companies human resources and relevant compliance, it is unlikely that CAO was not aware of the details surrounding an FMLA notice and related policy.

224. It is further unlikely that she would not have considered or conclusively deliberated the details which happened to coincide with the notice, regarding my eligibility.

225. It is a common reflex to admit something as an error when it is one and had there been a labeling of the wrong file, nothing would have prevented CAO from immediately attaching the correct file. Additionally, had there been a legitimate reason for delaying the relay of such information until 06/17/2022, CAO would not have provided the form on 06/07/2022, with instruction to sign it, nor

would she have created a new reply thread. It should not have taken as long to determine, as demonstrated by the filled form, that I was not a key employee.

226. For these reasons, and for the existence of other underhanded behaviors by the CAO, I aver that the same purposefully engaged an attempt to fraudulently aid Defendant's termination of my employment; such fraud would have been enabled with discrimination to my being disabled because my disability prompted my leave of absence.

227. This act caused me to feel the unending necessity of questioning everything Defendant sent to me, bringing on a damagingly evocative paranoia and distress that, in adding to my cumulation of previous experiences, brought on my first major depressive episode, experienced 06/11/2022 and diagnosed by my primary doctor on 06/17/2022 and treated in therapy since 06/22/2022.

228. By using administrative methods to attempt unlawful disability discrimination, Defendant has violated 43 P.S. § 955 (e) and is therefore liable for all applicable affirmative action, as granted under 43 P.S.§ 962, as well as any other relief designated by the court.

## COUNT XV:

## DISCRIMINATORY CONDITIONS OF EMPLOYMENT-HARRASSMENT ON THE BASIS OF DISABILITY IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT OF 1990, 42 U.S.C. § 12112 (a)

229. At the time of this event, I was I good standing and to the knowledge of myself and others was capable of adequately meeting the demands of my role.

230. My esteemed effective adequacy is further underlined by my supervisor's willingness to be cited as a refence to my performance in the 04/18/2022 email, as well as the accommodations meeting where HR accepted my affirmed capacity to meet their stipulation that I would receive my desired accommodation so long as I could complete 30 hours a week.

231. Despite these, the symptoms that I described in my email included items that established disability because they affected my major body function and aspect of life.

232. At no point did CAO express any doubt in my medical condition, despite my offer to disclose further information (up to and including signed doctor's visit notes); CAO insisted that my doctor's provision of the company disability form would be sufficient.

233. Although there was a general expectation of reasonable timeliness, CAO did not specify a deadline for the receipt of the company disability form; there was no specification over how the timeline of receipt of the form connected to the timeline of the implied instant relief of unpaid time off for the current pay period.

234. On 04/21/2022, CAO stopped me, while on my way to one of two doctor's appointments and informed me my request for unpaid time off would not go into effect until the next pay period and advised me to use paid time off for the, then current, pay period.

235. There were two reasons for Defendant to anticipate their communication as stress inducing:

    a)    In my email, sent 04/18/2022 I described the symptoms of my illness and the stressful dilemma I perceived between attending work or using sick days.

    b)    During our private accommodations meeting I exhibited several visual signs of anxiety including nervous fidgeting, shaky voice--and still reiterated how and why nonaccess to unpaid time off, and the associated fear of running out of PTO and being placed on probation despite meeting performance guidelines were causing me great stress.

236. The stress and vulnerability communicated to HR was largely due to performance pressures from four major sources:

    a)    From the start of my employment with Defendant I had faced several work comments criticizing my work ethic and attendance.

    b)    I had already been accused of stealing time in front of my colleagues by HR.

    c)    HR had already voiced concern while approving my scheduled PTO and asked my boss to have a separate talk with me since their inaccurate math suggested, that even barring sick days I would reach negative PTO during the year.

    d)     A then-teammate had already been placed on probation for running out of PTO due to his health, and as such had resolved to attend work or "make up the hours" on days where he was concerningly ill.

237.  To confirm their liability, it is common sense that giving false sense of urgent relief and taking it away can cause severe rebound stress to the victim., and the triggering actions of CAO held no legitimate purpose because:

    a)     They held sufficient authority to provide unpaid PTO.

    b)     There was no time-consuming obstacle of technical mechanism.

    c)     CAO's review and approval of timesheets for the pay period in question was not scheduled to take place until 04/25/2022.

    d)     There was no business loss, as the positive status of my tasks had been expressed by me over email and during our meeting and accepted by HR in the latter.

238.  CAO chose to relay this message in the front office which, in its open layout, held the main entrance to company, in addition to no less than 6, often occupied, cubicles- the furthest of which would have been about 20 feet from her own.

