

**Court of Common Pleas of Chester County—Civil Action**
**REQUEST FOR PRODUCTION OF DOCUMENTS AND THINGS**

**In light of case: Assata Acey v. InductEV Incorporated,**
**Please produce the following documents in PDF format:**

1. **The entire Personnel file relating to me, Assata Acey**
   **Answer:**

2. **Complaints and investigations Records regarding Omar Jackson**
   **Answer:**

3. **Complaints and investigations Records regarding Julian Jackson**
   **Answer:**

**Sincerely,**
**Assata Acey**
**5121 Brown St**
**Philadelphia, PA 19139**
Mar 14 2023

*2023-01782-CT*

**Supreme Court of Pennsylvania**

**Court of Common Pleas**

**Civil Cover Sheet**

<u>CHESTER</u>  County

| For Prothonotary Use Only: |
|---|
| Docket No: |
| **2023-01782-CT** |

*Filed and Attested by*
*PROTHONOTARY*
*14 Mar 2023 09:51 AM*
*M. SCHIAVONI*

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

## SECTION A

**Commencement of Action**

- ✔ Complaint
- ☐ Writ of Summons
- ☐ Petition
- ☐ Transfer from Another Jurisdiction
- ☐ Declaration of Taking

| Lead Plaintiff's Name: | Lead Defendant's Name: |
|---|---|
| **ASSATA ACEY** | **INDUCTEV INCORPORATED** |

| **Are money damages requested?** ✔ Yes  ☐ No | Dollar Amount Requested:  ☐ Within arbitration limits |
|---|---|
| | (check one)  ✔ outside arbitration limits |

| **Is this a Class Action Suit?** ☐ Yes ✔ No | **Is this an MDJ Appeal?** ☐ Yes ✔ No |
|---|---|

Name of Plaintiff/Appellant's Attorney:

✔ Check here if you have no attorney(are a Self-Represented [Pro Se] Litigant)

## SECTION B

**Nature of the Case:**  Place "X" to the left of the <u>ONE</u> case category that most accurately describes your *PRIMARY CASE.*

If you are making more than one type of claim, check the one that you consider most important.

**TORT***(do not include Mass Tort)*
- ☐ Intentional
- ☐ Malicious Prosecution
- ☐ Motor Vehicle
- ☐ Nuisance
- ☐ Premises Liability
- ☐ Product Liability*(does not include mass tort)*
- ☐ Slander/Libel/Defamation
- ☐ Other:

**MASS TORT**
- ☐ Asbestos
- ☐ Tobacco
- ☐ Toxic Tort - DES
- ☐ Toxic Tort - Implant
- ☐ Toxic Waste
- ☐ Other:

**PROFESSIONAL LIABILITY**
- ☐ Dental
- ☐ Legal
- ☐ Medical
- ☐ Other Professional

**CONTRACT***(do not include Judgments)*
- ☐ Buyer Plaintiff
- ☐ Debt Collection: Credit Card
- ☐ Debt Collection: Other
- ✔ Employment Dispute: Discrimination
- ☐ Employment Dispute: Other
- ☐ Other

**REAL PROPERTY**
- ☐ Ejectment
- ☐ Eminent Domain/Condemnation
- ☐ Ground Rent
- ☐ Landlord/Tenant Dispute
- ☐ Mortgage Foreclosure: Residential
- ☐ Mortgage Foreclosure: Commercial
- ☐ Partition
- ☐ Quiet Title
- ☐ Other:

**CIVIL APPEALS**

Administrative Agencies
- ☐ Board of Assessment
- ☐ Board of Elections
- ☐ Dept. of Transportation
- ☐ Statutory Appeal: Other
- ☐ Zoning Board
- ☐ Other:

**MISCELLANEOUS**
- ☐ Common Law/Statutory Arbitration
- ☐ Declaratory Judgement
- ☐ Mandamus
- ☐ Non-Domestic Relations
- ☐ Restraining Order
- ☐ Quo Warranto
- ☐ Replevin
- ☐ Other:

*2023-01782-CT*

**Chester County
Court of Common Pleas
Cover Sheet**

| Docket No: |
| --- |
| **2023-01782-CT** |

| Plaintiff(s): (Name, Address) | Plaintiff's/Appellant's Attorney(circle one) |
| --- | --- |
| **ASSATA ACEY**<br>5121 BROWN ST   PHILADELPHIA, PA  19139<br>**PHRC**<br>CHIEF COUNSEL PHRC CENTRAL OFFICE 333 MARKET ST,<br>8TH FLOOR HARRISBURG, PA  17101 | (Name, firm, address, telephone and attorney ID#) |
| Defendant(s): (Name, Address)<br><br>**INDUCTEV INCORPORATED**<br>660 ALLENDALE RD   KING OF PRUSSIA, PA  19406 | Are there any related cases? Please provide case nos. |

**Defendants who are proceeding without counsel are strongly urged to file with the Prothonotary a written statement of an address <u>AND</u> a telephone number at which they can be reached**

**Commencement of Action (if applicable):** __ Agreement for an Amicable Action __ Motion to Confirm Arbitration Award
Notice of Appeal

If this is an appeal from a Magisterial District Judgement, was appellant __ Plaintiff or __ Defendant in the original action?

Jury Trial Demanded __ Yes ✔ No

Nature of case if not on previous cover sheet - Please choose the most applicable

| | |
| --- | --- |
| __ Annulment | __ Writ of Certiorari |
| __ Custody - Conciliation Required | __ Injunctive Relief |
| __ Custody - Foreign Order | __ Mechanics Lien Claim |
| __ Custody - No Conciliation Required | __ Issuance of Foreign Subpoena |
| __ Divorce - Ancillary Relief Request | __ Name Change |
| __ Divorce - No Ancillary Relief Requested | __ Petition for Structured Settlement |
| __ Foreign Divorce | |
| __ Foreign Protection from Abuse | |
| __ Paternity | |
| __ Protection from Abuse | |
| __ Standby Guardianship | |

**Arbitration Cases Only**

| Arbitration Date | mm/dd/yyyy |
| --- | --- |
| Arbitration Time | hh:mm:ss |

Defendants are cautioned that the scheduling of an arbitration date does not alter the duty of the defendant to respond to the complaint and does not prevent summary disposition form occurring prior to the arbitration date.
This matter will be heard by a Board of Arbitrators at the time and date specified but, if one or more of the parties is not present at the hearing, the matter may be heard at the same time and date before a judge of the court without the absent party or parties. There is no right to a trial *de novo* on appeal from a decision entered by a judge.

**Notice of Trial Listing Date**
Pursuant to C.C.R.C.P. 249.3, if this case is not subject to compulsory arbitration it will be presumed ready for trial twelve (12) months from the date of the initiation of the suit and will be placed on the trial list one (1) year from the date the suit was filled unless otherwise ordered by the Court.

To obtain relief from automatic trial listing a party must proceed pursuant to C.C.R.C.P. 249.3(b), request an administrative conference and obtain a court order deferring the placement of the case on the trial list until a later date.

**File with:** Chester County Justice Center, Prothonotary Office, 201 W. Market St., Ste. 1425, PO Box 2746, West Chester, PA 19380-0989

*2023-01782-CT*

These cover sheets must be served upon all other parties to the action immediately after filing.

Submit enough copies for service.

Assata Acey

_____

Plaintiff ▾
vs.

InductEV Incorporated

_____

Defendant ▾

Docket # _____

*Filed and Attested by
PROTHONOTARY
14 Mar 2023 09:51 AM
M. SCHIAVONI*

# IN THE COURT OF COMMON PLEAS OF CHESTER COUNTY

## VERIFICATION

I  Assata Acey _____ , verify that I am the Plaintiff ▾
in the present action and that the facts and statements contained in the above
petition are true and correct to the best of my knowledge, information and/or
belief.  I understand that false statements are made subject to the  penalties of
18Pa.C.S. § 4904, relating to unsworn falsification to authorities.

Date   03/11/2023

_____
Signature

*2023-01782-CT*

Assata Acey

Plaintiff ▾

vs.

InductEV Incorporated

Defendant ▾



Docket Num

*Filed and Attested by*
*PROTHONOTARY*
*14 Mar 2023 09:51 AM*
*M. SCHIAVONI*

# IN THE COURT OF COMMON PLEAS OF CHESTER COUNTY

## NOTICE TO DEFEND

You have been sued in Court If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this Complaint and Notice are served, by entering a written appearance personally or by attorney and filing in writing with the Court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the Court without further notice for any money claimed in the Complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THESE PAPERS TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

LAWYER REFERRAL SERVICE
Chester County Bar Association
15 West Gay Street
West Chester, PA. 19381
(610) 429-1500

*2023-01782-CT*



*Filed and Attested by*
*PROTHONOTARY*
*14 Mar 2023 09:51 AM*
*M. SCHIAVONI*

## COURT OF COMMON PLEAS
## OF CHESTER COUNTY

ASSATA ACEY           :
           :
   Plaintiff,       :
           :       No.:
     v.        :
           :
InductEV Inc.         :    .
           :
   Defendant.    :
           :
           :

## COMPLAINT

I, Assata Acey, file this complaint, alleging that my rights pursuant to Title VII of the Civil

Rights Act of 1964; 42 U.S.C. § 2000e, Section 1981 of the Civil Rights Act of 1990; 42 U.S.C.

§ 1981, The Americans with Disabilities Act of 1990; 42 U.S.C. § 12101 et. seq., Pennsylvania

Human Relations Act; 43 P.S. § 951 - 963, and Pennsylvania tort law regarding IIED, have been

violated and aver as follows:

### I. PARTIES AND JURISDICTION

1. Plaintiff, Assata Acey, is an adult individual residing in Philadelphia, Pennsylvania with

   a mailing address of 5121 Brown Street, Philadelphia, PA 19139.

2. Defendant, InductEV Inc., formerly known as Momentum Dynamics Corporation (hereinafter "Defendant") is a company, owned and existing under the laws of the Commonwealth of Pennsylvania, with a principal place of business at 660 Allendale Road, King of Prussia, PA 19406.

3. Defendant was Plaintiff's employer for all relevant times herein.

4. Plaintiff worked for the Defendant's facility, formerly located at 3 Pennsylvania Ave, Malvern, PA 19355.

5. At all times material hereto, Defendant qualifies as Plaintiff's employer.

6. At all times material hereto, Defendant acted by and through its agents, servants, and employees, former and current, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendant.

7. I have exhausted my administrative remedies pursuant to the Equal Employment Opportunity Act and the Pennsylvania Human Relations Act. (See Exhibit "A," a true and correct copy of a "right-to-sue" issued by the Equal Employment Opportunity Commission).

8. This action is instituted pursuant to Title VII of the Civil Rights Act of 1964; 42 U.S.C. § 2000e, Section 1981 of the Civil Rights Act of 1990; 42 U.S.C. § 1981, The Americans with Disabilities Act of 1990; 42 U.S.C. § 12101 et. seq., Pennsylvania Human Relations Act; 43 P.S. § 951 - 963, and Pennsylvania tort law regarding IIED, and applicable federal and state law.

9. Jurisdiction is conferred by 42 Pa.C.S.A. § 931.

10. Supplemental jurisdiction over my federal law claims is conferred pursuant to 42 Pa.C.S.A. § 5301.

11. The venue is properly laid in this district because the Defendant conducted business in this district and because a substantial part of the acts and omissions giving rise to the claims set forth herein occurred in this judicial district. 42 Pa.C.S.A. § 5301 (1)(i) and (2)(iii), 231 Pa Code 2179(3). Plaintiff was working in Chester County, Pennsylvania at the time of the illegal conduct by the Defendant, as set forth herein.

## II. HISTORY OF THE CASE

1. I am an African American Woman.

2. I accepted an employment offer from Defendant for the role of Product Introduction Technician on 31, May 2021.

3. I did not see the employment offer as fair, because Defendant requested the same tasks were communicated during the Senior Technician interview process, for lower title and negotiating power. Despite this and, as a company outsider, I did not have reason to suspect the hiring decision of being rooted in racial or gender bias.

4. After beginning employment on June 14, 2021, I became aware of my being the only Black woman out of more than 80 employees.

5. Several colleagues, including then team member Rob Rosenberg, made comments about the nature and scope of my work.

6. I continued to bring these to my manager, providing direct quotes when possible and requesting clarification over my job duties to ensure good performance.

7. Eventually, I was informed by my supervisor of additional anonymous work complaints made to him regarding my bathroom break frequency, attendance, and time I spent working vs talking.

8. I came to view these complaints as biased, due to their contradiction of:

a) Communications of collaborative workplace culture

b) My working regular overtime as often the last to leave.

c) Comparative time that colleagues of greater esteem spent talking.

9. I resolved to discuss my reflections and concerns of being racially stereotyped to my supervisor, including stereotypical depiction of Black people as lazy or untrustworthy and how those receiving comparatively less criticism and most coworkers, thus eligible complainers, were both White men.

10. As criticisms continued, I felt so concerned about my role that I requested and attended another meeting with my supervisor to confirm that I was performing the expected duties.

