UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ASSATA ACEY,** | : | |
| | : | CIVIL ACTION |
| *Plaintiff* | : | |
| v. | : | |
| | : | |
| | : | |
| **INDUCTEV,** | : | |
| | : | |
| *Defendant.* | : | |
| | : | |
| | : | No. 2:23-01438-GEKP |

**Brief in Support of Doc 15 (Response to Defendant's Motion to Dismiss)**

I, am requesting the courts consideration of certain documents rendered by the defense in their partial pre-discovery production, as I believe that these documents significantly support counts in my complaint.

### Background

1. On May 25, 2023, I accepted the defense's request to exchange pre-discovery on June 5, (Ex. 1 (Letter to the Court, p. 1 paragraph 3), Ex. 2 (p.3, lower half of page).

2. On June 7, 2023, I contacted defense because their production appeared incomplete; noting it absent of Microsoft Teams (instant messaging) communications that I believed to exist, and that part 3 (2)(a) (ii) of the pre-discovery protocol required them to produce "all communications between hr, management and supervisors concerning factual allegations/claims" (Ex. 3, p. 3, bottom half of page).

3. On June 8, 2023, I requested an update from the defense, whether they intended to assert such documents as privileged, aver that they did not exist, or an estimate timeline for when they could be rendered (Ex. 3, p.2).

4. Defense was able to confirm the existence of qualifying Teams messaging and has provided an estimate update on June 14, 2023, to produce these documents (Ex. 3 (p.1, final paragraph).

5. As with the Answer deadline, defense has expressed lack of knowledge (via not knowing of company use of Teams messaging) as the reason for missing a deadline (this time for complete pre-discovery production), despite explicit mention of Teams messaging in my complaint, state and (semi-identical) federal production requests (Ex. 3( p.1, Third-to-last Paragraph), ECF No 8-1 (¶41 and ¶259), ECF No. 1-3(pp. 7-8), ECF No. 19 (p.1)).

6. Defense has expressed as of 5:23pm, that they will not be able to provide the missing documents due to technical difficulties, with a renewed promise to deliver "by Friday" (Ex. 3 (p. 1, ¶1)).

7. In the interest of timing for motions pending, this brief is written without consideration of awaited Teams messages, or the discovery request that Defense plans to answer at the "end of the month" (Ex.3, (p.1, last paragraph)).

8. Motion-relevant documents produced by the defense include:
    - Interview evaluations by former manager Joren Wendschuh, Engineering Supervisor Ben Cohen, and former Chief Administrative Officer Judy Talis (Ex. 4-6).
    - Email Correspondence Between Judy Talis and Former CEO Andy Daga (Ex. 7).
    - Two halves of one Email thread between Joren Wendschuh, Ben Cohen and Judy Talis regarding promotions for product introduction team members Omar Jackson(black) and S. Wolgemuth(white) (Ex. 8-9).

9. To evaluate me for hiring, InductEV used interview evaluation forms for interviewers to individually rate interviewees fit on a 1-5 scale for 3 competencies (technical, skills and culture), and explain each rating, in addition to calculating an overall score (Ex. 4 pp.1-2).

10. These evaluations were confidential, viewed only by HR when deciding to make offers to candidates.

11. After the 4th round of screening for the Senior Technician role (Zoom interview on 4/27/2021), Wendschuh gave me two higher marks (4 and 5) but also gave me a lower score (2) in the skill section (Ex.4 (p. 1, bottom of page)).

12. On the form, Wendschuh gave the following explanation for the lower rating:

    "I think Assata is a bit of a unique person for this role, and I would look to more as a technician ("title") coming on board, unless Omar & Seth are Sr's. Brings a unique "science and engineering" background and knowledge to the job - would expect to be doing some borderline engineering work, while learning some of the "Sr" tech side of things at least in our niche" (Ex.4, Bottom of p. 1)

13. After the 5th round of screening for the Senior Technician Role (Onsite interview 05/14/2021), in the overall fit section of his evaluation, Ben Cohen wrote:

"I would want to hear from the team on how she did with technician tasks, but I think she would be an asset to the Product Introduction team. Her long term goals are to be a "patent scientist" which I believe means that she enjoys solving problems in unique ways that can lead to patents. I think we should also run her resume past Frank McMahon for his team if Product Introduction decides to continue looking" (Ex. 5, Bottom of p.2).

