# EXHIBIT 1

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2                    -    -    -
 3   ASSATA ACEY,          :   No. 2023-cv-01438
                           :
 4            Plaintiff,:
                           :
 5       v.                :
                           :
 6   INDUCTEV,             :
                           :
 7            Defendant.:
 8                    -    -    -
 9                 April 11, 2024
10                    -    -    -
11            Oral deposition of ASSATA
12        ACEY, taken pursuant to Notice,
13        held at Fox Rothschild, 747
14        Constitution Drive, Suite 100,
15        Exton, Pennsylvania 19341,
16        beginning at approximately 9:10
17        a.m., before Mary Hammond, a
18        Registered Professional Reporter
19        and Notary Public in the state of
20        Pennsylvania.
21
22
23        Job No. CS6582623
24
```

Page 45

1   you try and direct your answers, as best you

2   can, directly to the question I'm asking you.

3        A.   Yes.

4        Q.   At what point in your employment at

5   InductEV did you determine that you felt you

6   had a claim that you could submit to the

7   Courts with respect to discrimination or

8   harassment on the basis of your gender or

9   race, at what point?

10            Not each incident, or what's the

11   first thing that happened that made you think

12   maybe you would, but at what point did you

13   determine that, "I'm" -- "I'm getting

14   discriminated against or harassed here on the

15   basis of my race or gender, and I think I

16   have a claim with the Courts"?

17       A.   Okay.  So I think that's a

18   different question.  I'm going to take a

19   minute to process that.

20            At what point did I think I had an

21   actionable claim on gender or race?

22            I didn't think I had an actionable

23   claim until maybe -- when was that -- oh, my

24   goodness, this is tricky.  When did I

Page 46

1   think...

2           It would have to be maybe the first

3   time that I thought Judy was just blatantly

4   not following protocol.  That would probably

5   be -- the phone incident, yeah.  So I -- I

6   had my phone broken.  But that's not race, is

7   it, completely.  Based on -- I felt like the

8   phone incident was too mirky, but that was

9   the first time I considered having an

10  actionable claim against the company.

11  Period.

12          The first time I thought I had --

13      Q.   Well, I'm asking you for an

14  actionable claim under Title 7.

15      A.   Yes.

16      Q.   I don't care if you think that

17  somehow they didn't get paid when they

18  should, or whatever --

19      A.   Right.

20      Q.   -- with regard to the phone.

21          I'm asking you:  At what point, you

22  know, did you wake up in the morning and go,

23  "I think I'm getting discriminated against or

24  harassed at work, and I think I have a claim

Page 47

1    that I could go to Court with, if I chose to
2    do so" --
3         A.   Okay.
4         Q.   -- based upon race or gender?
5         A.   Attorney Schauer, I think you've
6    interrupted my answers quite a few times
7    already.
8              Is that something that you intend
9    on doing?
10        Q.   I will if I need -- well, I
11   apologize if I do so, but --
12        A.   So you're okay with doing that.
13        Q.   I have seven hours.  I have seven
14   hours, and I want to get this deposition
15   completed in that time.
16        A.   Okay.
17        Q.   And I apologize if we do that.  I
18   apologize ahead, but...
19             So my question is:  It's roughly a
20   date, a month, or a day, at which point you
21   decided, or woke up in the morning, as an
22   example, and said -- or were at work and
23   said, "I'm being discriminated against or
24   harassed here, based on my race or gender,

Page 48

1   and I have a claim under the" -- "Title 7

2   under the law"?

3        A.   Okay.  Yeah.

4             I didn't really look at the claims

5   in a legal sense for race or gender until

6   maybe, like, April -- somewhere between

7   April 25th and May 4th.

8        Q.   And if it's fair, what, if

9   anything, happened between May 25th [sic] and

10  May 4th that caused you or was the final

11  straw, if you will, that caused you to

12  determine that you may have a claim for race

13  or gender discrimination or harassment under

14  Title 7 against InductEV?

15       A.   I'm trying to follow your words.

16            Okay.  So what happened that made

17  me think to file.

18       Q.   What happened between April 5th and

19  May 4th?

20       A.   Yes.  I have to repeat it because

21  when you're talking, I'm listening to your

22  volume and looking at your face, and, so, I

23  have to remember the words.  And every time

24  you re-start, I lose my train of thought, so

Page 49

1  I'm trying to get the answer as specifically

2  as you requested it in respect to your time.

