# EXHIBIT 2

                                              Page 1

1        IN THE UNITED STATES DISTRICT COURT
      FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

3                        - - -

4    ASSATA ACEY,              :
                               :
5            Plaintiff,    : No. 2023-CV-01438
                               :
6            vs.               :
                               :
7    INDUCTEV,                 :
                               :
8            Defendant.    :

9                        - - -

10            THURSDAY, APRIL 18, 2024

11                        - - -

12

13        Videotaped Deposition of ASSATA ACEY,

14   taken at Fox Rothschild, 747 Constitution Drive,

15   Suite 100, Exton, Pennsylvania, commencing at 9:21

16   a.m., before Lauren Sweeney, a Court Reporter and

17   Notary Public.

18

                         - - -

19

20

21

22

23        Job No. CS6660747

24

ASSATA ACEY

Page 26

1       Q.      Okay.  I'll suggest to you --
2  I'm not giving you legal advice -- that one of
3  the elements of a claim is lost wages.
4       A.      Yes, that's the compensatory,
5  yes.
6       Q.      And just for what it's worth, I
7  generally understand compensatory damages to
8  be more along the lines of embarrassment, pain
9  and suffering, distress, you know, that kind
10 of thing.
11      A.      Oh, I see.
12      Q.      You know, not something that
13 can be quantified, you know, by some
14 calculation of numbers.
15              Okay?  Do you understand that?
16      A.      Yes.
17      Q.      So let's talk about wage loss.
18              As of the end of September of
19 2022 --
20      A.      Yes.
21      Q.      -- at or around the time of the
22 mediation, if that helps fix it for you, you
23 were on disability.
24              Did you continue to receive

ASSATA ACEY

Page 27

1   short-term disability after September 19th of

2   2022?

3           A.      Yes.  Well, long-term but

4   disability.

5           Q.      All right.  And how long did

6   you remain on long-term disability?

7           A.      I am on long-term disability.

8           Q.      So you continue to receive

9   long-term disability payments?

10          A.      Yes.

11          Q.      Have you worked at all since

12  the end of September of 2022?

13          A.      No.

14          Q.      Are you capable of working in

15  your mind?

16          A.      Not at this moment, no.

17          Q.      How much do you receive in

18  long-term disability payments each month?

19          A.      I think it's 3,600.  It's like

20  43,000 a year.

21          Q.      What were you making roughly a

22  year -- well, in the year that you worked for

23  InductEV?

24          A.      Gross?

ASSATA ACEY

Page 28

1          Q.      Yes.

2          A.      Okay.  So somewhere around

3    76,000.

4          Q.      Do you know how much longer,

5    assuming that you qualify for them, how much

6    longer you would be eligible to receive

7    long-term disability benefits?  The rest of

8    your life, another two years, another six

9    years, another three months?  Something along

10   that, that's what I'm looking for.

11         A.      I don't know.

12         Q.      And you're not making any claim

13   for back wages in this case, that is wages

14   that you earned prior to your separation from

15   InductEV that you're claiming were not paid to

16   you by InductEV; is that correct?

17         A.      Not at this time, no.

18         Q.      Well, you last actively --

19   well, I guess, sometime -- you began receiving

20   short-term disability, if I recall, sometime

21   in April of 2022; is that correct?

22         A.      May 16th.

23         Q.      May 16th.  Okay.

24                 And prior to that time were you

ASSATA ACEY

Page 40

1        Q.        Well, do you know when that
2   happened roughly?
3        A.        Around the time I gave to you,
4   probably like late January between February.
5   It had to be before the meeting with Judy
6   because I was worried that if I had complained
7   about that whatever work he tried to do on a
8   promotion would just never happen.
9        Q.        I'm sorry, when you say you
10   were afraid that if you complained about
11   "that," what is that?  Not being properly
12   titled and compensated?
13        A.        Talking about race or --
14   talking about race or telling her that she had
15   to do something about the racial environment
16   at work.
17        Q.        Let's get back to that.
18                  What exactly did you tell Judy
19   in this meeting that you're referring to?
20        A.        Okay.  So I told her that she
21   -- it was a very painful meeting.
22        Q.        What did you tell her in the
23   meeting, Ms. Acey?
24        A.        I'm trying to get to it.

