```
                                                          Page 1
 1         IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2                      - - -
 3   ASSATA ACEY,           :   No. 2023-cv-01438
                            :
 4            Plaintiff,:
                            :
 5       v.                 :
                            :
 6   INDUCTEV,              :
                            :
 7            Defendant.:
 8                      - - -
 9                 April 11, 2024
10                      - - -
11            Oral deposition of ASSATA
12       ACEY, taken pursuant to Notice,
13       held at Fox Rothschild, 747
14       Constitution Drive, Suite 100,
15       Exton, Pennsylvania 19341,
16       beginning at approximately 9:10
17       a.m., before Mary Hammond, a
18       Registered Professional Reporter
19       and Notary Public in the state of
20       Pennsylvania.
21
22
23       Job No. CS6582623
24
```

Page 49

```
 1   I'm trying to get the answer as specifically
 2   as you requested it in respect to your time.
 3           So what happened that made me think
 4   at that point that I -- that I needed to
 5   sue -- that I had the right to sue under
 6   those claims.
 7           Judy Talis -- there -- there was a
 8   dispute.  Judy Talis called me while I was
 9   home, basically telling me that the evidence
10   that I had, disability was not enough, and
11   that she needed to take out PTO to make up
12   for my time off of work.
13       Q.   And you believe she did that
14   because of your race or gender or both?
15       A.   I believe that she did that because
16   of race and gender, possibly also disability,
17   since it related to disability more
18   specifically.
19       Q.   Well, briefly -- and we'll get into
20   this in more detail later, but I -- I take
21   that you did not want to have to utilize PTO
22   at the time that Ms. Talis told you you had
23   to?
24       A.   That's correct.
```

Page 50

1  Q. And what exactly was the protocol
2  that you think was being violated by
3  Ms. Talis?
4  A. Protocol?
5  Q. Well, what was she doing -- you
6  know, what was it that was improper that she
7  was doing to you by telling you that you
8  needed to take some PTO relative to time off
9  that had been taken, i.e., and you said you
10 didn't -- or she -- you said she said you
11 didn't provide it enough proof of disability,
12 and, so, you had to use PTO.
13      What was -- what was -- what was
14 wrong about that?
15 A. Okay. So, piecewise, there -- I
16 don't think there was anything wrong with her
17 wanting me to use PTO for time off in
18 isolation.
19 Q. Okay. Did she -- okay.
20      Tell me -- you applied for
21 employment at InductEV back in or around
22 April of 2021, correct?
23 A. I -- I believe so.
24 Q. Okay. Well, we're kind of going to

Page 254

1  access that, in my knowledge, without being
2  trackable on SharePoint.
3      Q.   When was it that you came to the
4  conclusion that InductEV utilizing SharePoint
5  for purposes of making its handbook available
6  to its employees was, you know, done so that
7  they could track access, when -- when did you
8  decide that?
9      A.   When I first needed information.
10 Joren -- we had talked a lot after work.
11 There was a discussion about PTO, whether you
12 can rollover unused PTO, and they were trying
13 to harp on what I heard in diversity training
14 or -- I mean, in orientation because it had
15 been a while for them.
16          And I wanted to find proof.  I
17 didn't want to just give them words, if there
18 could be proof.  So I went to -- to look for
19 the handbook to -- to find something to give
20 to them and I had trouble accessing it, and
21 when I found -- you know, finally found the
22 right link to click, and shaw it -- "shaw" --
23 saw it on SharePoint, I -- I felt, like,
24 that's probably why they didn't know the

Page 255

1   procedures, like, those barriers and the
2   feeling of being surveyed and that's what I
3   felt.
4        Q.   Did they tell you that, "they"
5   being Joren or -- or Marsha?
6        A.   Maria.
7        Q.   "Maria"?
8        A.   No.  They didn't volunteer to look
9   it up themselves, either, no.
10       Q.   Was there anything stopping you
11  from stopping by Diane Wilmes' office on your
12  way to or from you workplace, and say, "Hey,
13  by the way, I've got a question about PTO.
14  Can you tell me?"
15       A.   At that point, I felt alienated by
16  her.  Between the thing with Judy and the "he
17  said/she said," I just wanted to talk to them
18  in writing.
19       Q.   What point?  Where -- where are we
20  now in time?
21       A.   This is after.  So cell phone thing
22  is, like, around November 2021, I think.  At
23  least by that time it should have been
24  cleared out.  And, then, the thing about PTO,

Page 256

1  I'm not sure. I know it was sometime after
2  that. I believe there's a time stamp on that
3  mess same in discovery, because that was the
4  first time I looked into it. The second time
5  was before I asked Judy questions about
6  unpaid time off.
7      Q.   And do you recall when that was?
8      A.   The second time, or the first time?
9      Q.   The second time.
10          When was the second time?
11     A.   The second time I emailed her 4/18,
12 so I probably looked it up, like, within two
13 days of that.
14     Q.   Before April 18th of 2022?
15     A.   Yes.
16     Q.   Okay.
17          MR. SCHAUER: In any event, I
18          have here a handbook that I'm going
19          to mark as Exhibit-AA -- I guess
20          we're up to 19.
21          THE WITNESS: Yes, sorry.
22              -   -   -
23          (Whereupon, Exhibit AA-19,
24          Momentum Dynamics Corporation