```
                                                          Page 1

 1        IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2
 3                        - - -
 4   ASSATA ACEY,                :
                                 :
 5            Plaintiff,         : No. 2023-CV-01438
                                 :
 6        vs.                    :
                                 :
 7   INDUCTEV,                   :
                                 :
 8            Defendant.         :
 9                        - - -
10             THURSDAY, APRIL 18, 2024
11                        - - -
12
13        Videotaped Deposition of ASSATA ACEY,
14   taken at Fox Rothschild, 747 Constitution Drive,
15   Suite 100, Exton, Pennsylvania, commencing at 9:21
16   a.m., before Lauren Sweeney, a Court Reporter and
17   Notary Public.
18
                          - - -
19
20
21
22
23        Job No. CS6660747
24
```

1      Q.   Okay.  I'll suggest to you --
2  I'm not giving you legal advice -- that one of
3  the elements of a claim is lost wages.
4      A.   Yes, that's the compensatory,
5  yes.
6      Q.   And just for what it's worth, I
7  generally understand compensatory damages to
8  be more along the lines of embarrassment, pain
9  and suffering, distress, you know, that kind
10  of thing.
11      A.   Oh, I see.
12      Q.   You know, not something that
13  can be quantified, you know, by some
14  calculation of numbers.
15      Okay?  Do you understand that?
16      A.   Yes.
17      Q.   So let's talk about wage loss.
18      As of the end of September of
19  2022 --
20      A.   Yes.
21      Q.   -- at or around the time of the
22  mediation, if that helps fix it for you, you
23  were on disability.
24      Did you continue to receive