239.  Her assessment of the privacy of that space was demonstrated in her eschewing of it, for an isolated room with a door, for various onsite one-on one meetings, including the accommodations meeting.

240.  The administrative decision to suddenly, and without regard to my privacy, communicate the postponement of my requested accommodation was made with intent towards or reckless knowledge of the distress it would cause.

241.  CAO was Defendant's upper management, HR executive; Defendant acted through CAO, whom, at all times, acted within the scope of her role, with and for Defendant.

242.  Had I not been disabled, there would have been no stressful conflict between my need for sick days and fear of losing PTO; thus, there would have been no accommodations for CAO to fashion to my distress.

243.  By knowingly subjecting me to the condition of harassment on the discriminatory basis of my being disabled, Defendant intentionally violated 42 U.S.C. § 12112 (a), and is therefore liable for all

applicable affirmative action, compensatory and punitive damages as granted under 42 U.S.C §2000e–7, and 42 U.S.C. §1981a(a)(2), as well as any other relief designated by the court.

## COUNT XVI:

## DISCRIMINATORY CONDITIONS OF EMPLOYMENT-HARRASSMENT ON THE BASIS OF DISABILITY IN VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT, 43 P.S.§ 955 (a)

244. Pennsylvania statute 43 P.S.§ 955 (a) prohibits employers from discriminating against employees on the basis of disability.

245. Bringing for the allegations of Count XV, Defendant knowingly subjected me to the condition of harassment on the discriminatory basis of my being disabled; Defendant has violated 43 P.S. § 955 (a) and is therefore liable for all applicable affirmative action, as granted under 43 P.S.§ 962, as well as any other relief designated by the court.

## COUNT XVII:

## ATTEMPTING TO COERCE UNLAWFUL DISCRIMINATION -CONSTRUCTIVE TERMINATION IN VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT, 43 P.S. § 955 (e)

246. I put in a request for PTO days to avoid going to work until chances of settlement could be made clearer, since my FMLA leave had expired.

247. In accordance with previous practice, I emailed the new head of HR and my supervisor to make clear my intention/informally state that I was taking these days off.

248. I also gave the reason for giving notice informally; I was unable to access the employee PTO request site due to a then-apparent technical issue.

249. My initial notice went unaddressed until 09/23/2022, when Defendant advised me that I could not take PTO, citing reasoning that PTO cannot be disbursed for dates before my return to work, and that I had or

would be resigning sooner, and if I resigned by 09/25/2022, I would receive payment for all banked

PTO within the current pay period.

250. Because I had been given explicit written notice that I would be allowed to use PTO during FMLA

leave, the reason provided in paragraph 249 was false, and used as a pretext to deny my PTO.

251. This is further confirmed by Defendant's choice to not engage my request for explanation as to how

their reasoning aligned with the communications I received regarding leave, which I attached in my

clarity seeking email.

252. Further, Defendant's intent of coercing my resignation is shown by their insistence that I would be

resigning without having received or signed a written contract, as well as the undertone of presenting the

payment of eligible yet pretextually denied PTO as a direct benefit my resignation.

253. The suggestion of disbursing PTO in timing to a tendered resignation is not solely deciding; by stating a

denial of my request, stating the inevitability of resignation, and only spotlighting resignation as a path

for disbursement, Defendant constructed a problem and spotlighted resignation as the inevitable

solution.

254. Under 43 P.S.955(d) prohibits employers from discriminating against employees for having filed a

charge.

255. Under this statue, discrimination can be construed to include termination of employment, and, because

these actions occurred after a failed mediation, there is a reasonable connection between Defendant's

actions and my having filed a charge of discrimination.

256. The pressure of Defendant's coercion caused me to experience confusion, incredulous rage, and fear for

how my standing in the case would be affected should they succeed in unconditionally enforcing all of

their desired terms for settling my charges against them.

257. As a result of these actions, I suffered additional distress beyond what was already present from

processing Defendant's prior harm done to me.

258. By attempting to coerce unlawful discrimination, Defendant has violated 43 P.S. § 955 (e) and is therefore liable for all applicable affirmative action, as granted under 43 P.S.§ 962, as well as any other relief designated by the court.

.

## COUNT XVIII:

## DISCRIMINATION FOR FILING A CHARGE-WRONGFUL TERMINATION

## IN VIOLATION OF TITLE VII OF THE CIVIL

## RIGHTS ACT OF 1964, 42 U.S.C. §2000e-3(a)

259. On 09/27/2022, I reported to work virtually, by logging in to the company provided laptop and associated accounts, and informing my supervisor via Teams instant-message that I was available for new tasks.