11. The scrutiny over my work increased to the point that my supervisor and I planned and implemented use of Teamwork software to document my tasks for the team to see, to reduce tension, and assist team members in the documentation of their work.

12. I faced experiences where I felt targeted for my gender. Team meetings routinely divulged into tension between myself and former team member Rob-I noticed he would more regularly butt heads with myself and fellow blk team member that the only other regular conflict appeared to be female mech engineer woman, led me to conclude that my being a woman and Black had intensified his conflict towards me.

13. This suspicion grew the first time he muttered "bitch" under his breath. At the time it sounded to be directed to Maria because he was acting on Maria's request (to stretch one of the larger cabinet unit's tubing to remove the kinks) because he did not trust me to do it. I was skeptical of what I had heard because I did not think Rob cursed. Later observations, such as Rob calling a test bay jig a "bitch" after struggling with it, dispelled

my skepticism. This is why when he referred to me as "that bitch" it no longer seemed surprising that he would:

    a)      Curse

    b)      Curse about a woman.

This was supported by circumstantial evidence such as:

a) Removing tools from my workstation whenever a tool from the main set went missing regardless of my culpability

b) Complaining profusely about my use of the test bay lifts and, when a dedicated lift was bought to prevent others (including me) from using his lift, constantly and aggressively confiscating the lift from my building area.

14.   A close colleague of Rosenberg (Rob R)'s was Rob Sweirzawski (Rob S), and he exhibited the same behavior mostly towards myself and Maria. During early weeks, he was reported by his supervisor and reprimanded by Judy Talis (Defendant's former Chief Administrative Officer (CAO) and head of Human resources (HR)) for racially joking in front of colleagues about me being from "the wrong side of the tracks". In contrast, his subsequent actions were either unnoticed, unreported, or unreprimanded by HR or his manager, even while my supervisor worked with me to mitigate his behavior.

15.   My builds had to pass QA dept to enter Rob S's station- and Sweirzawski would often, on a whim, and regardless of priority, insist on waiting until a whole or half day had passed from completion, before reviewing a build. And, when he did conduct these inspections, he refrained from disclosing the time of the checks until after they were done, essentially assuring my absence during many of them.

16. At one point I went out to company's smoking dock to beg Rob S to do a check on the same day he had indicated in his email. I was accosted with silent hostility before he responded that he was smoking.

17. In contrast, Rob S and Rob R were kind to one another and Quality checks relating to the test bay seemed to schedule and meet approval without a hitch.

18. Rob S also often eschewed the assembly documents, choosing to determine major points irrespective of design intent or documented tolerances, resisted writing reasons for failing a unit and would find new issues in subsequent checks that were either minor to the assembly intent (a speck of dust/details unspecified by the SOP), inconsistent with his previous rejection reasons (something he saw before but did not mention), or inconsistent with my build notes and memory( an unplugged cable when all connections had been tightened and torque painted).

19. His purposeful negative impact on my work became so unreasonable that I:

    a) Coordinated with my supervisor to have same attend all "pop-up" inspections.

    b) Advocated and adopted the use of signed seals to prevent pre-inspection tampering.

20. There was little else I could do about Rob S' behavior but his bias towards women became as apparent as his bias towards Black people when, having been included in a time-consuming effort to investigate and correct a deviation in expensive PAI product, he disclosed to my face that he had purposefully ignored Maria's design stipulation when approving these products for my in house use or for compliance at PAI warehouses.

21. The investigation had started when he raised a complaint about my installation of an assembly, thus rejecting the build, AND spurring further review that exposed the cause of error to be the assembly itself instead of its installation.

22. The malice behind his actions was clarified in his statement, because it proved he was the only one to know or be best positioned to know his actions to be the true cause of his complaint- yet he remained committed to, withholding information, shifting blame and risking further issue in the field for the chief purposes(or known outcomes), obstructing my work, and exerting authority over Maria's documents.

23. At that point I was able to connect his behavior towards my work and constant recklessness towards cabinet assembly procedures to his:

    a)    Racial opposition towards myself

    b)    Sexually biased opposition towards following Maria's documents (especially since she was one of two female engineers on the male-dominated lab floor- and the only one with a senior designation).

24. At one point, during my 90-day check in, I expressed concern about sexual harassment at work and how I appreciated having my supervisor's support.

25. After CAO admonished me for relying on my supervisor instead of her, I described an experience with a senior member of the electrical engineering team, Bogdan Proca, who had:

    a)  Stared me down in orientation before commenting on relationships between subordinates and superiors being "natural".

    b)  Compared me to dark chocolate in front of another colleague during a company ice cream day.

    c)   Pursued me from across the lab while asking if we were the only employees left in the building.

26. In response to the fear and discomfort I described, CAO launched into an anecdote about a male worker staring at a female worker's breast; how they became close friends after the female worker learned that the male's "unconscious staring" was caused by autism.

27. CAO's response stuck with me throughout my time at Defendant.

28. As I continued to hear sexist comments by Electrical Engineer John Wolgemuth and experience discomforting stares from Proca, no level of sexual harassment, even an "accidental" grazing by PCB designer Mike Russel felt significant enough to be taken seriously by HR

29. At one time, the company's history of not hiring African Americans was expressed by a Black philanthropy coordinator, stating Defendant had "come a long way" by having more than three Black employees, as he had "told [acting CEO] Andy [that if he did not see more Black employees at his next visit] the money [is] off".

30. His statements, made within earshot of coordinator, Diana Wilmes, added to my concern over the company's possible bias against Black workers, being that there were 6 Black employees including me at the time.

31. Concurrently I received enhanced scrutiny and harassment from HR, including instances where:

    a) After trying to make light of a recruiter's misspelling of my name, I was told that my name's spelling "did not matter", and I was making myself look "unprofessional" for responding to an RSVP 10 minutes before the same recruiter chose to complain.

    b)  I was informed that I would be the only employee disallowed to carry my cellphone in the lab space—despite previous complaints of my being late for meetings and most of my job duties taking place in the lab.

32. Before the end of 2021, it became clear that the nature of my job duties was objectively more advanced than the formal designation of my role.

33. After tasks of organizing meetings to formalize the relationship between Quality and Mechanical departments, providing theoretical chemical consultation to maximize product use, and drafting circuitry for an upcoming high stakes project, it became clear that my task types were not aligned with my job classification- and as the one of the lower-ranking members of my team, I felt that this was due to race and gender.

34. I made sure to document these contributions in my performance review while hinting my desire to be properly compensated for future advanced duties.

35. I also took the time to communicate the concerns of being misclassified to my supervisor- even going so far as to send potential job titles and descriptions in line with current duties.

36. Despite this I continued to find myself completing advanced tasks such as, providing ANSI compliant calculations, documentation, and PPE procurement for laser usage—all without any change in role.

37. This continued until my leave of absence.

38. Between January and April of 2022, lack of cooperation from colleagues who had criticized me grew to be so great that my supervisor had to have me submit emails to him so that he could forward them to others with his stamp of approval—instead of the teamwide procedure of emailing others directly and cc-ing him as needed.

39. On February 7, 2022, in a meeting held by CAO to explain why we couldn't share my curated movie list for Black History Month-- I discussed recent experiences and why I saw the need for an ongoing diversity initiative.

40. These experiences included:

a) Witnessing a White employee complaining to two other non-Black employees, that Julian needed to "get off his lazy ass" to close a garage door sooner.

b) An event where one of those same witnessing employees had unrelentingly questioned me to regarding my job tasks and how I was "spending my time" while supporting a project at a location where they had been unable to surveil me.

c) Various acts of hostility towards me by a White team member including:

   i) Snatching my notes from my hands to prevent me from describing our joint project to supervising engineer.

   ii) Slamming a door in my face, after holding open the door for a White woman

   iii) Criticizing me in our shared team group chat with disproportionate and inappropriate fierceness.

41. Immediately following our meeting, I summarized its content to my supervisor in a Teams message.

42. In the days following, HR chose to call me again to confirm details, before emailing that I had not reported any events and was invited to recount details in writing along with suggestions for the annual diversity training.

43. Upon hearing I was working from home with nausea during one of the confirmation calls, CAO asked if I was pregnant and doubled down in suggesting that I see her daughter's gynecologist.

44. Around April 18, 2022, I experienced an onset of symptoms that would later become a chronic condition.

45. On April 18 I emailed CAO to request access to unpaid time off and complained that the current PTO policy placed ill people on a short track for probation and encouraged employees to prioritize attendance over safe execution of tasks.

46. During CAO's insisted in-person meeting to discuss these concerns off record, I again shared my impression about a safety infraction where I:

   a) Sought and received permission from Test Bay employees to view a model on behalf of a mechanical engineering employee.

   b) Briefly approached the model while keeping my hands raised and exaggerated standing as far away as possible.

   c) Responded to another employee's assertion of the dangerous voltage level in stating, "I know".

47. The safety report made about me had suggested that I was combative towards the Rob member when he tried to keep me from "touching" the high voltage model.

48. In my review, I expressed frustration that the accusations:

   a)  Were patently false.

   b) Contrasted verbal or visual cues before and while viewing the model.

49. I also expressed concern that bias had motivated the misconception, since:

   a) My perceived noncompliance contrasted with the electrical safety etiquette I had demonstrated over my time at the company.

   b) Those who were accusing me routinely ignored the safety rules and each other's noncompliance.

   c) My experience in high voltage testing, which I discussed with Rob when he interviewed me, contrasted the reckless behavior others had expected of me, as I was

trained to operate with voltages more than 30x of what the Test department was using.

50. HR responded to my concern about the bias behind the dismissed report and the stress it had caused me by stating that no one would have seen my resume to know my qualifications.

51. I was also reassured, during our 04/18/2022 meeting, that I would be allowed to take unpaid time following the communication of my conditions and, that there was an option to modify my role or tasks in a way that fit me and the company.

52. I immediately recounted these reassurances to my supervisor in hopes that it would be of use to another chronically ill team member.

53. Despite this, I was informed only 2 days before close of the pay period that my accommodations would only take place in the next pay period.

54. This caused me to immediately stay after hours while symptomatic to make up time taken to go to two doctor's appointments that day.

55. HR continued to affirm that I was denied unpaid time by emailing before the weekend and calling after I asked my supervisor to inform them of my abnormal MRI results—to request that I submit a PTO request for "missing time".

56. The trauma of being harassed by HR while simultaneously coming to terms with my sudden regard as having a serious illness was so jarring, that I resolved to evaluate my experiences in totality.

57. Finding several instances where I was treated below the legal standard, and holding no faith that these issues would cease to occur without further action, I filed a complaint to the PHRC office.

58. Due to the implications of medical results, I was placed on medical leave effective May 16, 2022.

59. On 06/07/2022, I was presented with an FMLA form and directed to sign it if my leave would be extended beyond 06/16/2022.

60. When reviewing the form to sign, and thus, confirm elections and understanding of all notices, I realized all sections, including the one indicating my job security during the leave were left blank.

61. When I enquired after why I was given a blank form to sign off on and requested a filled one instead, I was told only that I would receive a filled form after my leave had been extended.

62. The actions and explanation created a fear of being set up for firing while my illness was being investigated; this feeling was reasonably distressing.

63. On 06/22/2022, the company was served notice of my complaint from PHRC.

64. The pace and effects of medical treatment caused me to worry that I would not be able to attend EEOC-scheduled mediation, so, I coordinated with private mediation provider, CORA services to mediate with Defendant on 09/19/2022.

65. In order to attend, Defendant and I each signed separate copies of CORA services' "general consent" agreement, which detailed any binding agreement would be typed up and signed during mediation—with the sole exception of technological limitations (See Exhibit "C" a true and correct copy my executed general consent agreement with CORA services).

66. There had been no final, drafted agreement reached between myself and respondent at the end of mediation.

67. Respondent forwent a partial agreement, instead opting to write up a final agreement after mediation.

68. Instead, respondent and I had tentatively agreed that so long as I presented a return-to-work letter by September 26th, Defendant would present me with a contract contractual agreement to resign and drop my claims in exchange for $50,000, and so long as long as other terms seemed reasonable, I would consider this agreement.

69. Regarding a more formal medical disclosure on my disability and qualifying limitations, Defendant stated traditional accommodations forms "would not be necessary" and they just needed it documented that I was cleared to return to work "with or without" limitations.

70. My grandmother is witness to the events described in mediation, as she was brought on virtually, as nonparticipating emotional support.

71. I had largely assumed that additional terms, such as resignation date, opportunity to complete employee training, would continue to be negotiated.

72. This was affirmed in the mediators' parting statements and assurances that:

   a) Discussed terms were not final, no one was pressuring me to sign anything that day

   b) Remaining terms would continue to be negotiated as one agreement: leaving open the risk of settlement negotiations falling apart.

   c) They [the mediators] recommended bring any written contract from the respondent to a lawyer for review before signing.

73. On 09/21/2022 I provided the required return to work letter from my doctor.

74. I received no response from the respondent.

75. On 09/22/2022, instead of receiving the promised contract for review, I was copied in an email to the EEOC mediator requesting that the case be closed due to us reaching "settlement".

76. Seeing my case be recommended for closure without my receipt or review of any promised contract caused me to question the respondent's initial designs for obtaining my return-to-work letter.