14. After the 5th round of screening for the Senior Technician Role (Onsite interview 05/14/2021), in the culture fit section of her evaluation, Judy Talis wrote (highlighted for emphasis):

"Candidate has a very innovative take on her work. She has always looked beyond the task and thinks out of the box. ==It is in her nature.== She gave several examples of schooling where she would be given an assignment and she would complete it but then go beyond that initial assignment and look at it from different angles. ==She thinks MD is somewhere that can be valued.== Having said that ==she understands the need to do her job as asked as well"== (Ex.6 , (p.1, part 1)).

15. After my hiring, I joined my team to help interview three additional candidates for the role of senior technician.

16. After my teammates and I failed to reach consensus over who to hire, and before the promotion of O. Jackson and S. Wolgemuth, both my manager and the manufacturing manager (Mark Smith) deferred from giving a direct recommendation to Hr.

## Legal Argument

17. Wendschuh's skill section in his 04/28/21 evaluation suggests an intent to set employment conditions beyond the scope of my formal title because it uses numbering and words to:

   a) Aggressively reduce my overall fitness score for the Senior Role.

   b) Verbally suggest that I should not be hired at the level of senior technician.

   c) Imply that I could still be hired (and thereby compensated) under the "'title'" of a regular technician.

   d) Confirm an intent to have me complete "borderline engineering work" within the team.

18. J. Wendschuh's expression places foresight to the collection of beyond-scope jobs tasks that were initially introduced to me as incidental; even with the best intentions, any attempt to toe a border is likely to result in that line being crossed.

19. It is likely that the product introduction department did not have approval to hire an engineer to its team because, at the time, Senior Technician was their highest advertised role.

20. A reasonable person can understand a manager's desire to secure resources for their team, in spite of administrative barriers and especially when they can maintain diplomacy towards current team members.

21. Regardless, tasks and inherent liabilities of trailing and codifying repair procedure, emergency stop circuit (test environment safety) design, and laser classification (used to assign Administrative Controls and PPE leveling)—in the context of InductEV's principal, senior and regular engineering tiers, these tasks were reasonably beyond the scope of senior technicians, much less a regular technician (Ex. 10-13).

22. While my job tasks were within his direct control, and despite his reasonings, Wendschuh was not the key decision maker in defining my formal title, responsibilities, and terms of employment.

23. Wendschuh's scope of power is underscored by upper management; his evaluation advocated that Jackson and S. Wolgemuth should be considered for the Senior technician role before me, implicitly recommending them, but the team continued, under the direction of the HR team, to evaluate three additional candidates for the title.

24. It took 4 months after Wendschuh's initial recommendation for HR and upper management to give their critical approval to promote those team members (email/document dates on Ex. 4,8 and 9).

25. It is my position that my manager's disclosed intent to have me perform duties that the company would classify as "borderline engineering" while receiving formal designation of technician—this was approved and enabled by upper management due to the racial bias of the critical decision makers (and biological siblings), Ben Cohen and Judy Talis.

26. Judy Talis' racial bias is demonstrated in my complaint where she listened to my experiences of racial harassment, discussed them in detail with my manager (including date and time), and created a narrative over email that I had not provided specific complaints.

27. Her bias is also demonstrated in her interview evaluation: establishing a difference and hierarchy between engineering and technician tasks by positing them as a foundation, she also expresses her presumptuous assessment that I would not be interested in other roles at the company:

    "Assata is an out of box thinker. I of course addressed the fact that she has an engineering degree and did she see this technician role as a way to get into the company. She feels the technician role is fundamental to engineering. The lines can be blurry for an entry level engineering and the hands on components will make her a better engineer. She enjoys the job. She would eventually like to work on the R&D side as well and I would want to make sure she has a path forward, but she is not in a rush to get to the next step. She truly sees this as part of her journey. She would be wasted as a junior technician just doing cables…" (Ex. 6 (p.2, Overall fit-Section 4)).