3          So what happened that made me think

4  at that point that I -- that I needed to

5  sue -- that I had the right to sue under

6  those claims.

7          Judy Talis -- there -- there was a

8  dispute.  Judy Talis called me while I was

9  home, basically telling me that the evidence

10 that I had, disability was not enough, and

11 that she needed to take out PTO to make up

12 for my time off of work.

13     Q.   And you believe she did that

14 because of your race or gender or both?

15     A.   I believe that she did that because

16 of race and gender, possibly also disability,

17 since it related to disability more

18 specifically.

19     Q.   Well, briefly -- and we'll get into

20 this in more detail later, but I -- I take

21 that you did not want to have to utilize PTO

22 at the time that Ms. Talis told you you had

23 to?

24     A.   That's correct.

Page 71

 1              for identification.)

 2                     -   -   -

 3   BY MR. SCHAUER:

 4        Q.   I will show you what we've marked

 5   as Exhibit AA-6.  I'll ask you to take a

 6   moment, review that exhibit.  After you've

 7   had an opportunity to review it, I -- my

 8   question to you will be:  Does this or is

 9   this the job description for the senior

10   technician position that you applied for?

11        A.   (Witness reviews document.)

12             No.

13        Q.   Okay.  Did you receive or have in

14   your possession at the time you interviewed

15   for your position at InductEV a copy of a job

16   description?

17        A.   Yes.

18        Q.   And do you think -- and this one's

19   different?

20        A.   The one I had says, I believe, six

21   to eight years experience in a test

22   environment.  This one says, "8+."

23             I mean, everything else, I would

24   assume, is identical.

Page 72

```
 1        Q.    Well, take a moment and look at it.
 2        A.    (Witness complies.)
 3              I mean, the front is the same.
 4   Everything else looks identical.
 5        Q.    You mentioned that there -- you --
 6   you recall that there was a different -- your
 7   requirement in the -- the job description
 8   that you had seen?
 9        A.    Right.  I mean, I could be wrong.
10   I can't verify it.
11        Q.    I'm not -- I'm not trying to trick
12   you.
13              I'm asking:  Do you have a
14   different recollection of the job requirement
15   that was on the job description you reviewed
16   when you were applying for the job of senior
17   tech?
18        A.    Right.  Asked and answered.  Yes.
19   Six to eight on the experience.
20        Q.    Thank you.
21              Sometimes I miss things thinking
22   about the next question, so I apologize if I
23   repeat a question, or go over ground that was
24   covered.
```

Page 100

```
 1   too, that you're going, "Here's what they
 2   did, here's what they knew.  Here's what I
 3   thought should happen.  I can't think of any
 4   explanation other than race and gender"?
 5               I'm trying to understand your
 6   claim.
 7        A.   Right.  So the problem is -- they
 8   had a similar situation.  I was told when I
 9   got hired, that I couldn't be given the
10   senior tech role because I didn't have enough
11   years experience, right.
12        Q.   Okay.
13        A.   Okay.  That's their rule.  That's
14   their policy.  But, then, when they promoted
15   Seth and Omar, Omar had more than 20 years
16   experience, and since the job descriptions
17   are the same he was supposed to be hired with
18   that designation.
19        Q.   We're talking about you.
20        A.   And they didn't -- and they
21   promoted him at the same time as Seth.  Seth
22   was white, and he did not fit the full
23   description.
24        Q.   Do you know if all --
```

Page 115

1    beyond the scope of the formal requirements.

2            No one ever told him those formal

3    requirements.  And it's -- it's fine.  It's

4    fine to not promote someone who fits the

5    formal requirements.  That's subjective.

6            My problem is that they denied him

7    on the basis of experience.  They denied me

8    on the basis of experience.

9            We are black, and they allowed Seth

10   to be promoted, and he deserved it, but he

11   didn't fit the formal requirements, and they

12   were willing to break the formal requirements

13   for a white man, but not for me and not for

14   Omar.  And Omar deserved it more.

15       Q.   At the time of Mr. Jackson's

16   promotion, had he been in the eng- -- the

17   field for six to eight years after the break?

18       A.   Not after the break, no.

19       Q.   Correct.

20            And I think you -- the

21   understanding you had was he didn't come in

22   as a senior technician because of the break

23   in his service of some five or six years,

24   correct, isn't that your understanding?

Page 116

1          A.    Yes.

2          Q.    And that's what you feel was

3    unfair, right?