ASSATA ACEY

Page 41

```
 1              Q.      Well, you can think --
 2              A.      I'm trying to -- I have to
 3    speak it out because if I meditate all you're
 4    going to get is just utters and pained faces.
 5                      But what I'm trying to say is
 6    -- when I'm trying to remember that meeting it
 7    was painful.  And I talked to her about my --
 8    she told me about the movie and about how they
 9    can't do a movie list for black history month
10    because they didn't do anything for Jewish
11    history month, they don't have anymore -- or
12    Jewish, you know, holidays, things like that,
13    and they don't have a professional available
14    to provide planning, you know, so that every
15    -- so like every group would feel embraced
16    equally.
17                      And I believe at some point she
18    gave me the floor to describe why I felt it
19    was so important because of the comments I had
20    made in my e-mail about attracting diverse
21    talent and things like that, and I just went
22    in and I explained to her about my experiences
23    with my coworkers, that I felt like there was
24    general bias.
```

ASSATA ACEY

Page 42

1              But I also gave her some
2     examples that I felt were less messy and more
3     objective.  So I told her that Jorge had been
4     asking me about what I was doing when I was
5     working in the basement, asking me in the
6     frame of, you know, accounting for my time,
7     and that I had stated, you know, to him that I
8     was uncomfortable and that I didn't want to
9     talk about it in detail, but he was asking me,
10    and he just kept pursuing it as though he felt
11    he was entitled.
12              And I explained to her how I
13    had felt that my coworkers were being
14    hypervigilant of me, the things that I did,
15    how long I spoke, and things like that, and I
16    also went into an example about my coworker,
17    Brian Kenney, who I think like within two
18    weeks before that meeting he had -- there was
19    an incident where he basically asked me to use
20    my key pass to let him into the building, and
21    once I did so to pick up donuts for the team
22    -- that was my errand -- he opened the door
23    for the lady who was delivering the donuts two
24    times -- the lady happened to be white -- and

 1    once I had picked up the donuts and the coffee

 2    jugs the best I could 'cause my hands were

 3    full he had taken off.

 4                    Well, this was at the front

 5    office, and the place I was going was the

 6    basement, so I had to walk down the hill by

 7    myself, and I had explained to her how blatant

 8    that felt because I had just watched him give

 9    attentive support to somebody who was a

10    different race than me.

11                    And then his teammate, who he

12    relied on to get access to the building, I

13    explained that to her.  I had also explained

14    issues working with him and his complaints

15    about me.

16                    Then I think the third issue I

17    talked to her about was recently overhearing

18    one of the newer workers complaining about

19    Julian Jackson basically saying he should get

20    off his lazy A-S-S in reference to his regular

21    work where he would have to open the garage

22    door to receive or take out deliveries and how

23    this person had stated this in front of two

24    other coworkers who were also nonblack.  I

Page 44

1  believe it was Jorge -- I don't remember the

2  other person -- and how they had both felt

3  uncomfortable and just walked away from him at

4  that point.

5            And I had expressed concern to

6  her that these -- that at least situations

7  like that were more inflammatory and that I

8  felt like if someone was more easily offended

9  they would attempt to sue the company over

10  stuff like that because I wanted her to feel

11  some type of interest in reducing these

12  things.

13            And that's basically what I

14  disclosed.  She asked me a bunch of questions,

15  and I answered them.  But, yeah.

16               THE VIDEOGRAPHER:  Excuse me,

17        Ms. Acey, could you readjust your mic

18        so it's sticking up this way as

19        opposed to in your --

20                    - - -

21            (There was a discussion held

22        off the record.)

23                    - - -

24  BY MR. SCHAUER:

ASSATA ACEY

Page 45

1          Q.      Let's go -- you gave an
2    example.  You said a coworker talking about
3    Julian.
4                  Did you actually overhear that
5    comment or did somebody tell you about it?
6          A.      I was sitting at my desk and I
7    overheard the comment.
8          Q.      And who said it?
9          A.      It was this guy named Tom
10   Hornberger.
11         Q.      And who were the other
12   coworkers who you say were present when he
13   made that comment that didn't say anything?
14         A.      Jorge Ribe.  That's R-I-B-E.
15   The "E" has an apostrophe over it.  And I
16   don't know who the third person is.  I can't
17   remember who the third person is.
18         Q.      Brian Kenney, you say that on
19   the morning of the incident you're describing
20   with Brian Kenney he had purchased donuts for
21   the office or the coworkers.
22                  Is that what happened?
23         A.      No.  Joren had ordered donuts
24   in exchange for everyone having to be in the