ASSATA ACEY

Page 27

```
 1  short-term disability after September 19th of
 2  2022?
 3          A.      Yes.  Well, long-term but
 4  disability.
 5          Q.      All right.  And how long did
 6  you remain on long-term disability?
 7          A.      I am on long-term disability.
 8          Q.      So you continue to receive
 9  long-term disability payments?
10          A.      Yes.
11          Q.      Have you worked at all since
12  the end of September of 2022?
13          A.      No.
14          Q.      Are you capable of working in
15  your mind?
16          A.      Not at this moment, no.
17          Q.      How much do you receive in
18  long-term disability payments each month?
19          A.      I think it's 3,600.  It's like
20  43,000 a year.
21          Q.      What were you making roughly a
22  year -- well, in the year that you worked for
23  InductEV?
24          A.      Gross?
```

```
 1              Q.     Yes.
 2              A.     Okay.  So somewhere around
 3    76,000.
 4              Q.     Do you know how much longer,
 5    assuming that you qualify for them, how much
 6    longer you would be eligible to receive
 7    long-term disability benefits?  The rest of
 8    your life, another two years, another six
 9    years, another three months?  Something along
10    that, that's what I'm looking for.
11              A.     I don't know.
12              Q.     And you're not making any claim
13    for back wages in this case, that is wages
14    that you earned prior to your separation from
15    InductEV that you're claiming were not paid to
16    you by InductEV; is that correct?
17              A.     Not at this time, no.
18              Q.     Well, you last actively --
19    well, I guess, sometime -- you began receiving
20    short-term disability, if I recall, sometime
21    in April of 2022; is that correct?
22              A.     May 16th.
23              Q.     May 16th.  Okay.
24                     And prior to that time were you
```

```
 1   is 18789, in the lower right-hand corner.
 2                  And I'll describe it while you
 3   look at it.  It appears to be notes from your
 4   visit with Dr. Mallory.  It says June 18 of
 5   2022.
 6                  Do you see that?
 7         A.       I'm looking for it.  Oh, there
 8   we are.
 9         Q.       At the top.
10         A.       June 18th.  That's interesting.
11         Q.       I'm not really worried if the
12   date's the 18th or the 20th, but I do want to
13   go down to the history of present illness.
14   "Patient is 24 years female who presents with
15   complaints of depression and anxiety."
16                  Do you see that?
17         A.       Yes.
18         Q.       "Patient reports managing an
19   illness which has been challenging."
20         A.       Yes.
21         Q.       It describes, "patient has a
22   pituitary tumor that could impact her vision,"
23   correct?
24         A.       Yes.
```

```
 1           Q.    "Patient reports this increases
 2   her anxiety since she has a difficult time
 3   staying focused at work due to concerns about
 4   making a mistake."
 5                 Do you see that?
 6           A.    Yes.
 7           Q.    "Patient reports challenges
 8   with medical professionals which have been
 9   making her avoid going to the doctor."
10                 Do you see that?
11           A.    Yes.
12           Q.    Did you have some kind of an
13   interaction with a specific male doctor that
14   caused you concerns?
15           A.    Not at that time, but -- boy,
16   I'm sorry.  I did have a large concern with a
17   male doctor three months after this, but I
18   think I have negative experiences with male --
19   and this is in June.  I think I had negative
20   experiences with male and female doctors at
21   this point.
22           Q.    "Patient also reports
23   challenges with feeling unsupported at work."
24                 Do you see that?
```

```
 1   showing up for work after the mediation?
 2           A.    After the mediation.
 3           Q.    Now, without going into too
 4   much detail because there's a lot of paper
 5   around it --
 6           A.    Right.
 7           Q.    -- you would agree that Family
 8   Medical Leave is by the company, correct?
 9           A.    Yes.
10           Q.    You were given the ability to
11   work from home by the company, correct?
12           A.    Yes.
13           Q.    Were other people routinely, if
14   you know, given the ability to work from home
15   that did your technician job?
16           A.    Occasionally, yeah.  Joren
17   would allow Omar or Seth.  Seth worked from
18   home a lot.  Brian Kenney, he would work from
19   home whenever he could.  I mean, we had like
20   -- whenever we -- especially with the OSHA
21   training.  That's when it was a lot easier
22   because I was supposed to be on the computer
23   for 30 hours anyhow.
24           Q.    Well, my understanding is,
```

```
 1  though, you were given the ability to work at
 2  home pretty much full-time; is that correct?
 3          A.    Yes.
 4          Q.    Okay.  And these other people
 5  you mentioned, were they given the ability to
 6  work at home full-time?
 7          A.    Not that I know of.
 8          Q.    They had once in a while -- or
 9  periodically they would be allowed to work
10  from home because of whatever reason, but they
11  were not given the right to work at home or
12  the ability to work at home like you were,
13  correct?
14          A.    I don't think so.  I don't
15  know.
16          Q.    Okay.  Well, you observed other
17  people in the workplace, and your belief's
18  that you were treated differently than they
19  were.
20                Did you notice them having the
21  ability to work from home to the degree that
22  you did?
23          A.    I did not notice that when I
24  was at home.  When I was at home I couldn't
```

```
 1  see who was there or not.
 2          Q.      Did you notice it when you were
 3  working in the workplace?
 4          A.      Oh, okay.  So before I was
 5  allowed to work from home I did notice some
 6  people working from home nearly full-time but
 7  not a lot, no.
 8          Q.      Okay.  And while you may have
 9  some disputes with the process to obtain
10  Family Medical Leave Act clearance, you did
11  receive it from the company, correct?
12          A.      I believe so, yes.
13          Q.      And you're familiar with the
14  fact that in order to even qualify for the
15  Family Medical Leave Act you need to have been
16  employed by the employer for 12 months,
17  correct?
18          A.      Yes.
19          Q.      Okay.  And, in fact, you were
20  provided with FMLA on roughly the first month,
21  day of your one-year anniversary at InductEV,
22  correct?
23          A.      Yes.
24          Q.      And that was by Ms. Talis?
```

1      A.    Yes.

2      Q.    Okay.  I think you expressed
3 concerns because the form wasn't filled out
4 when she gave it to you to complete or to look
5 at; is that right?

6      A.    She e-mailed me to sign the
7 form and the form was blank.

8      Q.    All right.  And do you think
9 that somehow that reflects some kind of
10 discrimination based on race or gender in the
11 process of obtaining FMLA?

12      A.    I thought it was disability.  I
13 thought she was trying to fire me.  So that
14 was like -- my episodes started around the
15 11th, went for a while, and the two events
16 preceding it was the Judy e-mail with the FMLA
17 which caused me to spiral, which -- and then
18 the dispute with my current spouse before we
19 became married which came after.

20      Q.    Well, let's go to June 11th.
21 Were you given the opportunity
22 to take some time off or given some leave
23 after the 11th of 20 --