260. That afternoon I received an email asserting that I had "agreed to resign" during the private mediation, and that Defendant "accepts my resignation".

261. This was Defendant's provided reasoning for terminating me as an employee; shortly after reading the email, I discovered myself to be locked out of all work accounts.

262. The way I had reported to work was both ordinary and reasonable because:

   a) Reporting to supervisor after a break from work had been a normalized procedure.

   b) There had been a recent email requesting employees to report to work virtually due to parking lot construction.

263. I had not and to this time have not entered any binding agreement to drop charges against or resign from Defendant, as explained below:

   a) There was not and is not any written agreement between me and Defendant to enforce terms of resignation.

   b) Both parties signed an "agreement to mediate" prior to mediation, stipulating that any mediation settlement reached during the session would be compiled, into an agreement form, by the mediator.

c)    There was no written agreement created or distributed during the session; to the contrary, Defendant elected to create its own contract which was communicated to me on 09/27/2022, 8 days after the failed mediation.

d)    The stipulation of point b dictated one exception that could be relevant to verbal contracts: verbal signatures were to temporarily take place of written signatures-- only if "technology access" prevented signing and returning of documents, electronically or otherwise, in-session.

e)    During mediation, neither I nor Defendant made any claims of technical barrier, in contrast, Defendant elected to draw up their own proposal on the contingency of my providing a return-to-work letter from my primary doctor.

f)    The contingency stated in part d, asserts that Defendant did not recognize itself as bound to present me with a proposal, much less to adhere to the written terms of such proposal.

g)    Defendant's written proposal included a 10-day revocation period during which I could refuse the contract after signing; their written contract is to be taken as the embodiment of their asserted "verbal contract"; the inclusion of this revocation period suggests Defendant's acknowledgement that terms of their asserted "verbal contract" were not final or irreversible.

h)    During mediation, mediators expressed to me that: negotiations were not yet complete; "nobody was forcing me to sign anything [the day of session]"; after receipt of Defendant's proposal, and before signing anything, I should have everything reviewed by a lawyer.

i)    At all times during mediation, I was under the impression that, as an unrepresented employee without a legal license-that my contingency for executing Defendant's proposed terms was fully communicated: I agreed to discussed terms subject to reviewing and processing the final contract.

j)    Any verbal agreement stated as tentative, is subject to change and thus cannot be construed as equal to a final written agreement. It is clear that I meant to communicate that our

discussions of compensation were tentative and that any agreement would contingent upon review and approval of written terms.

k)    I was not made aware of all Defendant's desired terms during mediation (such as provision of a resignation letter or resignation date), and as such had no opportunity to question or negotiate those terms.

l)    We did not discuss all material terms during mediation; resignation date was a material term for me because it effected my ability to earn income in my final workdays as well as access to company sponsored OSHA-40 training-such training had not been completely organized until after my medical leave of absence.

m)    As a non-participating witness to the mediation, my grandmother confirmed that, neither she nor I heard of any precontract demands of a resignation letter or resignation date, nevertheless, requiring these as pre-contract contingencies would also support point e.

n)    As a non-participating witness to the mediation, my grandmother has confirmed, during mediation, neither she nor I heard of any agreement being final or otherwise not subject to the receipt and review of the final contract.

264.   I believe that these points are reasonably sufficient to establish their lack of authority to enforce their terms, I also believe that they either knew or should have known that their assertions were false because Defendant had held full knowledge of points a-g, and I had done everything in my power to articulate h-n to them.

265.   On 10/17/2022, and in response to my communications, Defendant chose to double down on their claims, including their intent to sue for breach of contract unless I "memorialize[d] our agreement".

266.   This doubling down relied on an emailed statement that I had clumsily and fearfully made on 09/27/2022: "I did agree to a verbal agreement in which I would resign and dismiss existing claims (prior to Sep 19) in return for a settlement amount of 50,000 from Momentum Dynamics Corp. The execution of this agreement was contingent on a contract that included agreeable material terms."

267. I am not a lawyer; though clumsily worded and improperly placed into two sentences, the combined meaning of both sentences is the same as communicated in point 263(i).

268. Defendant's doubling down was not an attempt to enforce the company's rights, but like my unlawful termination, and the coercive action of count XVI, Defendant was yet again attempting to coerce me from exercising my rights.

269. On, 12/27/2022 my FOIA request to view my charge file was granted with the exception of internal investigator notes.

270. According to this file, at no point did Defendant elect to submit their professed "proof" to our investigator to have the investigation concluded in their favor or determined to be non-jurisdictional— such a submission would have been the natural course of action had they truly believed that their evidence was clear and sufficient.