77. In order to act in good faith while protecting my interests, I maintained business as usual professional communications, including a PTO request to extending my leave 2 days beyond that allowed in FMLA, for the purposes of:

    a) Giving the respondent more time to produce a contract in case a settlement could be reached before returning to work.

    b) Maintain good standing so that I could return to work if negotiations fell through.

78. On Friday 09/23/2022, the respondent had not sent any contract to review, instead choosing to assert that I was not permitted to use previously assured PTO, that I had resigned or would be soon, and that I would be paid sooner if I resigned sooner.

79. I became shocked, scared, and angry at the realization that the Respondent might intend to exploit my legal inexperience good faith efforts by:

    a) Disqualifying me for the disability that I used to pay bills.

    b) Blocking me from the ability to remain in good standing and earn income through an accommodated return to work.

80. With those emotions, I emailed them to reemphasize my position, confront the previous false assertion of our having "settled", present conditions that I would be interested in as well as my intent to return to work until or unless negotiations worked out.

81. I also made sure to request PTO within the system that I gained access to through tech support and report to work on 09/27/2022.

82. That same evening, I was presented with a settlement agreement that requested my resignation effective 09/19/2022, while asserting that I would have 7 days from signing to recant my agreement.

83. The agreement was attached to an email stating that I had "verbally agreed to resign" and sent concurrently with my being locked out of company databases.

84. I rejected this offer on the principle that its terms were already being coercively enforced by my wrongful termination.

85. I also explained to respondent on several occasions why I did not see any legal obligation to accept and sign the proposed contract.

86. Reasons included:

   a) Lack of any signed agreement

   b) Lack of any verbal, non-contingent agreement to sign the presented contract.

   c) Non-discussion of all monetary terms (resignation date and access to then offered company training)

   d) Impression that all discussed terms had only been tentatively discussed.

   e) There having been no meeting of minds regarding whether we had been finalizing terms **in part** or tentatively negotiating partial terms before reviewing and approving all terms together as **one agreement**.

87. That respondent's asserted deadline for my return-to-work letter did not match the deadline I or my grandmother had noted was further assurance that we were not on the same page during mediation.

88. Despite my reasonings, respondent continued to argue the finality of tentative settlement terms, and on 10/27/2022 asserted that they would pursue me for any and all legal damages if I did not halt the EEOC investigation that had been reinitiated by our assigned EEOC mediator.

89. These threats caused me to feel reasonable distress, in addition to any PTSD I was facing from recounting my workplace experiences.

### III. LEGAL ARGUMENT

### COUNT I:

### DISCRIMINATORY INTIMIDATION FOR OPPOSING UNLAWFUL RACIAL HARASSMENT

### IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e-3 (a)

90. Racial tension is a common and expected workplace issue, to the extent that Employers have been encouraged to proactively empower employees to minimize illegal discrimination.

91. Generally, all of Defendant's employee education and communication regarding civil rights compliant behavior, policy and practices were relegated to an annual 3–6-hour training period and state regulated posters in the breakroom. Defendant abstained from perennial company-wide events or communications to advise employees of civil rights compliant behavior, or of any open-door policy or complaints process.

92. While the annual meetings satisfy state requirements in frequency and duration, the spirit of the law, and its intent of limiting harassment on bases that included race, was

recklessly discarded by the refusal proactively assess and regulate the understanding of employees, even when concerning ideas had been brought in training.

93. Before my 02/14/2022 meeting, I had described my experiences with racial bias with CAOon two occasions:

a) I had described previous racial experiences during new employee orientation, to help colleagues around a compliance concept.

b) I had described concerns brought to me in an offsite lunch with colleagues-where they raised questions around what constituted racial bias.

94. On both occasions there was no acknowledgement for the need for more company-led education; I was instead encouraged that contributions that I could give to employee understanding were welcome-on a volunteer basis.

95. Because I had been explicitly informed by CAO that any input that I volunteered towards employee education would be welcome, I set aside my time over the weekend to detail a voluntary diversity exercise for staff and presented it to CAO via email, and with reference to perceived business advantages and it being Black History Month.

96. On 02/07/2022, I relayed specific instances of racial harassment detailed instances of harassment I experienced from coworkers and why I felt the current diversity training was not effective. This was in the same 73-minute meeting CAO had initiated to inform me that neither my emailed activity nor any mention of Black History Month would be communicated on the company list serv.

97. On 02/11/2022 CAO called me, for 16 minutes, to "clarify details" of recounted experiences.

98. On 02/14/2022, I received an email claiming that I had not provided specific instances and requesting "brief notes" for use in training. This claim directly contradicted the duration and content of my meetings with CAO and enhanced then chronic, symptoms of anxiety and demoralization.

99. The person emailing had to be aware of the contradiction because they had been present for our meetings, knew first-hand the number of examples I had given, and had acknowledged the degree of detail through their reasoning for follow up in paragraph 97.

100. There would be no logical purpose to knowingly present false information except to convey to me that they were purposefully ignoring my allegations.

101. Such a conveyance was successful in making me feel like my suggestions, motivating complaints, and the trauma and trepidation involved in recounting them were being cast aside on purpose.

102. I aver the communication of paragraph 98 was sent with the intent and effect of intimidating me for opposing racial discrimination, and aiding administration in maintaining false images of both taking racial discrimination seriously and welcoming employee feedback.

103. By diligently and purposefully intimidating me in discrimination to my having opposed racial harassment, Defendant intentionally violated 42 U.S.C. §2000e-3(a); therefore, I demand judgment in my favor and against the defendant, in an undetermined award amount together with all applicable affirmative action, compensatory and punitive damages as granted under 42 U.S.C §2000e–7, and 42 U.S.C. §1981a(a)(1), as well as any other relief designated by the court.

## COUNT II:

## AIDING AND ABETING UNLAWFUL EMPLOYMENT DISCRIMINATION
## IN VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS
## ACT, 43 P.S. § 955 (e)

104. As stated in 43 P.S. §955(e), it is unlawful:

"For any person, employer, employment agency, labor organization or employee, to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful

discriminatory practice, or to obstruct or prevent any person from complying with the provisions of this act or any order issued thereunder, or to attempt, directly or indirectly, to commit any act declared by this section to be an unlawful discriminatory practice".

105. Bringing forth the allegations in Count I, I assert that CAO, acted on behalf of Defendant to aid the continuation of racial harassment within their provided work environment. This action caused me sufficient injury, as several memories I had to block out to complete my work for Defendant under the duress of racial discrimination—these memories have continued to resurface, and require the support of my therapist, even 10 months after my first day of medical leave.

106. Racial harassment, as a discriminant condition of employment, is declared unlawful by section 955 (a) of that same act, 43 P.S.§955(a).

107. By intimidating me in aid of workplace racial discrimination, Defendant intentionally violated 43 P.S. § 955 (e); therefore, I demand judgment in my favor and against the

defendant, in an undetermined award amount together with all applicable affirmative

action, as granted under 43 P.S.§ 962, as well as any other relief designated by the court.

## COUNT III:

## DISCRIMINATORY INTIMIDATION ON THE BASIS OF OPPOSING FORBIDDEN RACIAL DISCRIMINATION, IN VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT, 43 P.S. § 955 (d)

108.  I invoke the allegations from counts I and II.

109.  Corrective action can take various form including employee discipline, education, and training.

110.  When I sent my movie list on 02/07/2022, I made clear my intent of training Defendant employees to view Black people, thereby Black colleagues beyond the scope of harmful racial stereotypes.

111.  It became clear that I was advocating employee training as a corrective and or preventative action when I contextualized my suggestion with racial harassment I had witnessed and experienced at work.

112.  A reasonable person would have understood that I was opposing unlawful racial harassment once it became clear that I was advocating what I saw as corrective action to prevent further racial harassment.

113.  Workplace racial harassment is a condition of employment that operates with discrimination on the basis of race and is accordingly declared unlawful in 43 P.S. § 955 (a).

114. Incorporating paragraphs 108-113 with the arguments for counts I and II, I allege that Defendant willfully engaged in the adverse action of intimidation, AND that this action was done with discriminatory basis of my having opposed workplace racial discrimination, which is declared unlawful by 43 P.S.§ 955 (a).

115. By diligently and purposefully intimidating me in discrimination to my having opposed racial harassment, Defendant intentionally violated 43 P.S. § 955 (d); therefore, I demand judgment in my favor and against the defendant, in an undetermined award amount together with all applicable affirmative action, as granted under 43 P.S.§ 962, as well as any other relief designated by the court.

## COUNT IV:

## INTENTIONAL UNEQUAL PAINS-INTIMIDATION IN VIOLATION OF THE CIVIL RIGHTS ACT OF 1866; 42 U.S.C. § 1981

116. Calling forth the allegations of counts I-III, I suffered discrimination for opposing unlawful practices when Defendant purposefully intimidated me via email in response to my complaints of workplace racial harassment.

117. Discrimination for opposing a racial harassment is an unequal pain compared to White citizens because had I not been Black, I would not be engaged in the behavior that Defendant's discrimination was predicated upon; had I not been Black I would not have had to oppose racial harassment.

118. Therefore, , by extension, the pain of intimidation was unequal to that which White citizens are subjected to because but for my being Black I would not have suffered it.

119. By diligently and purposefully intimidating me in discrimination to my having opposed racial harassment towards me, Defendant subjected me to pains I would not have faced

had I been White; Defendant has intentionally violated 42 U.S.C. § 1981, ; therefore, I demand judgment in my favor and against the defendant, in an undetermined award amount together with all applicable equitable relief, compensatory and punitive damages, as well as any other relief designated by the court.

## COUNT V:

**RACIAL HARASSMENT AS A DISCRIMINATORY CONDITION OF EMPLOYMENT IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e-2 (a)(1)**

120.  As a Black employee, I experienced ongoing and pervasive racial harassment as a condition of my employment at Defendant.

121.   This harassment included:

   a)    Enhanced scrutiny from HR and their false accusations me of stealing time and purposefully missing meetings.

   b)    Anonymous and direct coworker criticisms of my work attendance, work ethic, bathroom breaks frequency.

   c)    Hostile sabotage from coworkers where my access to work tools and equipment, or my ability to get completed build approved were greatly affected.

   d)     Written and verbal jokes- including a comic posted on my cubicle about a hypothetical "phizzics" degree, and one employee's joke about me being on the wrong side of the tracks.

122.  Because of the race-specific element to my harassment, my White coworkers did not have to endure it as a condition of employment; it is a discriminant condition and an

"unequal pain" that is explicitly written in the purpose of the Civil Rights Act of 1866, 42 U.S.C. §1981 (a).

123. The racial basis of these experience is informed by circumstantial evidence and prevailing racial stereotypes:

    a)    Harassment described in paragraph 121 was based on adopted racial stereotypes of Black people being lazy or untrustworthy.

    b)    Black employees such as me, Omar Jackson, and Julian Jackson were each criticized as lazy on occasions where the reasoning or veracity was inaccurate or disproportionate.

124. HR did not act in good faith to investigate or prevent further instances of harassment.

125. The only person who acted in good faith to alleviate harassment was my supervisor and unfortunately his actions were not sufficient nor was his role designed to alleviate and prevent ongoing racial harassment.

126. Drawing forth the allegations of my previous counts, the company knowingly and recklessly enabled an environment of racial discrimination by:

  a)  Failing to proactively address workplace culture and attitudes before it produced further harassment.

  b)  Choosing not to maintain a reasonably nonhostile communication channel to communicate and address ongoing issues.

  c)  Knowingly acting to intimidate me from bringing further complaints.

127. This harassment was significant to prompt my having to plan how to document my work and progress for my teammates to view (on the teamwork site, before the company ever

transitioned to JIRA), having to send emails to the supply chain through my manager instead of just copying him to the email like my other teammates.

128. The additional labor required for me to perform my role under the condition of enduring racial harassment and caused me sufficient exhaustion in addition to various physical manifestations of anxiety, including nausea, sudden urge to defecate, and fear. This physical and emotional exhaustion also affected my home life: as I started placing my all into preforming under racial pressures, chronic stress caused me to lose interest in things I previously cared about; my previous enjoyment of and capacity to cook dwindled, requiring me to order take out more often (especially for work lunch), if I remembered to eat at all.

129. By intentionally subjecting me to an environment of racial discrimination as a condition of my employment, Defendant violated 42 U.S.C. §2000e-2(a)(1); therefore, I demand judgment in my favor and against the defendant, in an undetermined award amount together with all applicable affirmative action, compensatory and punitive damages as granted under 42 U.S.C §2000e–7, and 42 U.S.C. §1981a(a)(1), as well as any other relief designated by the court.

## COUNT VI:

## RACIAL HARASSMENT AS A DISCRIMINATORY CONDITION OF EMPLOYMENT IN VIOLATION OF IN VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT, 43 P.S. § 955 (a)

130. 43 P.S.§ 955 (a) forbids employers from discriminating on the basis of race with conditions of employment.

131. Drawing forth all previously stated allegations, as a Black employee, I experienced racial harassment as a race-based discriminatory condition of my employment.