28. Talis' assessment of my lack of interest to other roles stands in stark comparison to the internal record (used to process my candidature), which shows my having applied to their electrical engineering role prior to interviewing for the senior tech role (Ex. 20 (p.3, middle of page)).

29. Talis' assumption that I would be correctly and harmoniously placed in a role which she considers to be junior to engineering contrasts my qualifications (at the time of interview, I was already working with a prior employer as an engineer) because it was rooted in racial bias demonstrated in the classification of Omar Jackson.

30. During Talis' tenure over the HR department and in line with her bias, black employee Omar Jackson (resigned 10/2022) was deemed to be correctly and harmoniously placed as a regular technician--in spite of his conspicuous overqualification, at the time of his hire and, throughout the majority of the company's search for a product introduction senior technician.

31. Hiring bias towards Omar Jackson is also Ben Cohen's demonstration of implicit racial bias.

32. When discussing the promotion of the two employees, Wendschuh acknowledges Jackson's qualifications, but argues that an informal disqualification, his being "out of the market for a number of years", was reason for his initial classification as a regular technician (Ex. 7 (p.2, final paragraph)).

33. While Wendschuh describes this in a narrative sense, Ben Cohen "agrees" to Wendschuh's statement of things ("I think Wendschuh states this well" (Ex. 10 (p.2, middle of page)) without any corrections to the presented narrative.

34. Through his supervisory position in Jackson's hire, and his assent to the reasoning of Jackson's title, it is presumable that Cohen was a leader and approver in Jackson's initial classification.

35. The reasoning of Jackson's classification, the dates of Wendschuh's mention of the classification on 4/28/2021, and the date of written agreement from Cohen on 09/02/2021 –these details convey that it took 2 years for management to be satisfied that Jackson's performance was more aligned to his major experience instead of his years old break from the industry.

36. The decision, and the time it took to satisfy being out of the market is glaringly disproportionate when noting:

    a) Omar Jackson's "out of market" gap *May 2014- Jan 2018 was spent in supervising and head coach roles for youth sports programs (Ex. 14, p.1).

    b) Before the gap, he worked as a supervisor for 19 years; after the gap (and before his 2-year "demonstration" with InductEV) Jackson spent 18 months re-entering the market via his consecutive roles of assembler and Opto-Technician (Ex. 14, p.1).

    c) The formal education and experience requirements for the Senior Technician role were: Associates degree, completion of electronic technology certification, or equivalent technical experience AND 8+ years' experience in a test environment (ECF No. 15-61, p.2).

37. When all factors are considered, the standards placed on this Black job candidate- as relayed by Wendschuh and confirmed by Cohen-- to prove that candidate's fitness for a role for which he formally qualified, appear unreasonably great.

38. Contrastingly, when discussing S. Wolgemuth for the same position, in the same email, there is no mention of his being promoted without meeting the formal requirements, his growth and knowledge are acknowledged along with the statement that "he has certainly earned his spot" (ECF No 8-1 (153-154), Ex.9 (p.3), Ex. 15).

39. If S. Wohlgemuth's potential was clear in spite of not meeting objective formal requirements, and Jackson's potential was obscured without proportionate cause, then the racial distinction between the two must be considered.

40. It is a prima facie case of racial bias, where a formally qualified candidate faces a higher level of scrutiny than a formally unqualified candidate for the same role, where the candidates differ in race.

41. As Wendschuh's direct supervisor, Ben Cohen had access to updates about my job tasks, even receiving one early on from a material consultation I did for the former electrical engineering manager (Ex. 17).

42. As the head of HR, Judy Talis was also privy to job tasks, and had access to the intent communicated in Wendschuh's interview evaluation as well as confirmation of tasks completed in my performance evaluation.

43. Alternatively, when former CEO Andy Daga expressed interest "in my rising rapidly" and "help [the company] to invent", Talis makes the false contention of my "know[ing] that [ending up in another group] will depend on the job [I] do…" (Ex 7 (p. 1, bottom of page)).

44. Unironically, and within the expectations of the bias outlined in this motion, after my positive performance review had been discussed by management, when 4 white employees of varying experience and tenure were promoted or reclassified within 4 months of each other, upper management did not reclassify me (Ex.16, ECF No 8-1 (p. 15, ¶82-83)).