4          A.    Absolutely.

5          Q.    Okay.  And you weren't there for

6    his interview or anything like that, were

7    you, when he was hired, right?

8          A.    No.

9          Q.    Okay.

10         A.    I got to put these back on because

11   I can't really see without them, but...

12         Q.    Is it fair to say that pretty much

13   the focus of your claims of improper

14   treatment because of your race and gender

15   center upon Judy Talis?

16         A.    Judy Talis?

17         Q.    Yeah, sorry.

18         A.    It's okay.

19               Yes.  Most of them, yes.

20               Actually, I think the biggest legal

21   one is her, yes.

22         Q.    What's the biggest legal one?

23         A.    I mean, I experienced harassment,

24   but I think the only -- the biggest thing

1      Q.    And you've also recently filed a

2    Rule 54 Motion to -- I'm not sure what the

3    purpose of that is.

4      A.    Oh, okay, yeah.  Yes.

5      Q.    I'm not sure what the purpose is,

6    you know, but that also is a document that

7    contains emails, evidence ostensibly in

8    support of your claims, correct?

9      A.    Yes.

10      Q.    And you're saying there's still

11    more that you're sitting on?

12      A.    Yes.

13      Q.    Okay.  Do you have any idea what

14    those might be?

15      A.    They're probably mostly just emails

16    or text messages, either from Judy or Joren,

17    I think.  Yeah, I think so.

18      Q.    Do you have any emails that -- on

19    the face of the email, do you remember the

20    judge's decision or the judge said, you know,

21    that the plaintiff is citing interactions or

22    communications that are not -- you know, do

23    not racially reflect gender or racial animus,

24    do you remember that?

1      A.    (Witness complies.)

2                 MR. SCHAUER:  Okay.  Why don't

3           you take your bathroom break.

4                 THE WITNESS:  Thank you.

5                 MR. SCHAUER:  And, then, we'll

6           talk a little more about Exhibit

7           AA-11.

8                 We're off the record.

9                 THE WITNESS:  Okay.

10                THE VIDEOGRAPHER:  The time is

11          now 11:47 a.m.  We are going off

12          the video record.  This concludes

13          Media Unit Number 2.

14                      -   -   -

15                (Whereupon, there was a brief

16          recess held off the video record.)

17                      -   -   -

18                THE VIDEOGRAPHER:  Stand by.

19                The time is now 11:51 a.m.  We

20          are going back on the video record.

21          This will begin Media Unit

22          Number 3.

23   BY MR. SCHAUER:

24      Q.   Before the break, Ms. Acey, you

Page 131

1    were asked to mark the portions of

2    Exhibit AA-11 and AA-11-A, Judy Talis'

3    evaluation, from April 28th, 2021, that you

4    believe reflect racial or gender bias or

5    animus or the part of Ms. Talis relative to

6    you and your career at InductEV.

7              Is it -- do I fairly state what you

8    were asked to do?

9         A.    Yes.

10        Q.    And did you do that?

11        A.    Yes.

12        Q.    And are you satisfied that you have

13   fully done that?

14        A.    I believe so, yes.

15        Q.    You weren't -- you weren't rushed

16   or anything.

17              You had enough time to do that?

18        A.    Oh, I have, yes.

19        Q.    Okay.  So the first portion that

20   you wrote on is in Paragraph 1, a phrase near

21   the end.  At the first section it says, "her

22   job as asked as well."

23              Tell me how that reflects or

24   relates or reflects -- excuse me, reflects

Page 132

1  discriminatory animus on the part of

2  Ms. Talis towards you?

3       A.   Attorney Schauer, if I can clarify,

4  I actually meant to start, like, here

5  (witness indicating) with the word, "she."

6       Q.   Okay.  That's -- that's fine.

7            "She understands the needs to do

8  her job as asked as well."

9            Tell me how that reflects some kind

10 of gender or animus -- I'm going to -- I'm

11 going to -- I'll use a more general word,

12 improper animus on the part of Ms. Talis?

13      A.   Okay.  For me it -- it connects

14 more to a statement, like, "Don't get ahead

15 of yourself."  It connected more to ideas

16 of -- I guess, condescension.

17           I know historically when people

18 talk about forms of racial expressions with

19 black people, one of them was criticizing

20 them as being, like, "uppity," or "more

21 puffed up than they ought to be."