ASSATA ACEY

Page 46

1    basement early, and I had volunteered to go to
2    the front to pick them up.
3        Q.    And was -- did Brian Kenney,
4    was he bringing them in from the parking lot?
5    I'm trying to understand just what the
6    circumstances were, what was the physical
7    situation you're describing.
8        A.    The front is here.  The porch
9    is here.  The basement is here, downhill.  I
10   was coming out.  Brian -- and, I'm sorry, it
11   wasn't a card, it was a key.  Brian didn't
12   bring his key that day, so he was basically
13   relying on me in that moment to let him in
14   front of the building, 'cause you needed a key
15   to get in the front.
16            So I was going to pick up the
17   donuts and the coffee, and he came with me in
18   exchange for me letting him in, and I guess he
19   left before I did.
20       Q.    So tell me about, there was
21   somebody who was bringing -- he held the door
22   for somebody bringing the donuts in, a white
23   woman?
24       A.    There was a white woman.  She

ASSATA ACEY

Page 47

1   had a very nice coat and she brought in the

2   donuts.

3           Q.      But where did she bring them

4   to?

5           A.      She brought them into the front

6   desk.  It took her two trips.  So he made sure

7   to watch her and see when she needed help and

8   opened the door both times back and forth and

9   asked if she was -- you know, if she was okay,

10  if she needed help with anything really.

11          Q.      Okay.  And you were standing

12  there while he did that and saw him do it?

13          A.      Yes, I did see him do it.

14          Q.      Okay.  And then what happened?

15  He took - you know, did he take the donuts and

16  leave that space?  Or what is it that occurred

17  that you ended up outside the building?

18          A.      I recall he just ran.  It was a

19  cold day, and he ran from the door, the front.

20  He left.  After that woman was good and after

21  she delivered all the things that I was going

22  to have to carry, he ran from the front door,

23  out and down the hill back to the basement,

24  which meant that I had to hold these donuts

ASSATA ACEY

Page 48

1   and these jugs, that I had my arms full, down
2   the sloped hill, and I wasn't really clear on
3   how to get any doors open because --
4           Q.      So you were both -- I take it
5   that there was -- you weren't able to access
6   -- is the basement only accessible from
7   outside?
8           A.      Yes.  You have to go around.
9   I'm sorry, yes.
10          Q.      I'm trying to understand the
11  logistics of this issue on that item that you
12  raised.
13                  All right.  So you and Brian
14  are in the building on the first floor.  You
15  let in a delivery person who has -- a white
16  woman who has donuts and coffee.  She leans
17  them on a table near the reception.
18                  Do I have that right so far?
19          A.      It was Julian's desk.
20          Q.      Okay.  And then Brian, you say
21  disappeared.
22                  I mean, did he -- well, I
23  guess, all you know is after the donuts and
24  the coffee were delivered he wasn't there

ASSATA ACEY

Page 49

1    anymore.

2         A.    I mean, I saw him when I made

3    it into the basement.

4         Q.    Did you ask him where did you

5    go, what did you do?

6         A.    I knew what he did.

7         Q.    Did you ask him, you know, why

8    didn't you help me with the donuts?  Why

9    didn't you hang around?  You know, what's the

10   story here?

11        A.    No.  I complained to him.  I

12   didn't --

13        Q.    I didn't say complain.  You

14   know, that's a conclusion.

15              Did you say anything to him

16   after this incident with the donuts?

17        A.    Yes.

18        Q.    What did you say to Brian?

19        A.    I honestly don't remember.

20        Q.    Do you have any recollection of

21   what Brian might have said back to what you

22   might have said to him?

23        A.    I just know that he left and

24   got his own coffee after that.

ASSATA ACEY

Page 50

1          Q.      Okay.  All right.

2                  Did you raise this issue with

3     anyone other than Judy in this meeting?

4          A.      I told Joren the day that it

5     happened.

6          Q.      All right.  And did Joren

7     indicate to you that he had addressed it?