24      A.    June 11th?

```
 1            Q.      Yeah.
 2            A.      I'm sorry, June 11th of 2022, I
 3   was already on short-term disability.
 4            Q.      Okay.
 5            A.      So I guess the FMLA was more so
 6   a gesture of whether I would be fired or not
 7   or leave.  That was the section that was
 8   blank.  They hadn't indicated whether my job
 9   was essential or whether they would be able to
10   hold it, and they wanted me to sign it without
11   that indication on it.
12            Q.      When you went out on
13   disability, was there any particular projected
14   date for your return to the workplace?
15            A.      No.
16            Q.      And if they wanted to fire you,
17   they could have done so any time up until June
18   14th of 2022, couldn't they, because you
19   wouldn't have been there a year, right?
20            A.      I'm not sure about that.
21            Q.      Well, you say you were afraid
22   they were going to fire you, correct?
23            A.      Once my FMLA ran out.
24            Q.      Oh.  Well, but what about
```

```
 1  before that?
 2         A.      When she sent me that form
 3  about me being essential or not I assumed that
 4  was her way of trying to fire me.
 5         Q.      How did that make you think she
 6  was trying to fire you?
 7                 You know what -- yeah, how does
 8  that make you think she was trying to fire
 9  you?
10         A.      Because when the form is filled
11  out the employer has to indicate whether the
12  job is essential and whether they will hold
13  that job or not while you're on leave, and had
14  I signed it blank when she filled out that it
15  wasn't essential, it would have made it much
16  more difficult for me to dispute her
17  designation of my job as essential or not.
18                 It would be a lot easier for
19  her to fire me and say we told her that her
20  role was essential and that we couldn't hold
21  it for her and she signed this and it's -- you
22  know, that was my view of it.
23         Q.      Did you discuss that with
24  Ms. Talis?
```

```
 1          A.    Absolutely not, no.  By that
 2   time I had already started my complaint with
 3   PHRC.  I had given up on any kind of her doing
 4   anything for me unless she thought that she
 5   had to.
 6          Q.    She gave you FMLA, correct?
 7          A.    Because I was eligible for it.
 8          Q.    Well --
 9          A.    Legally.
10          Q.    And you were concerned that she
11   wouldn't do it because she wanted to fire you,
12   right?
13          A.    Right.
14          Q.    And she didn't.
15          A.    I refused to sign the form
16   without it being filled out.  There was no
17   signed form.
18          Q.    And she didn't fire you, right?
19          A.    Right, she didn't fire me and
20   she had no signed form.
21          Q.    Correct, correct.  Right.
22                And you were -- prior to that
23   time you were given the ability -- prior to
24   your disability you were given the opportunity
```

```
 1   to work from home, correct?
 2         A.    After I complained to her, yes.
 3         Q.    Okay.  Well, when you say
 4   complained, I mean, did you go, gee, I'd like
 5   to work from home or, you know, did you say I
 6   need to work from home?
 7               Is she supposed to have known
 8   somehow that you wanted to work from home?
 9         A.    On April 18th of 2022, I told
10   her that I was concerned that her PTO policy
11   was encouraging people who were less than well
12   like myself to come into work and fear that
13   they would lose time or be on probation later
14   if they ran out of PTO.
15               I disclosed to her how my
16   symptoms had affected me, and I disclosed to
17   her that I would have trouble working
18   full-time.  She set up a meeting with me where
19   she told me that effective immediately I would
20   be able to have unpaid time off as long as I
21   worked at least 30 hours a week and that my
22   doctor just had to give her documentation, and
23   somehow I guess six or so days after that she
24   told me that it wouldn't be accepted until
```

1   after that pay period.
2           Q.      And what about that do you
3   think was somehow reflective of some kind of
4   racial or gender animus towards you?
5           A.      I believe that was disability
6   and this -- primarily because she -- the
7   things that she told me about working 40 hours
8   and being eligible for benefits were not the
9   same things that had been disseminated to my
10  boss or my team members prior.
11                  I discussed it to my boss in
12  writing, and he wrote -- you know, I ended up
13  writing back I think in one of the messages to
14  my spouse that he was upset because it's not
15  information that he received.
16                  He also asked me in writing to
17  cc him on any further e-mails with Judy 'cause
18  he was confused about that.
19                  So I was already -- I was just
20  like, okay, then maybe something's off.  But
21  the thing is in my e-mail and in person with
22  Judy I detailed my anxiety about not being
23  able to fulfill those hours.  I detailed in
24  detail like what my symptoms were like.

1            And she understood.  I think a
2   reasonable person would understand about
3   offering immediate relief from unpaid time
4   off.  Because that week -- I think it was
5   either that week or the next week after she
6   said that that I said, okay, well, we're
7   trying to figure out what's wrong with my
8   illness, and I went to two doctors'
9   appointments in one day, which I probably
10  wouldn't have done.
11           And so she knew at that time
12  that I had a vested interest in having unpaid
13  time off, and it was clear from what she
14  articulated to me that it was effective
15  immediately and to bring that back after
16  knowing -- 'cause she sat by the door -- that
17  I had already taken time off to see a doctor.
18  I don't understand how that wouldn't be
19  reasonably distressing, how she would not
20  perceive it to be distressing.
21       Q.    You don't understand because
22  you think that, what, Ms. Talis should be
23  thinking about you at all times possible?
24       A.    I think she should remember