271. Defendant's assertion (in paragraph 260) was an intentional prescribing of pretext to a knowingly fraudulent enforcement of unagreed terms.

272. I affirm that Defendant's presented reason for and committed acts in relation to my termination, prove that my termination held no legitimate basis other than my having filed a charge against them.

273. After being terminated, I began to look for work until 12/07/2022 when the demands of managing my health and preparing this complaint became too great.

274. As to be expected of anyone under these circumstances, my sudden and wrongful termination caused a stressful initial combination of shock, outrage, and fear-- and these manifested through dizziness, and chest pains, in addition to days-long an inability to concentrate, and physical fatigue.

275. By discriminating against me for filing a charge of discrimination, Defendant violated 42 U.S.C. §2000e-3(a) and is therefore liable for all applicable affirmative action, compensatory and punitive damages as granted under 42 U.S.C §2000e–7, and 42 U.S.C. §1981a(a)(1), as well as any other relief designated by the court.

**COUNT XIX:**

**DISCRIMINATION FOR FILING A CHARGE-WRONGFUL TERMINATION IN VIOLATION**

**OF THE PENNSYLVANIA HUMAN RELATIONS ACT, 43 P.S. § 955 (d)**

276. Pennsylvania statute 43 P.S.§ 955 (d) prohibits employers from discriminating against employees for having filed a charge.

277. Bringing forth the allegations of Count XVII, Defendant terminated me on the discriminatory basis of my having filed a charge; Defendant has violated 43 P.S.§ 955 (d) and is therefore liable for all applicable affirmative action, as granted under 43 P.S.§ 962, as well as any other relief designated by the court.

## COUNT XX:

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS IN VIOLATION OF THE**

**PENNSYLVANIA TORT LAW**

278.  Bringing forth all previous allegations, I was subjected to an egregious and ongoing combination of various forms of unlawful harassment that was intentionally aided, escalated, or enacted by Defendant.

279. As detailed in the Pennsylvania Human Relations Act, the Civil Rights Act of 1964, and the Americans with Disability Act, Defendant is responsible for working in good faith to prevent, address or eliminate unlawful discrimination related to my race, gender, or disability, in which they have failed.

280. As detailed in 43 PS 25-2, Employer establishments are to protect the morals of employees "reasonably and adequately"; Defendant has effectively demoralized me to an extent of severe impact.

281. When viewed cumulatively, the reckless behavior of Defendant as expressed in previous counts meets the threshold of outrageous behavior.

282. In order to perform my role, I had to block out painful experiences from work that continue to resurface now that I have been removed from the work environment.

283. The outrageous acts of Defendant have caused me long term stress which caused early physical manifestations of stress including nausea, fecal urgency, and panic attacks—and later, contributed to the major depressive episode I suffered in June 2022, as well my concurrent diagnosis of major depressive disorder and need of ongoing therapy.

284. Further, Defendant's commitment to their pattern of outrageous behavior, has denied me the opportunity to pursue additional roles or classifications within the company that would have allowed me to perform adequately within my needed accommodations.

285. I am asking that the court find Defendant liable for their intentional infliction of emotional distress and grant all applicable compensatory and punitive damages.

### IV. CONCLUSION

**WHEREFORE**, I, Plaintiff, Assata Acey, demand judgment in my favor and against the Defendant, InductEV, finding them liable for their violations: 5 counts of violation of the Title VII of the Civil Rights Act of 1964; 42 U.S.C. § 2000e, 3 counts of violation of Section 1981 of the Civil Rights Act of 1990; 42 U.S.C. § 1981, 2 counts of violation of the Americans with Disabilities Act of 1990; 42 U.S.C. § 12101 et. seq., 9 counts of violation of the Pennsylvania Human Relations Act; 43 P.S. § 951 - 963, and one violation of Pennsylvania tort law (IIED),

And an award in excess of $50,000 together with:

A. Compensatory damages, including but not limited to: back pay, front pay, past lost wages, future lost wages, lost pay increases, lost pay incentives, lost opportunity, lost benefits, lost future earning capacity, injury to reputation, mental and emotional distress, pain and suffering.

B. Punitive damages.

C. Costs of suit.

D. Interest, delay damages; and.

E. Any other further relief under 43 P.S. §962, 42 U.S.C. §1981, §1981a(a)(1), (2) or as this Court deems just, proper, and equitable.

Respectfully submitted,

Assata Acey
5121 Brown St,
Philadelphia, PA 19139

Dated: March 10, 2023