132. By knowingly subjecting me to an environment of racial discrimination as a condition of my employment, Defendant violated 43 P.S. § 955 (a); therefore, I demand judgment in my favor and against the defendant, in an undetermined award amount together with all applicable affirmative action, as granted under 43 P.S.§ 962, as well as any other relief designated by the court.

## COUNT VII:

## DISCRIMINATORILY LIMITED OPPORTUNITY ON

## THE BASIS OF RACE IN VIOLATION OF TITLE VII OF THE CIVIL

## RIGHTS ACT OF 1964, 42 U.S.C. § 2000e-2 (a)(2)

133. Bringing forth the allegations of Count V, I endured continuous harassment based on my race as a condition of my employment at InductEV Inc..

134. While working for the Defendant, I completed tasks that were formally incorporated into other roles through internal job descriptions sent to internal interviewers during relevant hiring processes.

135. Such duties included:

   a.  Review assembly documents, find/report defects, and recommend/document preventative actions (senior quality technician).

   b.  Engage conflict resolution, intradepartmental structure, create procedure/implementation plans (project manager).

   c.   Provide theoretical and design background to various products, calculate safety threshold and test concepts, (R&D or electrical engineer).

136. I believe there is significant overlap between my duties and the duties described in the job descriptions emailed to internal interviewers (including recruiters Ryan Mackenzie and Jennifer Orloski) for each of those roles.

137. Informally, the role of Product Introduction Technician mainly consisted of assembly with or without supporting documentation, provision of verbal feedback, and occasional document redlining.

138. During the time of my employment, I created documentation for build progress, feedback for both assembly process and documentation, in addition to creating procedures for projects including laser, Oztek integration. Due to the level of detail in my documentation, I was chosen instead of PAI (Defendant's product manufacturing partner) to carry out fit checks for a new vendor evaluation.

139. The only other Product Introduction Team member who had authored documentation or procedures was, White male, Rob Rosenburg, and he was not only designated as a Senior Technician but reclassified into the Test department.

140. Similarly, tasks involving comparative research, material/test design, or compliance calculations were generally given to engineers.

141. Despite this, I completed comparative research and mathematical calculations on several projects under the designation of "Product Introduction Technician":

    a) laser classification calculations

    b) laser lens requirement calculations

    c) cabinet hole compliance calculations

    d) ANSI laser compliance research

    e) substrate chemical consult comparative research

f)  emergency Stop-Circuit schematic design

g)  environmental testing and diagnostics procedure design

142. The Human Resources Department (HR) was aware of my job tasks and received detailed description of several of them when I submitted my performance review on 12/04/2022.

143. Around 01/07/2022, my performance review was discussed and signed by both my manager and HR.

144. Despite this, I was not among the four employees reclassified between 12/20/2022 and 03/20/2022, with attention to company needs, and preexisting qualifications, and job tasks:  Diana Wilmes (White, female), Taylor Johnson (White, male), Harry Nask (White, male), and Andrea Neff (White, female).

145. Within 4 years before and sometime after my employment, Bill Gallagher (White, male) was reclassified from his role of Principal Electrical Engineer to Principal Test Engineer, and Senior Technician, Rob Rosenberger (White, male) reclassified from Product Introduction to the Testing Team and Daniel Schwartz (White male) was promoted to vice president of Supply Chain.

146. Similarly on May 31, 2021, I was:

a)    Presented an offer for a lesser role despite communications given to me and the role description provided to company interviewers to evaluate and approve me through 5 interview rounds.

b)    Told that the lower role was the basis for limiting my starting compensation.

c)    Presented an offer for a role with a description identical to Senior Technician description in every way but its titular "Senior" designation.

d)     Assured that despite the lower title, I would be expected to perform the same duties discussed in interviews for the Senior Technician Role.

147. At the time, I held no contextual knowledge to ascertain race as a cause of the decision, but hindsight of my previous racial experiences suggests an interconnection.

148. Omar Jackson is a former Black male coworker who, at the time held 20 years of experience and held roles beyond the requirements of the formal role yet was only promoted after controversy surrounding hiring process for a senior technician.

149. Such a controversy involved an hiring decision stalemate, when, after heated debate and split votes within my team, supervisors Joren Wendschuh and Mark Smith both refrained from giving any collaborative endorsement for selected external Senior Product Introduction Technician finalists.

150. This controversy was significant enough for CAO to interview product introduction team members individually to determine the cause of stalemate, at which point I disclosed Omar's non-promotion as a part of the conflict.

151. To my knowledge, Omar has been the only internally promoted/reclassified Black employee in the company's 12-year history.

152. It should not take a bachelor's degree, 2.5 times the minimum formal experience requirement AND controversy for Defendant to promote a Black employee for the first time, particularly where such a role also stipulates exchangeable requirements of an associate degree OR technical certification OR equivalent experience.

153. Contrastingly, our other White male colleague who was also simultaneously promoted to Senior Technician, held, at the time of promotion, 8.25 year of experience but no education or active certification beyond a high school diploma.

154. Even if the equivalent experience clause were applied on a year-for year basis, with an associate degree measured at two years, that would leave the employee below the "formal requirements" with a diploma plus two years supplementary experience, and 6.25 total years of additional experience.

155. The comparison between Omar's promotion and that of our teammate proves, Defendant's' willing practice of evaluating education and experience on a whole and general basis as opposed to strict adherence to formal requirements-the former being especial common among modern employers.

156. Further, Omar's initial classification as a product introduction technician instead of a senior technician lends additional circumstantial evidence to:

   a) Defendant's ongoing practice of limiting employees on the basis of their race.

   b) The relative insignificance of years of experience when hiring for the Senior Product Introduction Technician; Defendant would not have hired me for the role even if I had additional experience because I still would be Black.

157. Comparing further, the highest-ranked Black employee at InductEV Inc., titled, Manager of Project Engineering (hired for the role after possessing 23+ years of experience, an electrical engineering bachelor's degree, Pennsylvania professional engineer certification, master's degree in business and Project Management Professional certification) has also never been promoted in his 3+ years at the company.

158. HRs indifference towards and participation in racially based harassment provides additional circumstantial evidence to their holding of racial bias and likelihood of practicing intentional discrimination.

159. I do believe that engineers, as a class of employee at InductEV Inc., enjoy higher salary averages than general technicians.

160. Just as my non-senior designation was used in my hiring negotiation to deny my request of $40 per hour (in favor of the final rate of $35 per hour), my improper designation has broadly limited my negotiating power, thus effecting my overtime pay, and my ability to benefit from annual employee raises (I received a 3.5% raise effective 03/14/2022 for satisfying my role)

161. In closing, I allege that:

   a)   My job classification was incongruent to the formal and or informal associations of my tasks.

   b)   Defendant has an established willingness and ability to reclassify White employees of varied seniority, with and without strict adherence to formal role requirements.

   c)   Defendant has an established pattern of not promoting Black employees and setting exceeding high standards for Black candidates (compared to other candidates) when hiring above the general technician level.

162. These allegations support my overarching allegation that Defendant chose not to properly classify me due to their intentional enactment of racial bias against African American employees.

163. As a result of this I have sustained damages of self-doubt, lost dignity, performance anxiety, strained relationship with and emboldened racial scrutiny of coworkers, as well as loss of any salary benefits that would have been actualizable under appropriate classification.

164. By limiting my employment opportunities in discrimination to my race, Defendant intentionally violated 42 U.S.C. §2000e-2(a)(2); therefore, I demand judgment in my favor and against the defendant, in an undetermined award amount together with all applicable affirmative action, compensatory and punitive damages as granted under 42 U.S.C §2000e–7, and 42 U.S.C. §1981a(a)(1), as well as any other relief designated by the court.

## COUNT VIII:

### INTENTIONALL UNEQUAL CONTRACTS IN VIOLATION OF THE CIVIL RIGHTS ACT OF 1866, 42 U.S.C. §1981

165. As stated in 42 U.S.C. §1981 (b), the equal right to make and enforce contracts as conferred in 42 U.S.C. §1981 (a) is made to include rights to contract modification.

166. Calling forth previous allegations of Count VII, I was denied the privilege of contract modification on the basis of my race when Defendant, through its human resources department (HR), chose not to reclassify my role, despite choosing to do so for several White employees.

167. I further allege that my designation as outside of Engineer classification would not be but for my race; in support of which I call forth all previously made allegations in addition to my possessing a bachelor's degree in physics, relevant experience, nature, and performance of tasks during employment.

168. As a result of Defendant's actions, I have sustained damages of self-doubt, lost dignity, performance anxiety, strained relationship with and emboldened racial scrutiny of coworkers, as well as loss of any salary benefits that would have been actualizable under appropriate classification.

169. By following an unwritten policy of intentional racial bias, Defendant limited my

contract benefits and privileges with discrimination to my race; Defendant has violated

42 U.S.C. § 1981, ; therefore, I demand judgment in my favor and against the defendant,

in an undetermined award amount together with all applicable equitable relief,

compensatory and punitive damages, as well as any other relief designated by the court.

## COUNT IX:

### INTENTIONAL UNEQUAL PAINS- RACIAL HARASSMENT IN VIOLATION OF THE CIVIL RIGHTS ACT OF 1866; 42 U.S.C. §1981

170. 42 U.S.C. §1981 (a) states that all persons within U.S. jurisdiction shall be subject to like

pains as White citizens.

171. Calling forth previous allegations, I experienced harassment that was based in racial bias

and stereotypes that would not have applied to me had I been White.

172. This harassment was an unequal pain; and when formally made aware, Defendant

intentionally and willfully chose to aid these practices and discriminate against me for

reporting them.

173. The actions have perpetuated undue emotional turmoil, including anger, depreciating

self-image, self-doubt, and general trauma that has:

a) Physically manifested in headaches, panic attacks

b) Contributed to my major depressive episode of June 2022.

c) Contributed to my need for and attendance of therapy since June 2022.

174. By knowingly subjecting me to an environment of racial harassment as a condition of my

employment, Defendant has violated 42 U.S.C. § 1981, ; therefore, I demand judgment in

my favor and against the defendant, in an undetermined award amount together with all

applicable equitable relief, compensatory and punitive damages, as well as any other relief designated by the court.

<u>**COUNT X:**</u>

**DISCRIMINATORY CONDITIONS-SEXUAL HARASSMENT**

**IN VIOLATION OF TITLE VII OF THE CIVIL**

**RIGHTS ACT OF 1964, 42 U.S.C. § 2000e-2 (a)(1)**

175.  As a woman employee, I was subjected to a workplace culture and harassment on the basis of my gender.

176.  This harassment included targeted opposition, inappropriate office jokes, and unwanted touching from my colleagues.

177.  Generally, all of Defendant's employee education and communication regarding civil right compliant behavior, policy and practices were relegated to annual 3–6-hour training period and state regulated posters in the breakroom. Defendant abstained from perennial events or communications to advise employees of civil rights compliant behavior, or of any open-door policy or complaints process.

178.  New employees received an identical separate training in lieu of general annual training.

179.  While the annual meetings satisfy state requirements in frequency and duration, the spirit of the law, and its intent of limiting harassment on bases that included race, was recklessly discarded by the refusal proactively assess and regulate the understanding of employees, even when concerning ideas had been brought in training.

180.  During my new member orientation, Bogdan Proca stated, within a related question (the question was how Defendant dealt with families and couples operating within the company), that romantic involvement between bosses and subordinates was natural.

181. CAO, as the acting facilitator of company training, gave an impression of condonement to Proca's reasoning when, instead of addressing the inherent bias in same, she affirmed the question with examples of the company spouses and family members.

182. In further failure to discourage sexual harassment, and during training section covering sexual harassment, CAO gave an unclear anecdote: A female employee who complained of a male employee staring at her breasts during meetings; after complaining to CAO, the man disclosed his having autism and embarrassment and both parties became the best of friends.

183. CAO's anecdote:

   a)    Conveniently left out considerations of employee retaliation, or any other reason why a complaining employee would feel pressure to act as though they forgave a harasser who was aware of their complaints and whom they could not prove was purposefully harassing them.

   b)    Suggested to myself and others that her first method of investigation was to directly confront the person accused.

   c)    Encouraged harassment through its suggestion that the impact and determination of harassment could be constrained to the expressed intent of the person accused.

184. Later, during my 90-day check in, I complained of this same employee comparing me to dark chocolate ice cream in front of a colleague, continuously staring, commenting on my physical activity, and even pursuing me from across the lab after hours while asking if we were "the only employees left".

185. My complaint was given after being admonished to bring sexual harassment concerns to CAO instead of relying on my supervisor.

186. CAO's response to my complaint was to dismiss my concerns and experiences with the same anecdote from orientation.

187. As a human resources professional who had conducted employee training, they were aware of the seriousness of my claims, my protected right to work without the discriminatory condition of sexual harassment and the related laws.

188. A reasonable person could expect that unchecked unlawful behavior could continue or become worse.

189. With conclusion to paragraphs 184-188, CAO acted with reckless and intentional indifference to my rights by choosing:

   a)  To discourage further relay of details concerning sexual harassment

   b)  To refrain from investigating or thus addressing my complaints of harassment

190. Being warned not to go to my manager, and having my claims directly dismissed, I had no certain channel to communicate various consequential events of sexual harassment, including when:

   a)  Mike Russel went out of his way in a n open corridor to brush against me.

   b)  Sam G. behaved lewdly towards me in front of another colleague and started lying to other colleagues to pressure me into to attending group lunches with him.