45. Most employable persons have or would take a lower ranking role if it were the only role available to secure needs such as healthcare or paid time off; nevertheless, a reasonable person would not expect someone to take on a lower role with the expectation of doing higher level work.

46. Throughout the duration of my employment, and until I became ill, I was gaslit into regularly contributing work beyond the reasonable scope of responsibility, in addition to technician duties and without the benefits of informed negotiation or adequate classification--simply because upper management's ethical duties were obscured by bias.

47. Furthermore, racial bias, even where intentional or negligent, is inclusive of benevolent racism; racial bias does not require direct contempt, rather it is sufficient to approve or prescribe different standards of treatment on the basis of race, knowingly or recklessly.

48. Because of the racial bias of Ben Cohen and Judy Talis, knowledge of the disconnect between my job tasks and title, as well as the ability to predict that outcome, was recklessly ignored and overlooked at best, and purposefully enabled at worst.

49. The documents and supporting arguments of this motion directly support counts xx and xx of my complaint where I averred xx intentional racial discrimination and discriminatory terms and conditions of employment in violation of state and federal laws.

50. Furthermore, defense's partial pre-discovery also held documents that support my averment of having made final agreement with InductEV:

    a) At 7:36 AM on 09/23/2022, Patti Rensel, former successive head of HR (whose name is on the sheriff service affidavit; whose exit period began days after my filing for Summary Judgment), was unclear regarding the time and certainty of my resignation (Ex.18).

    b) At 3:04PM 09/26/2022, May Mon Post (former InductEV counsel) sent her drafted settlement agreement to our session mediators, and later at 3:37 and 4:07 PM emailed to "confirm" all terms as agreed to during mediation; the mediators chose not to reply, leaving her message without confirmation (Ex.19).

51. As a key witness to mediation (Patti Rensel, Alexa Heisler and May Mon Post were the only attendees on the defense-side), the timing of Rensel's uncertainty is significant because it had only been four days after mediation; details of mediation should have still been fresh in her mind, there was still 10 hours before the alleged resignation deadline, and 12 hours before I confronted the defense (ECF No 10-5(p. 2 (top pf page), p. 4(bottom half of page)).

52. If both parties had truly finalized resignation and settlement terms, Rensel's questioning of "IF' they would receive a letter from me, when coupled with her subordinate's reply ("If she resigns today-Sunday, she will receive her final pay check on 09/30. If she resigns 09/26 – 10/09, she'll receive her final pay check on 10/14"), would seem out of place (Ex.18).

53. Regarding attorney Post's emails, it is not only that the mediators withheld confirmation of her "record" of events, but -as with Rensel- the timing of her emails is poignant to my case.

54. Had settlement truly occurred, a reasonable person, especially counsel, would be expected to secure such an agreement in writing at the time of formation; naturally an attempt to confirm details of a critical, unwritten, settlement would occur immediately or maybe a day after the meeting instead of one week later, when the chances of favorable settlement appear dwindled.

55. As the Defendant's then-chose representative, Post's election during mediation (of not having the mediators complete a timely session record) is in line with her choice to send them a copy of a settlement agreement one hour before prompting me for a resignation letter and nearly 24 hours before I received any written offer of settlement (ECF No 10-5 (pp. 2, 5, bottom halves of both pages)); all details point to an

      intentional misrepresentation of mediation , impressions of mediation in attempt to corner me and indemnify InductEV from past and future harm caused.

56. It is my prayer that these new documents, supplementary documents, and their supporting arguments be considered by the court in all pending decisions.

57. The requests of my complaint responses, and motions remain the same.

                                                Sincerely,

                                                /s/ Assata Acey

                                                Assata Acey (Pro Se)