22           And when emphasized my ability to

23 do my job as asked, it kind of implied a

24 desire to go beyond the job task, or to be --

Page 133

1    to think that -- it just -- it just felt

2    condescending.  I'll just leave it there.

3         Q.   Do you think that that sentence had

4    nothing to with the sentences that go before

5    it in the comment section of Paragraph 1?

6         A.   I think it's connected in her train

7    of thought, but that's about it.

8         Q.   Well, her train of thought is what

9    this case is pretty much about, isn't it,

10   Ms. Acey?

11            I mean, she's the -- she's the

12   primary focus of your claims of gender and

13   race discrimination and harassment, isn't

14   she?

15        A.   So the first question, "her train

16   of thought," I believe the focus of this

17   Complaint is part of her thoughts, not

18   everything that she thought.

19            And the second one --

20        Q.   Okay.

21        A.   -- you asked if the -- the

22   claims -- the claims are based on -- on her

23   actions and her thoughts, yes.

24        Q.   Okay.  So her train of thought,

1  you're saying this last sentence isn't

2  connected to the prior or -- or the last

3  sentence of Box 1 in Paragraph -- of

4  Exhibit AA-11 -- AA-11, is separate and apart

5  from and reflects, you know, some kind of

6  separate idea or thinking of Ms. Talis?

7      A.   Yes.  Especially since --

8      Q.   Okay.

9      A.   -- the sentence starts with having

10  said that, which tells me that she wants to

11  set aside what she said at the beginning.

12      Q.   Oh, it doesn't mean that

13  incorporating everything else that was said,

14  in addition you understand the need to do

15  your job as asked as well.

16          You -- you don't read it that way,

17  do you?

18      A.   No.  I read it as positive, my

19  qualifications, against -- or my

20  impressions --

21      Q.   Okay.

22      A.   -- of my qualifications against my

23  ability to do the job as asked.

24      Q.   Is that, in part, because you

1  believe that Ms. Talis is fundamentally

2  has -- harbors gender or race animus?

3       A.   Yes, at least subconsciously.

4       Q.   Okay.  And this is an example of

5  that, right?

6       A.   Sure, yes.

7       Q.   Okay.  Let's go to, I guess, the

8  next place you have circled is, "She feels

9  the technician role is fundamental to

10 engineering."

11          Do you see that?

12      A.   Yes.

13      Q.   Is that something you said, or

14 something you communicated?  It may not be

15 those exact words --

16      A.   Sure.

17      Q.   -- but is that something that you

18 said?

19      A.   Sure.  Yeah, I communicated

20 something like that.

21      Q.   Okay.  Well, let's -- let's go

22 through that -- let's go through that

23 additional comment from Ms. Talis.

24      A.   Sure.

Page 143

```
 1        A.    No.   I mean --
 2        Q.    Did anyone require you to -- you --
 3   you -- I think one of your complaints is that
 4   you did work that was other than what you
 5   understand to be the job of a technician.
 6             Did anyone else do that, to your
 7   knowledge?
 8        A.    Do what?
 9        Q.    Do work outside of the job
10   description of whatever their job was.
11        A.    Not that I knew of.
12        Q.    Was it -- did -- did -- did you
13   enjoy work that you say you did outside of
14   your job description?
15        A.    Yeah, I -- I liked -- I liked the
16   work.  I like working.
17        Q.    Did you find it to be interesting?
18        A.    Yeah.
19        Q.    Okay.  So your issue isn't with the
20   work that you were doing outside of what you
21   felt was your actual job description.  It's
22   the fact that you think that you had a
23   contract that said you only had to do certain
24   things; is that right?
```

Page 144

1        A.    Yes.

2        Q.    Okay.  You were -- do you -- are

3   you familiar with the concept of an at-will

4   employee?

5        A.    Yes.

6        Q.    Okay.  Were you an at-will

7   employee?

8        A.    I think so.  I think this is an

9   at-will state.

10       Q.    But you didn't have a contract that

11  said you'll be there for a year or two years

12  unless you or -- (Inaudible) something?

13       A.    Oh, yeah, I think the -- the offer

14  of employment says, "at-will."  So, yes, I

15  was at-will.

16       Q.    Okay.  Okay.  So let's keep going

17  here.

18            And, then, there's a statement,

19  "She feels the technician role is fundamental

20  to engineering."

21            Now, did you say that?  You have it

22  circled.

23            Did you say that sentence?

24       A.    That "the technician role is

1    to them that I wanted to become a patent

2    scientist.