8          A.      No, not at that time.

9          Q.      Did he indicate to you at a

10    later time that he had talked to Brian about

11    this donut delivery incident?

12         A.      Yes.

13         Q.      And were you satisfied that

14    Joren had addressed the situation based upon

15    what Joren said to you?

16         A.      At the time, yes.

17         Q.      Well, when you say at the time,

18    what do you mean at the time?  In retrospect

19    you decided you shouldn't have been satisfied?

20         A.      Joren did his best, and every

21    time he confronted someone I thought that

22    would be the end, and it wasn't, so --

23         Q.      Well, is there some other thing

24    that Brian did that you relate to some kind of

ASSATA ACEY

Page 51

1    racial or gender animus, Brian Kenney?

2         A.    When we were both deciding to

3    do modifications for a prototype, metal box

4    thing -- and Maria and Bogdan Proca were the

5    lead engineers.  And Brian Kenney, he didn't

6    -- I'm trying not to give you a conclusion.

7    He -- his teamwork was -- it's very hard.  I'm

8    going to just have to tell you, and you'll

9    just have to tell me if it's your form or what

10   you need.

11        Q.    Sure.

12        A.    But basically he was not very

13   friendly.  He did not do all of his work.  And

14   when the opportunity showed up for him to make

15   himself look good he would become very hostile

16   towards me.

17             At one point he took no notes

18   of what was happening, what was necessary, and

19   he just snatched my notes out of my hand and

20   like stared at me when Bogdan Proca came so

21   that he could present him as though -- just so

22   he would present to him how things were going

23   and what his ideas were.

24             And then when things did not go

ASSATA ACEY

Page 52

```
 1    his way he shouted at me in front of the front

 2    office and stormed out.

 3            Q.      What was Brian's position?

 4            A.      He was general technician for

 5    the product -- he was general -- or product

 6    introduction technician.

 7            Q.      When did this event occur in

 8    front of the staff that you just described?

 9            A.      That was -- I think it would be

10    between February and April of 2022.  I think

11    that that project was also in discovery, yeah.

12            Q.      Did you speak with Brian after

13    the incident with the notes and you say

14    yelling at you about what's going on here, you

15    know, what is this behavior you're showing me

16    and demonstrating around?

17            A.      Absolutely not.  I only --

18    those types of things I only talk to my

19    manager and HR.  I don't want to escalate it

20    with him.

21            Q.      Okay.  Tell me, the incident

22    with Jorge about --

23            A.      Jorge.

24            Q.      Jorge, sorry.  About Jorge
```

Page 53

1   asking you about what you were doing in the

2   basement.

3           A.      Yes.

4           Q.      What's that about?

5           A.      That was weird.  I mean, his

6   desk is next to mine.  So like we were in the

7   cubicle.  Rob's across from me.  Tina's behind

8   me.  Jorge is diagonal.  And he was making

9   comments along the lines of not seeing me at

10  my desk, not seeing me around as often, and

11  what have you been doing.

12              And it didn't -- at the time I

13  did not feel comfortable because it was not

14  the first time I had heard people asking me

15  about what I had been doing or whether I was

16  doing enough work.

17              And so I wasn't comfortable

18  with the topic, and I just said, you know, I'm

19  helping out with this project.  And he started

20  asking me, more specifically, what my role was

21  or what I was contributing and why I had to be

22  there.

23              And I just kept trying to

24  indicate to him socially, you know, by trying

ASSATA ACEY

Page 54

1    to answer his questions without being overly

2    specific and saying that's what I feel

3    comfortable sharing.

4              And he just kept pushing me and

5    being insistent and it gave me the same

6    feeling as -- it made me kind of lump him in

7    with my other coworkers who had been

8    hypervigilant at work.

9         Q.    Approximately when did this

10   incident occur with Jorge that you are

11   describing?

12        A.    That would have to be between

13   January and February.  So most of the stuff

14   that's happening in the basement is around a

15   project that we labeled as VW.

16             So the issues with Brian and

17   the donuts, again, that's the VW project.  The

18   questions about Jorge leaving the basement.

19   So all of these are kind of around the same

20   time period.

21        Q.    Did you go to Joren regarding

22   the questions that you were being asked by

23   Jorge?

24        A.    Yes.  Joren knew about it

ASSATA ACEY

Page 55

1   before Judy did.