191. CAO did not act in good faith to investigate or prevent further instances of harassment.

192. The only person who acted in good faith to alleviate harassment was my supervisor, who went out of his way to redirect Bogdan when he stared at my backside instead of observing a team member's demonstration and spoke to Sam's supervisor to get him to

stop pressuring me. Unfortunately, his actions were not sufficient nor was his role designed to alleviate and prevent ongoing sexual harassment and the warning from CAO made asking him for hep very trepidatious.

193. Calling forth paragraph 6, CAO was Defendant's upper management, HR executive; Defendant acted through CAO, whom, at all times, acted within the scope of her role, with and for Defendant.

194. By knowingly subjecting me to the discriminatory work condition of sexual harassment, Defendant has intentionally and recklessly violated 42 U.S.C. §2000e-2(a)(1); therefore, I demand judgment in my favor and against the defendant, in an undetermined award amount together with all applicable affirmative action, compensatory and punitive damages as granted under 42 U.S.C §2000e–7, and 42 U.S.C. §1981a(a)(1), as well as any other relief designated by the court.

### COUNT XI:

### DISCRIMINATORY CONDITIONS- SEXUAL HARASSMENT

### IN VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT, 43 P.S.

### 955(a)

195. 43 P.S.§ 955 (a) forbids employers from discriminating with conditions of employment on the basis of sex.

196. Drawing forth all previously stated allegations, as a female employee, I experienced sexual harassment as a sex-based discriminatory condition of my employment and, despite my complaints, my employer intentionally and recklessly aided in this condition.

197. By knowingly subjecting me to the discriminatory work condition of sexual harassment, Defendant has violated 43 P.S. § 955 (a); therefore, I demand judgment in my favor and

against the defendant, in an undetermined award amount together with all applicable affirmative action as granted under 43 P.S.§ 962, as well as any other relief designated by the court. Pleading.

## COUNT XII:

### AIDING UNLAWFUL DISCRIMINATION-SEXUAL HARRASSMENT

### IN VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT, 43 P.S.

### 955(e)

198. CAO knew or should have known the seriousness of my allegations.

199. CAO knew or should have known that uncorrected employee behavior bears risks of continued or escalated behavior.

200. With reasonable knowledge of the risks, they chose to:

    a)    Dismiss any claims I brought about behavior escalating from the previous behavior that they chose to ignore.

    b)    Admonish me not to share issues with the second most reasonable choice-my manager with the intent of dismissing the majority of my allegations without prejudice.

201. It is pertinent to note that, per the company handbook, any complaints about the CAO, had to be raised to the CEO, and because the HR department consisted of two people, the next most diplomatically favorable option for employees to escalate concerns dismissed by HR, was to continue bringing them directly to HR or have them voiced by their manager.

202. The choice to limit my opposition to harassment was made with knowledge that it would aid my being harassed further.

203. CAO was Defendant's upper management, HR executive; Defendant acted through CAO, whom, at all times, acted within the scope of her role, with and for Defendant.

204. By intimidating me and choosing not to investigate my claims, Defendant knowingly aided the discriminatory condition of workplace sexual harassment; Defendant intentionally violated 43 P.S. § 955 (e); therefore, I demand judgment in my favor and against the defendant, in an undetermined award amount together with all applicable affirmative action, as granted under 43 P.S.§ 962, as well as any other relief designated by the court.

## COUNT XIII:

### PERPETUATING DISABILITY DISCRIMINATION THROUGH ADMINISTRATIVE METHODS

### IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT OF 1990;

### 42 U.S.C. § 12112 (b)(3)(B)

205. On 06/07/2022, Defendant emailed me with explicit instruction to sign an attached FMLA notice "on or before 06/29/2022", should my leave extend past 06/17/2022.

206. On the notice, all sections, including employer designations of whether my job was essential or not was left blank; signing the document would have suggested my acceptance of various unknown terms.

207. To be clear in what I was acknowledging being informed of, I requested that the blank sections be filled, and enquired as to why they were unfilled.

208. In response, Defendant gave no explanation of the blank section and instead asserted that I would receive a filled form to sign after my leave had been extended.

209. Employers are obligated to hold jobs during FMLA, except for "key employee" roles, the holding of which would cause undue hardship.

210. Since they are not obligated to hold an opening for essential role, the employer is free to terminate the "key" disabled employee's employment at any point during or after leave.

211. However, while the employer may designate a role as "key", that decision is open to dispute.

212. Additionally, room to dispute is greatly reduced where it is demonstrated that the employee was formally informed and accepting of employer's designation of their role.

213. Such an informed acceptance could have been fraudulently recorded had I signed the form while blank.

214. Because this documentation would ultimately and severely hinder any attempt to question Defendant's designation and consequent right to terminate my employment, any administrative methods resulting in the receipt of such documentation would provide fraudulent aid to my being terminated on the basis of my disability.

215. Because my leave would not have occurred without my having held a disability, such status is an critical factor in my having received this form, and a basis for the discriminate effect of these actions on persons with disability.

216. It is for all of these reasons that I affirm that Defendant's administrative method of sending me a blank FMLA form perpetuated the progeny of discrimination on the basis of disability.

217. To date, Defendant has provided neither acknowledgement of these actions or addressed the emotional harm caused by them.

218. This act caused me to feel the unending necessity of questioning everything momentum sent to me, bringing on a damagingly evocative paranoia and distress that, in adding to my cumulation of previous experiences, brought on my first major depressive episode, experienced 06/11/2022, diagnosed by my primary doctor on 06/17/2022 and treated in therapy since 06/22/2022.

219. By deploying administrative methods that perpetuate disability discrimination, Defendant violated 42 U.S.C. § 12112 (3)(B), ; therefore, I demand judgment in my favor and against the defendant, in an undetermined award amount together with all applicable affirmative action, compensatory and punitive damages as granted under 42 U.S.C §2000e–7, and 42 U.S.C. §1981a(a)(2), as well as any other relief designated by the court.

## COUNT XIV:

### ABETTING OR ATTEMPTING DISABILITY DISCRIMINATION

### IN VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT, 43 P.S. § 955 (e)

220. Bringing forth the allegations of count XIII, the actions taken by Defendant regarding my leave of absence would have provided fraudulent aid to the company's election to terminate my employment on the basis of my disability.

221. Certain circumstances support that this act was intentional, including:

    a)    At no point during the 6-day period, from before the form was sent to after I mentioned its blankness, did the CAO correctively fill the form, recognize the error, inform me and fill the form.

    b)    After being confronted with the error CAO eschewed explanations of administrative purpose nor an accident to explain, choosing instead to not respond.

    c)    After being asked to fill out the form CAO insisted on a delay and stated, "[a filled form would be sent] if leave was extended beyond 06/17/2022.

222.   These actions are not expected for an honest mistake, when viewed cumulatively, there is little support for a simple mistake in the multiplied odds that someone would:

    a)    Edit a form's name to include the name of the intended employee.

    b)    Miss that the labeled form was blank.

    c)    Within 6 days of not getting a response from a subordinate, never check the sent email, and

    d)    Never notice that the from was mistakenly blank or reach out to correct it.

    e)    Once informed of the error, offer no assertion of it being a mistake.

    f)    Once requested to fix the error, refuse to provide a corrected version (if one existed) or update the form with predetermined answers.

    g)    Present an irrelevant cause to delay information that had been critical to the execution of their previous and explicit instruction.

223.   As an executive officer who presided over the companies human resources and relevant compliance, it is unlikely that CAO was not aware of the details surrounding an FMLA notice and related policy.

224.   It is further unlikely that she would not have considered or conclusively deliberated the details which happened to coincide with the notice, regarding my eligibility.

225. It is a common reflex to admit something as an error when it is one and had there been a labeling of the wrong file, nothing would have prevented CAO from immediately attaching the correct file. Additionally, had there been a legitimate reason for delaying the relay of such information until 06/17/2022, CAO would not have provided the form on 06/07/2022, with instruction to sign it, nor would she have created a new reply thread. It should not have taken as long to determine, as demonstrated by the filled form, that I was not a key employee.

226. For these reasons, and for the existence of other underhanded behaviors by the CAO, I aver that the same purposefully engaged an attempt to fraudulently aid Defendant's termination of my employment; such fraud would have been enabled with discrimination to my being disabled because my disability prompted my leave of absence.

227. This act caused me to feel the unending necessity of questioning everything Defendant sent to me, bringing on a damagingly evocative paranoia and distress that, in adding to my cumulation of previous experiences, brought on my first major depressive episode, experienced 06/11/2022 and diagnosed by my primary doctor on 06/17/2022 and treated in therapy since 06/22/2022.

228. By using administrative methods to attempt unlawful disability discrimination, Defendant has violated 43 P.S. § 955 (e); therefore, I demand judgment in my favor and against the defendant, in an undetermined award amount together with all applicable affirmative action, as granted under 43 P.S.§ 962, as well as any other relief designated by the court.

**COUNT XV:**

## DISCRIMINATORY CONDITIONS OF EMPLOYMENT-HARRASSMENT ON THE BASIS OF DISABILITY IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT OF 1990, 42 U.S.C. § 12112 (a)

229. At the time of this event, I was I good standing and to the knowledge of myself and others was capable of adequately meeting the demands of my role.

230. My esteemed effective adequacy is further underlined by my supervisor's willingness to be cited as a refence to my performance in the 04/18/2022 email, as well as the accommodations meeting where HR accepted my affirmed capacity to meet their stipulation that I would receive my desired accommodation so long as I could complete 30 hours a week.

231. Despite these, the symptoms that I described in my email included items that established disability because they affected my major body function and aspect of life.

232. At no point did CAO express any doubt in my medical condition, despite my offer to disclose further information (up to and including signed doctor's visit notes); CAO insisted that my doctor's provision of the company disability form would be sufficient.

233. Although there was a general expectation of reasonable timeliness, CAO did not specify a deadline for the receipt of the company disability form; there was no specification over how the timeline of receipt of the form connected to the timeline of the implied instant relief of unpaid time off for the current pay period.

234. On 04/21/2022, CAO stopped me, while on my way to one of two doctor's appointments and informed me my request for unpaid time off would not go into effect until the next pay period and advised me to use paid time off for the, then current, pay period.

235. There were two reasons for Defendant to anticipate their communication as stress inducing:

    a)    In my email, sent 04/18/2022 I described the symptoms of my illness and the stressful dilemma I perceived between attending work or using sick days.

    b)    During our private accommodations meeting I exhibited several visual signs of anxiety including nervous fidgeting, shaky voice--and still reiterated how and why nonaccess to unpaid time off, and the associated fear of running out of PTO and being placed on probation despite meeting performance guidelines were causing me great stress.

236. The stress and vulnerability communicated to HR was largely due to performance pressures from four major sources:

    a)    From the start of my employment with Defendant I had faced several work comments criticizing my work ethic and attendance.

    b)    I had already been accused of stealing time in front of my colleagues by HR.

    c)    HR had already voiced concern while approving my scheduled PTO and asked my boss to have a separate talk with me since their inaccurate math suggested, that even barring sick days I would reach negative PTO during the year.

    d)    A then-teammate had already been placed on probation for running out of PTO due to his health, and as such had resolved to attend work or "make up the hours" on days where he was concerningly ill.

237. To confirm their liability, it is common sense that giving false sense of urgent relief and taking it away can cause severe rebound stress to the victim., and the triggering actions of CAO held no legitimate purpose because:

   a)   They held sufficient authority to provide unpaid PTO.

   b)   There was no time-consuming obstacle of technical mechanism.

   c)   CAO's review and approval of timesheets for the pay period in question was not scheduled to take place until 04/25/2022.

   d)   There was no business loss, as the positive status of my tasks had been expressed by me over email and during our meeting and accepted by HR in the latter.

238. CAO chose to relay this message in the front office which, in its open layout, held the main entrance to company, in addition to no less than 6, often occupied, cubicles- the furthest of which would have been about 20 feet from her own.

239. Her assessment of the privacy of that space was demonstrated in her eschewing of it, for an isolated room with a door, for various onsite one-on one meetings, including the accommodations meeting.

240. The administrative decision to suddenly, and without regard to my privacy, communicate the postponement of my requested accommodation was made with intent towards or reckless knowledge of the distress it would cause.

241. CAO was Defendant's upper management, HR executive; Defendant acted through CAO, whom, at all times, acted within the scope of her role, with and for Defendant.

242. Had I not been disabled, there would have been no stressful conflict between my need for sick days and fear of losing PTO; thus, there would have been no accommodations for CAO to fashion to my distress.

243. By knowingly subjecting me to the condition of harassment on the discriminatory basis of my being disabled, Defendant intentionally violated 42 U.S.C. § 12112 (a), ; therefore, I demand judgment in my favor and against the defendant, in an undetermined award amount together with all applicable affirmative action, compensatory and punitive damages as granted under 42 U.S.C §2000e–7, and 42 U.S.C. §1981a(a)(2), as well as any other relief designated by the court.