                                                5121 Brown St,

                                                Philadelphia, PA 19139

                                                aceyassata@gmail.com

                                                770-231-1017

Date: 06/16/2023

**Original Exhibit Names**

1. Exhibit 1 06-03-2023 Letter to the Judge
2. Exhibit 2 Defense Request Agreement on Extension of Time
3. Exhibit 3 Estimate Date for Additional Documents
4. Exhibit 4 04-28-2021 Joren Wendschuh Interview Eval -INDUCTEV INITDISCL000140
5. Exhibit 5 05-14-2021 Ben Cohen Interview Eva I -INDUCTEV INITDISCL000l 52
6. Exhibit 6 04-28-2021 Judy Talis Interview Eval INDUCTEV INITDISCL000144
7. Exhibit 7 05-22-2021 Judy and CEO approval Email- INDUCTEV INITDISCL000242
8. Exhibit 8 09-07-2021 Upper Management Promotion Discussion Jackson INDUCTEV INITDISCL000313
9. Exhibit 9 09-07-2021 Upper Management Promotion Discussion Wolgemuth INDUCTEV INITDISCL000403
10. Exhibit 10 02-24-2022 Defect Correction Procedure
11. Exhibit 11 01-10-2022 Laser Classification Calculation-R&D
12. Exhibit 12 02-16-2022 ANSI Laser PPE and Administrative Controls Determinations-PM
13. Exhibit 13 11-12-2021 Multi-Switch Emergency Stopcircuit Final Board Schematic-R&D
14. Exhibit 14 Omar Jackson Indeed Resume
15. Exhibit 15 S Wolgemuth Indeed Resume
16. Exhibit 16 02-06-2022 Signed Performance Review
17. Exhibit 17 09-24-2021 Cost-Tiered Primer Surface Energy Consult-PM
18. Exhibit 18 09-23-2022 Resignation Date Discussed INDUCTEV INITDISCL000066
19. Exhibit 19 09-26-2022 May Mon Post Email Confirmation INITDISCL000447
20. Exhibit 20 04-11-2021 Employee Application -INDUCTEV INITDISCL000l 36

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ASSATA ACEY, | : | |
| | : | CIVIL ACTION |
| *Plaintiff* | : | |
| v. | : | |
| | : | |
| | : | |
| INDUCTEV, | : | |
| | : | |
| *Defendant.* | : | |
| | : | |
| | : | No. 2:23-1438 |

**<u>Verification of Service</u>**

Letter is to confirm that:

I submitted my Brief in support of Doc 15 through the Pro Se EDS (Electronic Documents Submission) on 06/16/2023 at 9:57 AM. This was subsequently filed by court staff via entry onto the ECF (Electronic Case Filing) system, at which time service of Defendant was made complete through ECF's Notice of Electronic Filing.

Sincerely,

/s/ Assata Acey

Assata Acey (Pro Se)

5121 Brown St,

Philadelphia, PA 19139

aceyassata@gmail.com

770-231-1017

Date: 06/16/2023

# United States District Court, EDPA Electronic Document System (EDS)

This system is provided for your convenience. Please review the EDS portion of the Court's website prior to using EDS. To file using EDS, you will need to complete this form to the best of your ability and upload your documents in the box below. A technical failure with EDS will not constitute an excuse for missing a filing deadline. In the event of a technical failure of EDS, users must submit documents by one of the other filing methods provided for self-represented litigants: by mail; by placing them in the dropbox in the courthouse lobbies which are available 24 hours per day; or delivering them in person at the Clerk's Office during the hours the courthouses are open to the public. If you successfully file using EDS, you should not mail or deliver additional copies of your filing to the Clerk's Office. PLEASE ALLOW THE UPLOAD TO FINISH. DO NOT CLOSE THIS PAGE UNTIL THE UPLOAD IS COMPLETE. ALL DOCUMENT SECURITY PROTECTIONS MUST BE REMOVED BEFORE UPLOADING FILES.

**Upload files** *



- Breif in Support of Doc 15.pdf — 278.9 KB
- Exhibit 1 06-03-2023 Letter to the Judge.pdf — 210.1 KB
- Exhibit 2 Defense Request Agreement on Extension of Time.pdf — 178.2 KB
- Exhibit 3 Estimate Date for Additional Documents.pdf — 222.2 KB
- Exhibit 4 04-28-2021 Joren Wendschuh Interview Eval -INDUCTEV INITDISCL000140.p… — 859.9 KB
- Exhibit 5 05-14-2021 Ben Cohen Interview Eval -INDUCTEV INITDISCL000152.pdf

Add another file

**Name:** *

Type your name as it appears on your documents.

Assata Acey

Submit