3         Q.    Any chance that, perhaps,

4    Mr. Rosenberger may have been being a little

5    defensive about him being a technician, and

6    you with the qualifications and things that

7    you have?

8         A.    I mean --

9         Q.    If you know.

10        A.    I don't know.  I mean, he -- he

11   showed signs of insecurity with other people,

12   so it's possible.

13        Q.    I don't know him.

14        A.    I've -- I've worked with him.  I've

15   seen him.  His desk was right next to mine.

16   I know when he would start smoking, because I

17   would smell it.  I remember his hands, his

18   glasses, his wife, even though I've never met

19   her.  I've just heard the calls.

20        Q.    All right.

21        A.    Yeah.

22        Q.    Did you have any reason to believe

23   that Mr. Rosenberger -- well, Mr. Rosenberger

24   is also a senior technician or was.

Page 188

1       A.    Yeah.

2       Q.    Was he involved in -- you know,

3  really involved in the decision to hire you

4  or not in the sense of management?

5       A.    He wasn't management.  But when we

6  decided to hire someone after a job process,

7  everyone waited.  And I believe his or a

8  teammate's notes are written in the manager's

9  evaluations as well.

10       Q.    Okay.  All right.

11             Well, you've seen these documents,

12  so I'll move forward, I believe.

13                      -   -   -

14             (Whereupon, Exhibit AA-13,

15             Momentum Wireless Power Interview

16             Evaluation Form, was marked for

17             identification.)

18                      -   -   -

19  BY MR. SCHAUER:

20       Q.    Let me show you Exhibit AA-13.

21  This is the Interview Evaluation Form by

22  Mr. Rosenberger, dated --

23       A.    Yes.

24       Q.    -- May 14, 2021.

Page 189

1              You see that?

2         A.    Yes.

3         Q.    Okay.   And I think you said that

4    you had seen this document in the production

5    that's been made in this case?

6         A.    Yes.

7         Q.    Is there anything that you can

8    point to me in this document --

9         A.    Yes.

10        Q.    -- Exhibit AA-13, that you believe

11   reflects some kind of animus towards you

12   based upon race or gender?

13        A.    No.

14             (Witness reviews document.)

15             I do believe it was an insincere

16   evaluation, but I don't see any animus on it.

17        Q.    You think it was insincere?

18        A.    Yes.

19        Q.    Well, what -- what -- what's your

20   basis for that conclusion?

21        A.    One day when the contention with

22   Rob was a little bit bigger, he gave me this

23   evaluation as proof that he didn't have any

24   hard feelings against me, but it's also in

Page 190

1    the messages of me overhearing Judy arguing
2    with him about what he wanted to put in
3    someone else's performance evaluation and
4    telling him what he can't put in it.
5              So, for my knowledge, I just
6    believe it's too probable that it wasn't
7    sincere, especially the way that he -- he
8    treated me, and -- yes.
9         Q.   Are you saying that he essentially
10   was kind of doing a little CYA --
11        A.   Yes.
12        Q.   In the back --
13        A.   Yes.
14        Q.   -- against what might come later?
15        A.   I don't even know if it's a "might
16   come later."  I don't know if he felt guilty.
17   I just know one day he handed it to me, and
18   intimated it as proof that he never had hard
19   feelings against me.
20             I mean, at one point, he gave me a
21   red cabbage.  I think that's also in the
22   messages.  I was very confused.  But, again,
23   I assumed it was in the same direction.
24        Q.   Just briefly, he just gave you a

Page 191

1  red cabbage?

2       A.   Yes.   One day instead of yelling at

3  me or criticizing me, he presented me with

4  this random red cabbage.  I was very

5  confused.  I think I messaged my boss and

6  asked him if it was poisoned.  Now, that's

7  probably not rational, but I was confused.  I

8  mean, he just...

9       Q.   Well, what was the context in which

10  he gave you a red cabbage?

11       A.   The same context as this evaluation

12  form, I guess.  Just trying to make it seem

13  like he wasn't mad at me, or, like, he was --

14  maybe he felt guilty, I don't know.  I don't

15  even eat red cabbage, um, so I don't know.

16       Q.   Did he give a red cabbage to

17  anybody else in the office --

18       A.   No.

19       Q.   -- if you know?

20            MR. SCHAUER:  Let's look at

21            the -- next, we have an evaluation

22            here.