2           Q.      And did Joren address it to

3   your knowledge -- to your knowledge, did Joren

4   address it?

5           A.      Yes, February 18th or so he

6   sent me a message saying that he had spoken to

7   Jorge about it.

8           Q.      Did you notice any difference

9   in Jorge's, you know, inquisitiveness of you

10  after that time?

11          A.      I mean, a month or two later I

12  overheard him talking to another coworker

13  about willingness to share information and

14  being a team player, and I felt like he was

15  talking about me.

16          Q.      Do you know he was talking

17  about you?

18          A.      Not without reviewing the

19  evidence in front of me.

20          Q.      Well, what evidence would you

21  need for that?

22          A.      Well, when it happened, as was

23  my pattern, I told my boss what I was

24  overhearing and where he was and exactly the

ASSATA ACEY

Page 56

1    words I heard him say.  Without those specific

2    words and those details I can't confirm for

3    you whether he was talking about me.  I can

4    just tell you what I felt.

5            Q.      Let's talk about your

6    compensatory damages.

7                    What are you making a claim for

8    as far as what I'll describe as kind of, you

9    know, nonmonetary based damages?

10                   And I think, as I described

11   earlier, that would be, you know, what you

12   think you ought to get for pain and suffering

13   or embarrassment or emotional distress that

14   you suffered because of the wrongful behavior

15   toward you by InductEV.

16           A.      Okay.  So I remember the end of

17   the question, but can you repeat the beginning

18   so I can try to be as succinct as possible?

19           Q.      Please describe for me the

20   basis of the claim you're making for

21   compensatory damages, those being damages

22   related to distress, pain and suffering,

23   embarrassment, humiliation as a result of

24   violations of the law by InductEV.

ASSATA ACEY

Page 125

1          A.      Yes.

2          Q.      Okay.  What was your purpose in

3    writing this e-mail of September 23 at 10:39?

4    Take your time and look at the whole thing if

5    you want to.

6          A.      The purpose of the e-mail was

7    in my mind to cut through the games that I

8    felt were being played and to get as soon as

9    possible a tangible contract with all terms

10   and to adjust the amount on that contract

11   commensurate with what I saw as their behavior

12   and my -- I guess my attempt to still try to

13   be fair.

14         Q.      Did any of the facts that you

15   cite -- let's refer to page 53 in the lower

16   right-hand corner.

17         A.      Okay.

18         Q.      You knew all those facts when

19   you were in the mediation on September 19th,

20   didn't you?

21         A.      Yeah, I was stating some of

22   them before -- when I was rebutting the May

23   Mon Post.

24         Q.      There's nothing in this e-mail

Page 190

1  looking at accommodations with my doctors and
2  medication and stuff.
3        Q.    And it suggested you were kind
4  of concerned because you had sort of lost
5  track of Joren.  Mr. Hackman said, oh, he's
6  been in touch with me.
7        A.    Yes.
8        Q.    And then starting with, "hope
9  he's just tired or doing family stuff and
10  that's he's okay."
11             My understanding is that's a
12  reference to Joren?
13        A.    Yes.  I did want to clarify,
14  the mention about a two-week vacation, I think
15  what I was saying is if I came back to the
16  company with a new job I might only be back
17  for a week or two.
18        Q.    Thank you.  Yes.  Okay.  Okay.
19        A.    But you said that I'm asking
20  about Joren, worried that he's not okay.
21  Yeah, that was about Joren.
22        Q.    Yes, that's what I thought.
23             Okay.  Then is it your
24  recollection that the mediation occurred -- it

ASSATA ACEY

Page 191

1    was September 19th, correct?

2             A.       I believe so.

3                         - - -

4             (Exhibit AA-43 was marked for

5        identification.)

6                         - - -

7    BY MR. SCHAUER:

8             Q.       I'm going to show you what's

9    been marked as Exhibit AA-43.

10            A.       Yes.

11            Q.       This is taken -- I was going to

12   say to you, ask if you can confirm, but this

13   is taken again from the messages between you

14   and your grandmother I believe on

15   September 19th of 2022.

16            A.       I don't recall if this is the

17   date, but it looks like the message -- this

18   looks like a familiar message.  I think this

19   is the screen shot that I sent.  I don't know

20   if I sent it to my grandmother on my husband,

21   but -- yeah.