## COUNT XVI:

## DISCRIMINATORY CONDITIONS OF EMPLOYMENT-HARRASSMENT ON THE BASIS OF DISABILITY IN VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT, 43 P.S.§ 955 (a)

244. Pennsylvania statute 43 P.S.§ 955 (a) prohibits employers from discriminating against employees on the basis of disability.

245. Bringing for the allegations of Count XV, Defendant knowingly subjected me to the condition of harassment on the discriminatory basis of my being disabled; Defendant has violated 43 P.S. § 955 (a); therefore, I demand judgment in my favor and against the defendant, in an undetermined award amount together with all applicable affirmative action, as granted under 43 P.S.§ 962, as well as any other relief designated by the court.

## COUNT XVII:

**ATTEMPTING TO COERCE UNLAWFUL DISCRIMINATION -CONSTRUCTIVE TERMINATION IN VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT, 43 P.S. § 955 (e)**

246. I put in a request for PTO days to avoid going to work until chances of settlement could be made clearer, since my FMLA leave had expired.

247. In accordance with previous practice, I emailed the new head of HR and my supervisor to make clear my intention/informally state that I was taking these days off.

248. I also gave the reason for giving notice informally; I was unable to access the employee PTO request site due to a then-apparent technical issue.

249. My initial notice went unaddressed until 09/23/2022, when Defendant advised me that I could not take PTO, citing reasoning that PTO cannot be disbursed for dates before my return to work, and that I had or would be resigning sooner, and if I resigned by 09/25/2022, I would receive payment for all banked PTO within the current pay period.

250. Because I had been given explicit written notice that I would be allowed to use PTO during FMLA leave, the reason provided in paragraph 249 was false, and used as a pretext to deny my PTO.

251. This is further confirmed by Defendant's choice to not engage my request for explanation as to how their reasoning aligned with the communications I received regarding leave, which I attached in my clarity seeking email.

252. Further, Defendant's intent of coercing my resignation is shown by their insistence that I would be resigning without having received or signed a written contract, as well as the undertone of presenting the payment of eligible yet pretextually denied PTO as a direct benefit my resignation.

253. The suggestion of disbursing PTO in timing to a tendered resignation is not solely deciding; by stating a denial of my request, stating the inevitability of resignation, and only spotlighting resignation as a path for disbursement, Defendant constructed a problem and spotlighted resignation as the inevitable solution.

254. Under 43 P.S.955(d) prohibits employers from discriminating against employees for having filed a charge.

255. Under this statue, discrimination can be construed to include termination of employment, and, because these actions occurred after a failed mediation, there is a reasonable connection between Defendant's actions and my having filed a charge of discrimination.

256. The pressure of Defendant's coercion caused me to experience confusion, incredulous rage, and fear for how my standing in the case would be affected should they succeed in unconditionally enforcing all of their desired terms for settling my charges against them.

257. As a result of these actions, I suffered additional distress beyond what was already present from processing Defendant's prior harm done to me.

258. By attempting to coerce unlawful discrimination, Defendant has violated 43 P.S. § 955 (e); therefore, I demand judgment in my favor and against the defendant, in an undetermined award amount together with all applicable affirmative action, as granted under 43 P.S.§ 962, as well as any other relief designated by the court.

## COUNT XVIII:

## DISCRIMINATION FOR FILING A CHARGE-WRONGFUL TERMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. §2000e-3(a)

259. On 09/27/2022, I reported to work virtually, by logging in to the company provided laptop and associated accounts, and informing my supervisor via Teams instant-message that I was available for new tasks.

260. That afternoon I received an email asserting that I had "agreed to resign" during the private mediation, and that Defendant "accepts my resignation".

261. This was Defendant's provided reasoning for terminating me as an employee; shortly after reading the email, I discovered myself to be locked out of all work accounts.

262. The way I had reported to work was both ordinary and reasonable because:

    a)    Reporting to supervisor after a break from work had been a normalized procedure.

    b)    There had been a recent email requesting employees to report to work virtually due to parking lot construction.

263. I had not and to this time have not entered any binding agreement to drop charges against or resign from Defendant, as explained below:

    a)    There was not and is not any written agreement between me and Defendant to enforce terms of resignation.

    b)    Both parties signed a separate "Consent to Mediate" agreement prior to mediation, stipulating that any mediation settlement reached during the session would be compiled, into an agreement form, by the mediator.

    c)    There was no written agreement created or distributed during the session; to the contrary, Defendant elected to create its own contract which was communicated to me on 09/27/2022, 8 days after the failed mediation. (See Exhibit "C," a true and correct copy of Defendant's submitted proposal).

d)      The stipulation of point b dictated one exception that could be relevant to verbal contracts: verbal signatures were to temporarily take place of written signatures-- only if "technology access" prevented signing and returning of documents, electronically or otherwise, in-session.

e)      During mediation, neither I nor Defendant made any claims of technical barrier, in contrast, Defendant elected to draw up their own proposal on the contingency of my providing a return-to-work letter from my primary doctor.

f)      The contingency stated in point d, confirms that Defendant did not recognize itself as bound to present me with a proposal, much less to adhere to the written terms of such proposal.

g)      Defendant's written proposal included a 7-day revocation period, during which I could refuse the contract after signing; their written contract is to be taken as the embodiment of their asserted "verbal contract"; the inclusion of this revocation period suggests Defendant's acknowledgement that terms of their asserted "verbal contract" were not final or irreversible.

h)      Defendant's written proposal also required me to verify that I had been offered 21 days to consider the contract; this verification would have been false as no such offer had been made to me, and such an offer, together with our mediation date, would have contradicted Defendant's sentiment as presented in paragraph 265.

i)      During mediation, mediators expressed to me that: negotiations were not yet complete; "nobody was forcing me to sign anything [the day of session]";

after receipt of Defendant's proposal, and before signing anything, I should have everything reviewed by a lawyer.

j)   At all times during mediation, I was under the impression that, as an unrepresented employee without a legal license-that my contingency for executing Defendant's proposed terms was fully communicated: I agreed to discussed terms subject to reviewing and processing the final contract.

k)   Any verbal agreement stated as tentative, is subject to change and thus cannot be construed as equal to a final written agreement. It is clear that I meant to communicate that our discussions of compensation were tentative and that any agreement would contingent upon review and approval of written terms.

l)   I was not made aware of all Defendant's desired terms during mediation (such as provision of a resignation letter or resignation date), and as such had no opportunity to question or negotiate those terms.

m)  We did not discuss all material terms during mediation; resignation date was a material term for me because it effected my ability to earn income in my final workdays as well as access to valuable company sponsored OSHA-40 training-such training had not been completely organized until after my medical leave of absence.

n)   As a non-participating witness to the mediation, my grandmother confirmed that, neither she nor I heard of any precontract demands of a resignation letter or resignation date, nevertheless, requiring these as pre-contract contingencies would also support point e.

o)   As a non-participating witness to the mediation, my grandmother has confirmed, during mediation, neither she nor I heard of any agreement being final or otherwise not subject to the receipt and review of the final contract.

264. I believe that these points are reasonably sufficient to establish their lack of authority to enforce their terms, I also believe that they either knew or should have known that their assertions were false because Defendant had held full knowledge of points a-h, and I had done everything in my power to articulate i-o to them.

265. On 10/17/2022, and in response to my communications, Defendant chose to double down on their allegation of a binding verbal agreement, including their intent to sue for breach of contract unless I "memorialize[d] our agreement".

266. This doubling down relied on an emailed statement that I had clumsily and fearfully made on 09/27/2022: "I did agree to a verbal agreement in which I would resign and dismiss existing claims (prior to Sep 19) in return for a settlement amount of 50,000 from Momentum Dynamics Corp. The execution of this agreement was contingent on a contract that included agreeable material terms."

267. I am not a lawyer; though clumsily worded and improperly placed into two sentences, the combined meaning of both sentences is the same as communicated in point 263(i).

268. Defendant's doubling down was not an attempt to enforce the company's rights, but like my unlawful termination, and the coercive action of count XVI, Defendant was yet again attempting to coerce me from exercising my rights.

269. On, 12/27/2022 my FOIA request to view my charge file was granted with the exception of internal investigator notes.

270. According to this file, at no point did Defendant elect to submit their professed "proof" to our investigator to have the investigation concluded in their favor or determined to be non-jurisdictional—such a submission would have been the natural course of action had they truly believed that their evidence was clear and sufficient.

271. Defendant's assertion (in paragraph 260) was an intentional prescribing of pretext to a knowingly fraudulent enforcement of unagreed terms.

272. I affirm that Defendant's presented reason for and committed acts in relation to my termination, prove that my termination held no legitimate basis other than my having filed a charge against them.

273. After being terminated, I began to look for work until 12/07/2022 when the demands of managing my health and preparing this complaint became too great.

274. As to be expected of anyone under these circumstances, my sudden and wrongful termination caused a stressful initial combination of shock, outrage, and fear-- and these manifested through dizziness, and chest pains, in addition to days-long an inability to concentrate, and physical fatigue.

275. By discriminating against me for filing a charge of discrimination, Defendant violated 42 U.S.C. §2000e-3(a); therefore, I demand judgment in my favor and against the defendant, in an undetermined award amount together with all applicable affirmative action, compensatory and punitive damages as granted under 42 U.S.C §2000e–7, and 42 U.S.C. §1981a(a)(1), as well as any other relief designated by the court.

**COUNT XIX:**

**DISCRIMINATION FOR FILING A CHARGE-WRONGFUL TERMINATION IN VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT, 43 P.S. § 955 (d)**

276. Pennsylvania statute 43 P.S.§ 955 (d) prohibits employers from discriminating against employees for having filed a charge.

277. Bringing forth the allegations of Count XVII, Defendant terminated me on the discriminatory basis of my having filed a charge; Defendant has violated 43 P.S.§ 955 (d); therefore, I demand judgment in my favor and against the defendant, in an undetermined award amount together with all applicable affirmative action, as granted under 43 P.S.§ 962, as well as any other relief designated by the court.

## <u>COUNT XX:</u>

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS IN VIOLATION OF THE PENNSYLVANIA TORT LAW**

278.  Bringing forth all previous allegations, I was subjected to an egregious and ongoing combination of various forms of unlawful harassment that was intentionally aided, escalated, or enacted by Defendant.

279. As detailed in the Pennsylvania Human Relations Act, the Civil Rights Act of 1964, and the Americans with Disability Act, Defendant is responsible for working in good faith to prevent, address or eliminate unlawful discrimination related to my race, gender, or disability, in which they have failed.

280. As detailed in 43 PS 25-2, Employer establishments are to protect the morals of employees "reasonably and adequately"; Defendant has effectively demoralized me to an extent of severe impact.

*2023-01782-CT*

281. When viewed cumulatively, the reckless behavior of Defendant as expressed in previous counts meets the threshold of outrageous behavior.

282. In order to perform my role, I had to block out painful experiences from work that continue to resurface now that I have been removed from the work environment.

283. The outrageous acts of Defendant have caused me long term stress which caused early physical manifestations including nausea, fecal urgency, and panic attacks—and later, contributed to the major depressive episode I suffered in June 2022, as well my concurrent diagnosis of major depressive disorder and need of ongoing therapy.

284. Further, Defendant's commitment to their pattern of outrageous behavior, has denied me the opportunity to pursue additional roles or classifications within the company that would have allowed me to perform adequately within my needed accommodations.

285. Wherefore, I demand that the court find Defendant liable for their intentional infliction of emotional distress and grant all applicable compensatory and punitive damages.

## IV. CONCLUSION

**WHEREFORE**, I, Plaintiff, Assata Acey, demand judgment in my favor and against the Defendant, InductEV Inc., finding them liable for their violations: 5 counts of violation of the Title VII of the Civil Rights Act of 1964; 42 U.S.C. § 2000e, 3 counts of violation of Section 1981 of the Civil Rights Act of 1990; 42 U.S.C. § 1981, 2 counts of violation of the Americans with Disabilities Act of 1990; 42 U.S.C. § 12101 et. seq., 9 counts of violation of the Pennsylvania Human Relations Act; 43 P.S. § 951 - 963, and one violation of Pennsylvania tort law (IIED),

granting an award in excess of $50,000 together with:

A. Compensatory damages, including but not limited to: back pay, front pay, past lost wages, future lost wages, lost pay increases, lost pay incentives, lost opportunity, lost benefits, lost future earning capacity, injury to reputation, mental and emotional distress, pain and suffering.

B. Punitive damages.

C. Costs of suit.

D. Interest, delay damages; and.

E. Any other further relief under 43 P.S. §962, 42 U.S.C. §1981, §1981a(a)(1), (2) or as this Court deems just, proper, and equitable.