23            We'll mark it as Exhibit

24            AA-14.

Page 192

```
 1                    -    -    -
 2                (Whereupon, Exhibit AA-14,
 3           Momentum Wireless Power Interview
 4           Evaluation Form, was marked for
 5           identification.)
 6                    -    -    -
 7    BY MR. SCHAUER:
 8         Q.    I apologize.
 9              On this one, I apparently did not
10    capture the portion in -- in the comments
11    section.  I guess I have to figure that out
12    at some point in time.
13         A.    That's all right.
14         Q.    So, tell me, Seth Wolgemuth --
15         A.    Wolgemuth.
16         Q.    Okay.  He was a senior technician?
17         A.    He started off as a normal one.  He
18    was promoted around, like, November.  They
19    sent out a company email to welcome him, I
20    think.
21         Q.    Okay.  It says that as of May 17th,
22    2021, he was -- oh, his position -- he was
23    promoted with Omar; is that right?
24         A.    Yes.  So this is the position --
```

Page 193

1    that's the position he was interviewing me

2    for.

3         Q.   Yeah.  All right.

4              So have you or did you have the

5    opportunity to review this particular review

6    form in the course of receiving the discovery

7    in this case?

8         A.   Yes.

9         Q.   And take your time and look at it

10   now, and, as well, based upon your prior

11   review of the document, was there anything in

12   here that you feel particularly reflects some

13   kind of, you know, animus towards blacks or

14   women?

15        A.   (Witness reviews document.)

16             No.

17        Q.   Do you think his review was

18   sincere?

19        A.   Absolutely.

20        Q.   Was -- I was going to say, "Seth."

21             Was he there the whole time that

22   you worked at InductEV?

23        A.   Yes.

24        Q.   Let's go to the last -- Section 4.

1        A.    (Witness complies.)

2        Q.    There he says, "My only real

3   concern is her not being satisfied in this

4   position and leaving us without an

5   experienced tech in the role a year from

6   now."

7             Do you see that?

8        A.    Yes.

9        Q.    That -- you were comfortable with

10   that assessment made by Seth?

11        A.    Yes.  It's almost -- it's very

12   close to the discussion I had with Judy

13   beforehand.

14        Q.    Okay.  Did you have any reason to

15   believe, based upon your time working at

16   InductEV, that Mr. Wolgemuth harbored any

17   particular animus towards you based upon

18   gender or race?

19        A.    I wouldn't call it animus.  He was

20   protective if somebody appeared to be biased,

21   but he's also a very quiet, very kind person.

22             MR. SCHAUER:  And Exhibit

23             AA-15.

24                       -   -   -

1      A.    Yes.

2      Q.    -- which is an offer letter for you

3  to begin on June 7, 2021.

4          Do you see that?

5      A.    Yes.

6      Q.    I also believe that it -- was at

7  some point the letter modified to have you

8  start on June 14th, 2021?

9      A.    Yes, it did.

10     Q.    But other than that change -- and I

11  apologize for not having that exact document,

12  but other than that change, is the offer

13  letter that you received and accepted from

14  InductEV the same as Exhibit AA-16?

15     A.    No.  They changed the date, and I

16  think they changed the hourly rate.  I'm not

17  sure.  I -- I know there was some negotiation

18  of the hourly rate, and she updated the

19  offer.

20     Q.    Do you recall what the hourly rate

21  was that you received when you began at

22  InductEV?

23     A.    I want to say $34 per hour.

24     Q.    And were you an hourly non-exempt

Page 274

1          And he asked about, you know,
2    whether I run, and I was excited.  I was,
3    like, "Well, you know, not" -- "not as much."
4          But I -- you know, I thought it was
5    a fun conversation, but when he found out
6    that I didn't run, he looked -- he started
7    frowning, almost in a cartoonish way, but I
8    guess he wasn't happy.  And I guess the topic
9    of ice cream came up and he was looking at me
10   and he mentioned dark chocolate.
11         The exact words he stated were
12   probably more accurately recounted to my
13   boss, I believe, like, a day or two after we
14   had teams, but I can't remember his direct
15   quotes right now.
16     Q.   When you say you shared his comment
17   that bothered you with your boss, do you
18   know, did Joren speak with Bogdan?
19     A.   No.  He just said it was weird, and
20   that he had noticed a creepy vibe from him
21   before.  And we agreed that if it ever came
22   up for me to have to work with Bogdan or be
23   in the same room, he would support me keeping
24   a healthy distance.