22            Q.       And at 3:32 p.m. on

23   September 19th, you're communicating with this

24   guy Greg Casee, who you worked previously,

ASSATA ACEY

Page 218

1     get through these.

2              A.      Yes.

3              Q.      This says, "excited utterance"

4     -- paragraph 11 -- "excited utterance from

5     myself to my supervisor about unwanted touch

6     from Mike Russell, who had tapped my shoulder

7     while grazing past me from behind in a

8     standard-size walkway."

9                      Do you see that?

10             A.      Yes.

11             Q.      And is that just what you are

12    describing?

13                     Did this Mike Russel walk past

14    you in a standard-size walkway and tap you on

15    your shoulder in addition to grazing past you?

16             A.      Yes.

17             Q.      And did he -- the grazing part,

18    did he brush up against you in some fashion or

19    did he nod and the only contact here was

20    tapping your shoulder?

21             A.      I believe he brushed across my

22    -- it's hard to describe that without using

23    physics, but the surface, the surface of my

24    form, he brushed across that.

ASSATA ACEY

1      Q.      Okay.  And he was going past
2  you in a hallway?
3      A.      He wasn't going that far.  I
4  was like right in front of his desk.
5      Q.      Was he going past you in a
6  hallway?
7      A.      He was going past me, and I was
8  in the hallway, yes.
9      Q.      Okay.  And when you say
10 standard-size walkway, what is that to you or
11 did you ever measure that?  I'm just trying to
12 get a visual of what happened to you.
13     A.      I would guess about from that
14 metal post there to about here.
15     Q.      Okay.  That would be about 6
16 feet?
17     A.      Yep.
18     Q.      And then you -- what follows is
19 a dialogue of sorts between and you Joren
20 where you send information and Joren writes
21 back, correct?
22     A.      Yes.
23     Q.      And basically you said if it
24 happens again I will address it with Russell,

ASSATA ACEY

Page 226

```
 1                          - - -
 2                THE VIDEOGRAPHER:  The time is
 3         now 2:41 p.m.  We're going back on the
 4         video record.  This will begin media
 5         unit number four.
 6                MR. SCHAUER:  Thank you.
 7    BY MR. SCHAUER:
 8         Q.     Ms. Acey, I'd like for you  to
 9    turn to page 17 of, please -- of Exhibit
10    AA-47, your third brief in response to Motion
11    to Dismiss.  Okay?
12         A.     Okay.
13         Q.     And there is a paragraph 3,
14    where you say -- this is July 7th, 2021 --
15    "excited utterance, present sense impression
16    and recorded recollection from myself to my
17    supervisor about negative and seemingly
18    derogatory comments from my coworkers."
19                Do you see that?
20         A.     Yes.
21         Q.     All right.  And is this the
22    writing you say -- you mentioned earlier today
23    that you made to Joren about your coworkers
24    and what they're saying, the things they say?
```

ASSATA ACEY

Page 230

1   for."

2                   What was his job?

3           A.      I don't recall.  I just know he

4   worked in inventory.  It's in the evidence

5   somewhere, but, yeah.

6           Q.      He wasn't in assembly; is that

7   right?

8           A.      Right.  He was not in assembly.

9           Q.      He was not a technician or was

10  he?

11          A.      I don't think he was.

12          Q.      You don't know?  Okay.

13                  And then in "c" there it says,

14  "Frank: "This is Assata.  She's a technician

15  with a" -- then you have it in bold -- Physics

16  degree.  She's doing better things,

17  introducing a new hire with a smile."

18                  Do you see that?

19          A.      Yes.

20          Q.      And did that bother you?

21          A.      Yes.  He was making a big deal

22  to a stranger about my role and my degree

23  being at odds -- as though they were at odds

24  with each other, like I was some commodity,

ASSATA ACEY

Page 231

1   and it made me feel uncomfortable.  It's like

2   --

3           Q.     Well, how do you interpret him

4   then following up with, "she'll be doing

5   better things" -- that's not complimentary or

6   do you consider that to be somehow belittling

7   or --

8           A.     It made me uncomfortable.  I

9   don't think Frank was trying to belittle me.