Respectfully submitted,

Assata Acey
5121 Brown St,
Philadelphia, PA 19139

Dated: March 11, 2023

# EXH. B



# CONSENT TO MEDIATE

**Mediation Process and Role of the Mediator**
I understand that the mediator(s) will explain the mediation process at the beginning of the mediation session, and that I will have an opportunity to ask questions at that time. I understand that CORA Good Shepherd Mediation and its mediators are not providing me with legal advice, legal representation, counseling or therapy. I understand that the mediation process may involve the mediator(s) speaking privately to each participant. I understand that the mediator(s), acting in a neutral capacity, will not take sides or make a legal ruling. The mediator's role is to facilitate the mediation process and help the parties understand each other's point of view. I understand that if the disputants reach a mediated settlement, the mediator(s) will write it out on an agreement form. I have been informed that prior to signing the mediated settlement, I may have it independently reviewed by my own legal counsel. A copy of the agreement (if a settlement is reached), along with this Consent to Mediate form, will be retained by CORA Good Shepherd Mediation. The terms of settlement may be legally binding in that the parties may seek its enforcement in the courts, unless the agreement, by its terms, sets forth the parties' intent that it is not legally binding or enforceable in a court of law.

**Costs of Mediation**
The mediation will be conducted by volunteer or staff mediators affiliated with CORA Good Shepherd Mediation. Some mediations take more than one session, depending on the complexity of the matters involved. We understand that the per-session fee is due prior to the start of each mediation session.

**Voluntary Nature of Mediation**
I am voluntarily participating in the mediation process to attempt to resolve a specific conflict. I am willing to abide by the mediation ground rules as described in the mediator(s)'s opening statement. I understand that if either disputant fails to follow the ground rules, the mediator(s) may terminate the mediation session at the mediator(s) discretion. I also understand that any disputant may decide to withdraw from the mediation at any time during the process.

**Confidentiality of Mediation**
Furthermore, I understand that all mediation communications and documents are privileged and that disclosure of mediation communications and mediation documents may not be required or compelled through discovery or any other process. I understand that mediation communications and mediation documents, except the mediated settlement agreement, shall not be admissible as evidence in any action or proceeding,

CORA Services, Inc.   ● 8540 Verree Road ● Philadelphia, PA 19111-1399   ● 215-342-7660



including, but not limited to, a judicial, administrative or arbitration action or proceeding.
[Section 1, Title 42 § 5949 (a)] I understand that all of the mediator (s) notes and the
notes taken by the disputants will be destroyed at the end of the final mediation session.
I, therefore, agree not to call the mediator(s) or CORA Good Shepherd Mediation staff
as a witness(es) in any future proceedings pertaining to this case.

**Exceptions to Confidentiality**

I understand that some communications and conduct are excluded from protection
under the Confidential Mediation Communications and Documents law in Pennsylvania
[Section 1, Title
42 § 5949 (b)]. If subsequent legal proceedings are held in this matter, the mediator
may be required to testify in regard to:

- A fraudulent communication during mediation that is relevant evidence in
  an action to enforce or set aside a mediated agreement reached as a result
  of that fraudulent communication;
- A communication or threat that bodily injury may be inflicted upon a person;
- A communication of a threat that damage may be inflicted on real or
  personal property under circumstances constituting a felony;
- Conduct during a mediation session causing direct bodily injury to a person.

In mediations involving youth, mediators are required by the Pennsylvania Child
Protection Services Act to report any suspicion of child abuse to the Child Abuse
Hotline.

**Modifications for "Virtual" Mediations**

I understand that I may be asked to sign this document and the agreement
electronically. If that is not possible, I agree to sign and return this document as soon as
possible. In addition, I understand that the agreement might be signed by the parties
after the mediation session has ended, if technology access does not allow for both
parties to sign the agreement during the mediation session. I agree to sign and return
the agreement as soon as possible (given my technology access), and I understand that
my verbal consent during the mediation session serves as my signature until I can sign
and return the written agreement.

**Release from Liability**

I hereby release CORA Good Shepherd Mediation and its employees and its volunteers
from any liability in regard to this mediation.

Assata S. Acey
_____
Signature

09/06/2022
_____  _____
Date

CORA Services, Inc.  ● 8540 Verree Road ● Philadelphia, PA  19111-1399  ● 215-342-7660

**Signature:** _Assata A Acey_
Assata Acey (Sep 6, 2022 02:06 EDT)

**Email:** aceyassata@gmail.com

# general consent form- virtual mediation

Final Audit Report                                      2022-09-06

| | |
|---|---|
| Created: | 2022-08-25 |
| By: | Alexandra Harris (aharris@coraservices.org) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAzERBcrClpsbjkgmMWHKnQgC2c_qY_wPe |

## "general consent form- virtual mediation" History

Document created by Alexandra Harris (aharris@coraservices.org)
2022-08-25 - 2:31:38 PM GMT

Document emailed to Assata Acey (aceyassata@gmail.com) for signature
2022-08-25 - 2:32:11 PM GMT

Email viewed by Assata Acey (aceyassata@gmail.com)
2022-08-25 - 2:32:29 PM GMT

New document URL requested by Assata Acey (aceyassata@gmail.com)
2022-09-06 - 5:52:36 AM GMT

Email viewed by Assata Acey (aceyassata@gmail.com)
2022-09-06 - 5:52:49 AM GMT

Document e-signed by Assata Acey (aceyassata@gmail.com)
Signature Date: 2022-09-06 - 6:06:27 AM GMT - Time Source: server

Agreement completed.
2022-09-06 - 6:06:27 AM GMT

**Adobe Acrobat Sign**

# EXH. C

<u>**CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE**</u>

This CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE (the "Agreement") is made and entered into by and between **ASSATA ACEY** ("Acey") and **MOMENTUM DYNAMICS CORPORATION** ("Momentum"). Acey and Momentum are each individually referred to as a "Party" and collectively as the "Parties."

WHEREAS, Acey is a current employee with Momentum and, in connection therewith, Acey has dually filed a Complaint of Discrimination ("Complaint") against Momentum with the Pennsylvania Human Relations Commission and The Equal Employment Opportunity Commission with the docket numbers PHRC Case No.: 202102397 and EEOC No.: 17F202261016; and

WHEREAS, Momentum denies all allegations made in the Complaint; and

WHEREAS, the Parties desire to fully and finally compromise, settle, resolve and release all claims, charges, disputes, grievances, disagreements, differences, complaints and causes of action of any kind whatsoever, whether known or unknown, whether asserted or unasserted, which Acey had, has or may have against; and

WHEREAS, the Parties hereto, each having received independent legal advice in this matter, have agreed that it is in their mutual interest to resolve any and all disputes arising from or related to Acey's employment with, and/or Acey's resignation therefrom, upon the terms and conditions more fully set forth hereinafter; and

NOW, THEREFORE, intending to be legally bound and in consideration of the foregoing, the promises and mutual covenants, conditions and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

Section 1.     <u>**Defined Terms**</u>.

"**Released Parties**" means Momentum and its past and present officers, trustees, employees, agents, parents, subsidiaries, affiliates, managers, members, administrators, attorneys, insurers, re-insurers, successors and assigns (each in his, her or its capacity as such) and the heirs, executors, administrators, successors and assigns of any such person or entity (each a "**Released Party**" and collectively, the "**Released Parties**").

"**Causes of Action**" means any: (a) claims, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses and offsets; (b) all rights of setoff, counterclaim or recoupment and claims on contracts or for breaches of duties imposed by law; (c) rights to object to claims or interests; and (d) claims and defenses such as fraud, mistake, duress and usury and any other defenses of any kind or nature whatsoever, known or unknown, contingent or non-contingent, matured or unmatured, anticipated or unanticipated, suspected or unsuspected, whether arising in contract, sounding in tort, at law, in equity, or pursuant to any other theory of law.

"**Effective Date**" is given the meaning ascribed in Section 2.

1

Section 2.      **Effective Date**. This Agreement shall become effective (the "Effective Date") on the date Momentum's counsel receives a copy of this Agreement executed by Acey.

Section 3.      **Consideration**. Acey will resign from employment with Momentum effective immediately. Acey agrees to provide Momentum with the said resignation letter on or before September 23, 2022. Additionally, Acey agrees to provide Momentum with a verification form from a medical provider returning Acey to return to work on full duty with or without restrictions. Acey shall provide Momentum with said verification form on or before September 23, 2022. Within thirty (30) days of the Effective Date of this Agreement, provided that Momentum's counsel has received an IRS Form W-9 for each payee under this Agreement who will receive any payment to be reported on an IRS Form 1099, and that the revocation period described in Section 9, below, has expired without revocation by Acey, in exchange for the promises and releases contained in this Agreement, will pay settlement proceeds in the total amount of Fifty Thousand Dollars ($50,000) to be disbursed in the following payments:

  a.  One check, made payable to "ASSATA ACEY" for the gross sum of [spell out dollar amount] ($_____), less all ordinary deductions required by law and which shall be reported on an IRS Form W-2;

  b.  One check, made payable to "ASSATA ACEY" for the exact amount of [spell out dollar amount] ($_____), representing payment for alleged non-economic or wage-related damages, which shall be reported in Box 3 on an IRS Form 1099; and

Section 4.      **Release**. Acey expressly understands and agrees that Acey's acceptance of this Agreement forever and irrevocably binds Acey, and for the consideration set forth herein, the adequacy of which Acey acknowledges, hereby expressly, unconditionally, and voluntarily releases and forever discharges the Released Parties from: (i) any and all waivable Causes of Action which arose on or before the Effective Date of this Agreement, arising out of, or in any way related to, or as a consequence of Acey's employment with, separation from or any other relationship with the Released Parties under any possible legal, equitable, tort, contract, or statutory theory, including, but not limited to, any claims for defamation, slander, tortious interference with business relations, any claim for constructive or wrongful discharge and breach of contract; and from (ii) any and all other possible Causes of Action, including but not limited to claims asserted verbally or in writing which arose on or before the Effective Date of this Agreement, including but not limited to claims for discrimination, harassment, or retaliation based upon race, age, color, ethnic or national origin, ancestry, religion, marital status, sex, sexual orientation, gender identity, citizenship status, medical condition, disability or any other protected status or associational status under any common law, statute, law or ordinance, and all possible claims arising under any federal, state and/or local employment laws, regulations or ordinances, including, but not limited to, claims under the Employee Retirement Income Security Act ("ERISA"); Title VII of the Civil Rights Act of 1964 ("Title VII"); the Civil Rights Act of 1991; 42 U.S.C. §§ 1981, 1983, 1985, 1986 and 1988; the Age Discrimination in Employment Act ("ADEA"); the Vietnam Era Veterans Readjustment Assistance Act of 1974; the Americans With Disabilities Act ("ADA"); the Older Workers Benefit Protection Act ("OWBPA"); the Worker Adjustment and Retraining Notification Act ("WARN"); the federal Family and Medical Leave Act ("FMLA"); the Equal Pay Act of 1963 ("EPA"); the Rehabilitation Act of 1973; the

2

Fair Labor Standards Act ("FLSA"); the Pennsylvania Human Relations Act ("PHRA"); the Pennsylvania Wage Payment and Collection Law ("WPCL"); the Pennsylvania Minimum Wage Act ("MWA"); the Consolidated Omnibus Budget Reconciliation Act ("COBRA"); the United States Constitution; the Pennsylvania Constitution; the Occupational Safety and Health Act; and all claims under any other federal, state or local civil rights law, regulation or ordinance.

This Agreement does not release any claims, nor does it relinquish any rights, that Acey might have, if any, which may not be waived by law. Notwithstanding the foregoing, this section shall not preclude Acey from filing a charge of discrimination with any administrative agency, but Acey will not be entitled to any monetary or other relief from the agency or from any court as a result of litigation brought on the basis of or in connection with such charge except if and to the extent that the release contained in this paragraph is held to be invalid or unenforceable (in which event, the Released Parties will be entitled to restitution or set off for all amounts paid to it hereunder, as and to the extent determined by the court). Acey acknowledges and agrees that, but for providing this release, Acey would not be receiving the amounts being provided to Acey under the terms of this Agreement.

Section 5.    **No Admission of Liability**. Acey agrees that, by entering into this Agreement, the Released Parties, individually and collectively, in no way admit to any wrongdoing or any liability to Acey under any theory, and Acey acknowledges that the Released Parties expressly deny any such allegation. Acey further agrees that, by entering into this Agreement, the Released Parties, individually and collectively, in no way admit to liability for any claim, asserted or otherwise, arising from any relationship between Acey and any of the Released Parties.

Section 6.    **No Other Claims**. Acey represents that Acey has not filed any complaint or charges, either formal or informal, against any Released Party with any other local, state or federal agency or court relating to Acey's employment with Momentum, that Acey will not do so at any time hereafter except as provided under Section 4, or unless necessary to enforce this Agreement or for claims arising after the date of Acey's execution of this Agreement, and that, if any such agency or court assumes jurisdiction of any such complaint or charge against any Released Party, Acey will direct that agency or court to withdraw from the matter. Acey will not voluntarily seek to cooperate or participate in the investigation or prosecution of any action against any Released Party, except as specifically set forth in this Agreement. Acey shall not in any manner solicit any former, current or future employee of Momentum to pursue any claims released, as outlined in Section 4, above.