10          Q.     Right.

11          A.     I mean, it just made it clear

12   he thought what I was doing -- there was

13   something better, and it made me feel like he

14   thought negatively of what I was doing and

15   like he thought I was a commodity for having

16   that role with a degree.

17          Q.     What's Frank's role?

18          A.     He was -- what was Frank?  He

19   was the manager of R & D.  He oversaw Stan

20   Gallagher, R & D, engineering.

21          Q.     On page 18, right above

22   paragraph 4, it appears that Joren responds to

23   you at 11:06:23, where he invites you to sit

24   down and discuss it with him.

Page 243

1  comparing, when I took my aspirins, and even

2  my teammates, former teammates, nobody had

3  been -- complained, remembered being

4  complained about by Diana for those small

5  things she complained about me.

6          Q.     Well, she checked with your

7  boss; isn't that correct?

8                 That's what she did; is that

9  right?

10         A.     Yes.

11         Q.     Okay.  Does any of that show up

12 in your evaluation review?  Do you recall

13 being dinged for missing meetings?  No, you

14 didn't.  You weren't, were you?

15         A.     You know what I thought or I

16 recall.  I'm sorry, Attorney Schauer, I don't

17 think it's appropriate --

18         Q.     I'll strike the question.  I'll

19 strike the question.  It's getting long in the

20 day.  Okay.

21                Okay.  Let's go to paragraph 14

22 on page 22.  Take a moment, if you would,

23 please, and kind of look through that.

24                Is this a paragraph where you

ASSATA ACEY

Page 244

1   address the concept that you felt you were

2   being accused of stealing time?

3          A.     I believe so.

4          Q.     And is it my understanding,

5   correct, that you appear to be 30 minutes --

6   short 30 minutes of a 40-hour workweek in a

7   particular week?

8                 Is that correct?

9          A.     Yes.

10         Q.     Well, we can look at the entry

11  at 10:34:47, where you communicate with Joren

12  saying, "I talked to Judy again.  She'd given

13  me the impression before that vacation

14  automatically prepopulates into gaps when it's

15  under 40 hours and that we're only supposed to

16  request vacation in four-hour increments."

17                Do you see that?

18         A.     Yes.

19         Q.     Okay.  And so what did Judy

20  come to you and -- or it says Joren came to

21  you in the beginning and said Assata Acey,

22  39.5 hours last week.

23                Is that right?  Do you see

24  that?

ASSATA ACEY

1      A.      Attorney Schauer, it is Acey.

2      Q.      I'm sorry, Acey.

3      A.      And, yeah, he messaged to me on

4  Teams while I was out and about.  And I guess

5  according to this Judy came to me before I saw

6  his message.

7      Q.      But this is the series of

8  messages that relate to your belief that you

9  were accused of stealing time by Ms. Talis?

10     A.      Yes.

11     Q.      If you go to the very bottom of

12  the page, 10:56:44, where it says, "direct

13  reply to message, 10:55:47," which is up

14  above.

15              "So possibly implying time,

16  quote, theft, but that's not what she's saying

17  you should do and that's not what you are

18  doing."

19              Right?  Do you see that?

20     A.      Yes.

21     Q.      All right.  And then you

22  respond, correct?

23     A.      Yes.

24     Q.      Oh, fifteen on page 23 involves

ASSATA ACEY

Page 251

1   you wanted to at least let Joren know where

2   you stood, your thoughts.

3                    Is that fair?

4        A.      Yes.   I mean, it's generally

5   saying if they don't have that role, I'm okay

6   with not being there, but I needed them to

7   know what I was seeking.

8        Q.      Okay.  Let's go to page 28,

9   paragraph 26.

10                   Is this a report by you on a

11  conversation with Judy around February 10 of

12  2022?

13       A.      Yes.

14       Q.      It says, "Judy has decided to

15  make everyone redo diversity training and

16  plans to teach mustache man how to not risk

17  company lawsuit.  She may be reaching out to

18  you about Brian (I've explained that it's been

19  handled, etc., but she was clear she wanted

20  something easy to try)."