Section 7.    **No Re-Employment**. Acey expressly waives, releases and foregoes any chance or opportunity to seek or accept employment with Momentum or any successor or affiliate by way of consolidation, merger, acquisition or otherwise; and Acey agrees that Momentum will never be obligated to provide Acey with future employment.

Section 8.    **Taxes**. Acey agrees that the Released Parties shall have no responsibility, and that the Released Parties are indemnified, for any and all taxes due or owing on the amounts paid and reported on an IRS Form 1099 under this Agreement, including any and all additional payments (including interest and penalties) that result from Acey's underpayment or failure to

3

pay taxes for the amounts paid on an IRS Form 1099 under this Agreement. Acey expressly acknowledges that Acey has not relied on the Released Parties for any tax advice.

Section 9.    **Review and Revocation Periods**. Acey expressly warrants that no promise or inducement has been offered to Acey except as set forth herein, that this is the complete agreement between Acey and the Released Parties, and that there is no written or oral understanding or agreement between Acey and the Released Parties not recited herein. The Released Parties hereby advise Acey to consult with an attorney prior to executing this Agreement and Acey agrees that Acey has had an opportunity to do so. Acey acknowledges that Acey has carefully read the Agreement, that Acey understands completely its contents, and that Acey has executed this Agreement of Acey's own free will, act and deed. Acey acknowledges that Acey has been afforded the opportunity to consider this Agreement for a period of twenty-one (21) calendar days. Acey shall have a period of seven (7) calendar days following Acey's execution of this Agreement to revoke this Agreement by delivering written notice to May Mon Post, by personal delivery to Bunker & Ray, 436 Walnut Street, WA01A, Philadelphia, Pennsylvania 19106, or facsimile to (215) 569-0284. This Agreement shall not be effective or enforceable prior to the expiration of the seven (7) day revocation period. If the revocation period expires without revocation by Acey, on the eighth day following the Effective Date, this Agreement shall be forever effective, binding and enforceable. If Acey revokes this Agreement, Acey will not receive any consideration stated in this Agreement.

Section 10.    **Dismissal**. Acey agrees that Acey will withdraw Acey's Complaints of Discrimination filed with the Pennsylvania Human Relations Commission and the Equal Employment Opportunity Commission and/or otherwise notify both agencies that this matter has been resolved so that the respective investigations must cease.

Section 11.    **Non-Disparagement**. Acey agrees that, except as may be required under compulsion of law, Acey shall make no representations or statements, either direct or indirect (in the form of oral or written statements) to anyone (including but not limited to prospective employers, existing or prospective clients or employees of, or to any representative or agent of the media) that disparages any Released Party, any employee, member or owner of Momentum and/or any Released Party's past, present, or future performance, operational condition, services or organizational capabilities. Acey further agrees not to induce, incite, or encourage others to make derogatory statements, either oral or written, or otherwise disparage the Released Parties and/or Momentum and its subsidiaries, affiliates, divisions, predecessors, successors, subrogees, assigns and/or related companies, including but not limited to, Momentum or any of their services.

Section 12.    **Neutral Reference.** In response to any inquiry from a prospective employer which is directed to Momentum regarding Acey's employment or separation therefrom, shall provide the following information only:  Dates of Employment; Last Position; and, if requested, Final Rate of Pay.

Section 13.    **Return of Property**. Acey represents and acknowledges that Acey has returned all Momentum's property, including all documents, data, equipment, reports, employee information, notes, and materials held or used by her, that is or was related to her employment, to Momentum and that Momentum has returned all of Acey's personal property to Acey.

Section 14.    **Confidentiality**. Acey agrees that, except as may be required under compulsion of law, the terms of this Agreement and the contents of this Agreement are to be kept completely confidential. Acey agrees that Acey has not revealed and will not reveal such terms to any person other than a spouse, legal counsel or accountant, management, insurance agency, or any appropriate taxing authorities. Acey further expressly agrees that Acey will not disclose to any person, or use or convey directly or indirectly, any confidential or proprietary information of

Section 15.    **Compensation, Costs, Expenses, and Fees**. The payments and other consideration specified in Section 3 include full and complete compensation for any and all of Acey's counsel or other fees, expenses, and costs incurred in connection with any claim Acey might possibly have against the Released Parties, and Acey expressly agrees that the Released Parties are not responsible for any additional payment to Acey or any of Acey's agents or counsel beyond the settlement proceeds set forth herein. Acey further acknowledges that Momentum owes Acey no compensation of any manner relating to Acey's employment and separation therefrom other than the payments promised in this Agreement should Acey execute and not revoke the Agreement.

Section 16.    **Governing Law; Jurisdiction**. Each Party agrees that this Agreement will be governed by the laws of the Commonwealth of Pennsylvania. If any term, condition, clause, or provision of this Agreement shall be determined by a court of competent jurisdiction to be void or invalid at law, or for any other reason, then only that term, condition, clause, or provision as is determined to be void or invalid shall be stricken from this Agreement, and this Agreement shall remain in full force and effect in all other respects. Each Party agrees that, in the event of any dispute arising under this Agreement, each Party consents to the exclusive jurisdiction and venue of the courts of the Commonwealth of Pennsylvania or any federal district court within the Commonwealth of Pennsylvania as to any litigation or dispute that arises from or relates to this Agreement or any breach thereof.

Section 17.    **Headings**. The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

Section 18.    **Entire Agreement**. This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements (oral and written) and all other prior negotiations. This Agreement may only be modified, altered, amended, or supplemented by an agreement in writing signed by the Parties.

Section 19.    **Counterparts**. This Agreement and any amendments, waivers, consents or supplements hereto or in connection herewith may be executed in any number of counterparts and by different Parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument. Delivery by telecopier or electronic mail of an executed counterpart of a signature page to this Agreement shall be effective as delivery of an original executed counterpart hereof.

Section 20.    **Rule of Interpretation; Survival**. The provisions of this Agreement shall be interpreted in a reasonable manner to affect the intent of the Parties hereto. None of the Parties hereto shall have any term or provision construed against such Party solely by reason of

such Party having drafted the same. The provisions of this Agreement are several and, if any part is found to be unenforceable, the other portion shall remain fully valid and enforceable. The unmodified portions of Agreement shall survive the termination or modification of any provisions contained herein.

Section 21.    **Reservation of Rights**. Nothing herein shall be deemed an admission of any kind. If the transactions contemplated herein are not consummated or this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

Section 22.    **Representation by Counsel**. Each Party acknowledges that it has had the opportunity to be represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

Section 23.    **Medicare Representation**. Acey acknowledges that Momentum may have a legal obligation to report the terms of this Agreement to the federal government pursuant to Section 111 of the Medicare, Medicaid and SCHIP Extension Act of 2007 (P.L. 110-173) ("MMSEA") which, in part, amended the Medicare Secondary Payer statute at 42 U.S.C. § 1395y(b)(7) and (8). The following provisions of this Agreement relate to compliance with MMSEA.

    a.  "CMS" means the Centers for Medicare & Medicaid Services within the U.S. Department of Health and Human Services, including any agents, representatives, or contractors of CMS, such as the Coordination of Benefits Department of Health and Human Services, including any agents, representatives, or contractors of CMS, such as the Coordination of Benefits Contractor ("COBC") or Medicare Secondary Payer Recovery Contractor ("MSPRC").

    b.  "Conditional Payments" shall have the meaning ascribed to it under the MSP Statute and implementing regulations.

    c.  "MMSEA" means the Medicare, Medicaid, and SCHIP Extension Act of 2007 (P.L. 110-173), which, in part, amended the Medicare Secondary Payer statute at 42 U.S.C. § 1395y(b)(7) and (8). This portion of MMSEA is referred to herein as "Section 111 of MMSEA".

    d.  "MSP Statute" means the Medicare Secondary Payer ("MSP") statute. 42 U.S.C. § 1395y(b).

    e.  "Released Matter" means any claims that are released herein.

6

f.  "Releasees" means Momentum, its past, present and future officers, directors, employees, parent companies, subsidiaries, divisions, affiliates, insurers, and attorneys; and its respective predecessors, successors, and assigns.

g.  Acey represents that Acey is not enrolled in the Medicare program, was not enrolled in the Medicare program at the time of the Released Matters, or anytime thereafter through the date of this Agreement, and has not received Medicare benefits for medical services or items related to, arising from, or in connection with the Released Matters.

h.  Acey represents and warrants that Acey has not received any medical services or items related to, arising from, or in connection with the Released Matters.

i.  Acey represents and warrants that no Medicaid payments have been made to or on behalf of Acey and that no liens, claims, demands, subrogated interests, or causes of action of any nature or character exist or have been asserted arising from or related to any Released Matters.

j.  Acey further agrees that Acey, and not the Released Parties, shall be responsible for satisfying all such liens, claims, demands, subrogated interests, or causes of action that may exist or have been asserted or that may in the future exist or be asserted.

k.  To the extent that Acey's representations and warranties related to Acey's Medicare status and receipt of medical services and items related to the Released Matters are inaccurate, not current, or misleading, Acey agrees to indemnify and hold harmless the Released Parties from any and all claims, demands, liens, subrogated interests, and causes of action of any nature or character that have been or may in the future be asserted by Medicare and/or persons or entities acting on behalf of Medicare, or any other person or entity, arising from or related to this Agreement, the payments provided for in this Agreement, any Conditional Payments made by Medicare, or any medical expenses or payments arising from or related to any Released Matters that are subject to this Agreement or the release set forth herein, including but not limited to: (a) all claims and demands for reimbursement of Conditional Payments or for damages or double damages based upon any failure to reimburse Medicare for Conditional Payments; (b) all claims and demands for penalties based upon any failure to report, late reporting, or other noncompliance with or violation of Section 111 of MMSEA that is based in whole or in part upon late, inaccurate, or inadequate information provided to Released Parties by Acey; and (c) all Medicaid liens. This indemnification obligation includes all damages, double damages, fines, penalties, attorneys' fees, costs, interest, expenses, and judgments incurred by or on behalf of the Released Parties in connection with such claims, demands, subrogated interests, or causes of action. Regardless of the accuracy of the representations and warranties made above, Acey agrees to indemnify and hold Releasees

harmless for taxes on the payments made to Acey and any tax consequences related thereto, except those prohibited by law.

l.   It is understood and agreed that Releasees expressly rely upon the promises, representations, and warranties made by Acey in this Agreement and that any breach of such promises, representations, and warranties would constitute a material breach of this Agreement; and that in the event of any such breach, Releasees shall be entitled to any and all of the following relief:  (a) the immediate repayment to Releasees of the full Settlement Amount hereunder; (b) the indemnification and hold harmless protection set forth in Paragraph l above; (c) specific enforcement of all promises and undertakings made by Acey hereunder; and (d) all other relief and damages available at law or in equity.

Section 24.   **No Waiver**. The failure of any Party hereto to exercise any right, power or remedy provided under this Agreement or otherwise available in respect hereof at law or in equity or to insist upon compliance by any other Party hereto with its obligations hereunder and any custom or practice of the Parties at variance with the terms hereof, shall not constitute a waiver by such Party of its right to exercise any such right, power or remedy or to demand such compliance.

Section 25.   **Accord and Satisfaction**. Acey agrees that the foregoing shall constitute an accord and satisfaction and a full and complete settlement of Acey's claims and shall constitute the entire amount of monetary consideration to be provided to Acey, pursuant to this Agreement. Acey agrees that Acey will not seek further compensation for any other claimed damages, costs, or attorneys' fees in connection with the matters encompassed in this Agreement.

IN WITNESS THEREOF, ASSATA ACEY has executed and delivered this Agreement on her own behalf, and MOMENTUM DYNAMICS CORPORATION has caused this Agreement to be executed and delivered by its duly authorized officer.

**ASSATA ACEY**                          **MOMENTUM DYNAMICS CORPORATION**

_____          _____

DATED: _____            BY: _____

                                         DATED: _____

8

# EXH. A

 **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

Philadelphia District Office
801 Market St, Suite 1000
Philadelphia, PA 19107
(267) 589-9700
Website: www.eeoc.gov

## DISMISSAL AND NOTICE OF RIGHTS
### (This Notice replaces EEOC FORMS 161 & 161-A)

Issued On: 12/16/2022

**To:** Assata Acey
5121 Brown Street
Philadelphia, PA 19139

Charge No: 17F-2022-61016

EEOC Representative and email:   Legal Unit
(267) 589-9707

---

### DISMISSAL OF CHARGE

The EEOC has granted your request for a Notice of Right to Sue, and more than 180 days have passed since the filing of this charge.

The EEOC is terminating its processing of this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

**PRIVATE SUIT RIGHTS   --   Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than <u>2 years (3 years)</u> before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit <u>before 7/1/10</u> -- *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice <u>and</u> within the 2- or 3-year EPA back pay recovery period.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission,

Digitally Signed By: Karen McDonough
12/16/2022
_____

Karen McDonough
Deputy District Director

**Cc:**
May Mon  Post
436 Walnut St WA01A
Philadelphia, PA 19106

Judy Talis
Momentum Dynamics
3 PENNSYLVANIA AVENUE
MALVERN, PA 19355

Marisa  Barreras
436 Walnut St WA01A
Philadelphia, PA 19106

Please retain this notice for your records.