21                   Do you see that?

22       A.      Yes.

23       Q.      And that's a result of the

24  conversation that you had with Judy Talis,

ASSATA ACEY

Page 252

```
 1   correct?
 2           A.      Yes.
 3           Q.      Okay.  You expressed concern
 4   around, I guess, what -- Ms. Talis recommended
 5   you might want to visit her gynecologist?
 6           A.      Her daughter's gynecologist.
 7           Q.      Her daughter's?  Okay.
 8                   And did you somehow believe
 9   that was an inappropriate suggestion on her
10   part?
11           A.      Absolutely.
12           Q.      And why was that?
13           A.      It was uncomfortable.  I didn't
14   want to see the same gynecologist of somebody
15   who would supervise me at work.  It would be a
16   weird cross of private information.
17                   Nor did I think I should be
18   exposed to her daughter's private information
19   as far as where she goes or what problems
20   she's had.
21                   And I also did not think it was
22   Judy's place to ask me about like feminine
23   health things that didn't involve work.  I
24   don't think feminine health things do involve
```

ASSATA ACEY

Page 253

1   work unless I brought them to her.

2          Q.     Do you think that Ms. Talis

3   made that recommendation for the purpose of

4   making you uncomfortable?

5          A.     No.  I think she overstepped

6   her bounds.

7          Q.     Do you think she was doing it

8   to somehow be of some assistance to you,

9   however misplaced her thinking might have been

10  in your mind?

11         A.     No.

12         Q.     You don't think she was trying

13  to be helpful?

14         A.     No.  She's the head of HR, and

15  a lot of women lie about whether they're

16  pregnant or not because of a belief that HR is

17  not trying to be helpful in pregnancy --

18         Q.     Well, I'm not talking about

19  many women.

20         A.     I know --

21         Q.      I'm talking about Ms. Talis,

22  and I'm talking about you.

23              Do you believe that somehow she

24  was going to try and get information from you

ASSATA ACEY

Page 254

1   about you by the fact that you might use her

2   daughter's gynecologist?   That's your thought

3   process in part?

4          A.      No.   I believe she was trying

5   to get information from me and asking if I was

6   pregnant.

7          Q.      Okay.   Did she ever ask if you

8   were pregnant?

9          A.      She did.

10         Q.      Okay.   And when did that

11  happen?

12         A.      The same time of the comment

13  about her daughter's gynecologist.   I believe

14  it's disclosed in the same transcript.

15         Q.      Is that -- do you believe that

16  she was somehow doing that because of your

17  race or gender?

18         A.      Gender, yes.   I don't think she

19  would ask a man if he was pregnant.

20         Q.      I think you're probably right.

21  It says, as I read it here, "she barely

22  stopped herself from asking if I was pregnant

23  after the implicitly now obligatory

24  explanation of hormonal nausea."

ASSATA ACEY

Page 255

1                    Do you see that?

2        A.      Yes.

3        Q.      What do you mean by she barely

4   stopped herself from asking if I was pregnant?

5        A.      She got the words out before

6   she changed the sentence.

7        Q.      So that's what you're referring

8   to as asking you if she [sic] was pregnant?

9        A.      Yes.

10       Q.      Okay.  We're going to skip to

11  page 42.

12                    Do you see -- look at paragraph

13  17 at the bottom of page 42.

14       A.      Okay.

15       Q.      April, 1, 2022.  "Excited

16  utterance.  Present sense impression to" Joren

17  "about Rosenberg's opposition to the team's

18  newly-purchase lift and inappropriate

19  statement."

20                    Do you see that?

21       A.      Yes.

22       Q.      Okay.  So let's go to page 43

23  at the top.

24                    There's an entry next to

1    11:26:32, correct?

2           A.     Yes.

3           Q.     "Rob" -- you're saying that Rob

4    said, quote, "brand new one, to make the bitch

5    happy," end quote.

6                  Do you see that?

7           A.     Yes.

8           Q.     Then there's an asterisk, "says

9    something else (that I can't quite parse

10   without making up words)."

11                 So what was Rob referring to,

12   if you know, when he said first, "the brand

13   new one"?

14                 Is that the lift?

15          A.     Yes.

16          Q.     And do you know who he was

17   referring to when he said "to make the bitch

18   happy"?

19          A.     Me.

20          Q.     And he said this to you or in

21   front of you?

22          A.     He said it in front of me.

23          Q.     Okay.  Did you say anything to

24   him?