## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ASSATA ACEY<br><br>                    Plaintiff,<br><br>v.<br><br>INDUCTEV<br><br>                    Defendant. | Case No.: 2:23-cv-01438<br><br>Judge Paul S. Diamond |

### Plaintiff's Response to Defendant's Statement (Doc 131-3) -- in Opposition to Defendant's Motion for Summary Judgement (Doc 131)

I, Plaintiff, submit the following answers to the Defendant's statement of facts (131-3):

1.    Plaintiff Assata Acey ("Plaintiff") began working as a Product Introduction Technician with Defendant on June 14, 2021. (Schauer Dec. at Ex. 1 at 200:6-9).

**PLAINTIFF'S ANSWER: Admitted.**

2.    On May 8, 2022, Plaintiff filed a complaint with the Pennsylvania Human Relations Commission ("PHRC") followed by an amended complaint with the PHRC on June 21, 2022. (Schauer Dec. at Exs. 8 and 9).

**PLAINTIFF'S ANSWER: Admitted.**

3.    Both PHRC complaints were served on Defendant under a cover letter dated June 22, 2022. (Schauer Dec. at Ex. 10).

**PLAINTIFF'S ANSWER: Admitted.**

4.    The PHRC determined it lacked jurisdiction over Plaintiff's

complaints and indicated that the case would be transferred to the United States
Equal Employment Opportunity Commission ("EEOC") (*Id.*)

**PLAINTIFF'S ANSWER: Admitted.**

5.      On September 19, 2022, a mediation (the "Mediation") occurred to
resolve Plaintiffs' complaints with the EEOC. (Schauer Dec. at Ex. 2, 125:18-23,
190:23-191:2).

**PLAINTIFF'S ANSWER: Admitted.**

6.      It was agreed during the Mediation that Plaintiff would resign from
her employment in exchange for $50,000. (Schauer Dec. at Ex. 13; Ex. 3, 14:4-9).

**PLAINTIFF'S ANSWER: Denied. This alleged agreement was never
finalized-verbally or otherwise. Defendant cites my grandmother's deposition.
Both Plaintiff's email and her grandmother's testimony state that the
defendant's production of a contract was a condition precedent (obligation
that would only finalize the Defendants alleged agreement once the contract
had been received and signed). Plaintiff's grandmother testified that the
Defendant violated the agreement of a condition precedent by firing the
plaintiff and trying to release her claims before a contract had been received
and signed.  Doc 131-7, 16:5-17:18. Doc 131-17. Exhibit 1 (03/27/2024 J. Acey
Dep. 28:16-29:7).**

7.      It was agreed during the Mediation that Plaintiff would provide
Defendant with a verification form from a medical provider on or before

September 23, 2022. (Schauer Dec. at Ex. 13; Ex. 3, 16:19-24).

**PLAINTIFF'S ANSWER: Admitted.**

8.     It was agreed during the Mediation that Plaintiff would execute a general release, a non-disparagement and confidentiality, and Defendant agreed to provide a neutral reference. (Schauer Dec. at Ex. 13).

**PLAINTIFF'S                      ANSWER:                      Denied. Both Plaintiff's email and her grandmother's testimony state that the defendant's production of a contract was a condition precedent (obligation that would only finalize the Defendants alleged agreement once the contract had been received and signed). Plaintiff's grandmother testified that the Defendant violated the agreement of a condition precedent by firing the plaintiff and trying to release her claims before a contract had been received and                                                        signed. Doc 49, pp. 5-6. Doc 131-7, 16:5-17:18, Exhibit 1, 28:16-29:7. Doc 131-17.**

9.     Plaintiff admits: "In mediation I did agree to a verbal agreement in which I would resign and dismiss existing claims(prior to Sep 19) in return for a settlement amount of 50,000 from Momentum Dynamics Corp" and that "I was of *impression* that anything tentatively discussed would be bound by a formal written contract." (Schauer Dec. at Ex. 13, Ex. 17).

**PLAINTIFF'S ANSWER: Denied. Defendant's quoted "admission" continues to be incomplete, as determined by the court on pp.5-6 of Doc 49. Both Plaintiff's email and her grandmother's testimony state that the defendant's production of a contract was a condition precedent (obligation that would**

**only finalize the Defendants alleged agreement once the contract had been received and signed). Plaintiff's grandmother testified that the Defendant violated the agreement of a condition precedent by firing the plaintiff and trying to release her claims before a contract had been received and signed. 03/27/2024 J. Acey Dep. excerpts: Doc 131-7, 16:5-17:18; Exhibit 1, 28:16-29:7.                     Doc                     131-17.**

10.     In exchange for these terms, within thirty (30) days of the execution of a written settlement agreement, Defendant agreed to pay Plaintiff $50,000 (less ordinary deductions as required, if applicable). (*Id.*).

**PLAINTIFF'S ANSWER: Denied.**

**Both Plaintiff's email and her grandmother's testimony state that the defendant's production of a contract was a condition precedent (obligation that would only finalize the Defendants alleged agreement once the contract had been received and signed). Plaintiff's grandmother testified that the Defendant violated the agreement of a condition precedent by firing the plaintiff and trying to release her claims before a contract had been received and signed.**

**03/27/2024 J. Acey Dep. excerpts: Doc 131-7, 16:5-17:18; Exhibit 1, 28:16-29:7. Doc 131-17.**

11.   Plaintiff's grandmother, Jacqueline Acey, attended the Mediation with Plaintiff. (Schauer          Dec.          at          Ex.          3,          12:8-11.)

**PLAINTIFF'S ANSWER: Admitted.**

12. Jacqueline Acey testified "[t]here was a verbal agreement that [Plaintiff] would resign and dismiss existing claims in return for a settlement amount of $50,000 dollars from dyn – Momentum Dynamics, Corporation, but the agreement was never received and never executed." (*Id.* at 14:4-9).

    **PLAINTIFF'S ANSWER: Admitted.**

13. Jacqueline Acey did not recall any details of her conversation with Plaintiff about being harassed on the basis of race and did not recall Plaintiff mentioning racism in the workplace. *Id.* at 69:6-9, 71:2-23.

    **PLAINTIFF'S ANSWER: Admitted.**

14. Former HR director, Patti Rensel also attended the mediation. (*Id.* at Ex. 4, 6:10-12).

    **PLAINTIFF'S ANSWER: Admitted.**

15. During Plaintiff's deposition of Ms. Rensel, Ms. Rensel testified that she recalled a verbal agreement being entered in which Plaintiff was "asked to resign from employment in exchange for compensation." (*Id.* at 7:3-13).

    **PLAINTIFF'S ANSWER: Admitted.**

16. On September 27, 2022, Plaintiff received a copy of a settlement agreement from Defendant. (*Id.* at Ex. 13).

    **PLAINTIFF'S ANSWER: Admitted**

17. Plaintiff refused to execute the settlement agreement, repudiated her oral agreement with Defendant, and demanded $130,000 to resolve her claims. (*Id.*).

**PLAINTIFF'S ANSWER: Denied. The defendant's alleged agreement was never finalized-verbally or otherwise. Defendant cites my grandmother's deposition. Both Plaintiff's email and her grandmother's testimony state that the defendant's production of a contract was a condition precedent (obligation that would only finalize the Defendants alleged agreement once the contract had been received and signed). Plaintiff's grandmother testified that the Defendant violated the agreement of a condition precedent by firing the plaintiff and trying to release her claims before a contract had been received and                                                                           signed. 03/27/2024 J. Acey Dep. excerpts: Doc 131-7, 16:5-17:18; Exhibit 1, 28:16-29:7 ; Doc 131-17.**

18.   On October 24, 2022, Plaintiff filed an Amended Charge of Discrimination with the EEOC asserting discriminatory terms, conditions, and privileges of employment based on race and gender, harassment based on race and gender, retaliation for protesting ADA/PTO policy, discriminated based on disability, and retaliation for filing an EEOC complaint. (Schauer Decl. at Ex. 16.)
**PLAINTIFF'S ANSWER: Admitted.**

19.   Plaintiff filed a Complaint in the Court of Common Pleas of Chester County Pennsylvania on or about March 10, 2023, asserting twenty claims for alleged discrimination and/or retaliation in violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e), Section 1981 of the Civil Rights Act of 1990 (42 U.S.C. § 1981), The Americans with Disabilities Act of 1990 (42 U.S.C. § 12101), The

Pennsylvania Human Relations Act (43 Pa. Stat. Ann. § 962.1) and one claim for Intentional Infliction of Emotional Distress under Pennsylvania law. Notice of Removal (ECF No. 1) at Ex., A ("Compl.").

**PLAINTIFF'S ANSWER: Admitted.**

20. On April 14, 2023, Defendant removed Plaintiff's Complaint to the United States District Court for the Eastern District of Pennsylvania. Notice of Removal (ECF No. 1).

**PLAINTIFF'S ANSWER: Admitted.**

21. April 27, 2023, Defendant moved to dismiss Plaintiff's Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. Defendant's Motion to Dismiss (ECF No. 10).

**PLAINTIFF'S ANSWER: Admitted.**

22. On February 27, 2024, the Honorable Judge Gene E.K. Pratter, U.S.D.J. issued an order granting in part and denying in part Defendant's Motion to Dismiss. Feb. 27, 2024 Memorandum (ECF No. 49).

**PLAINTIFF'S ANSWER: Admitted.**

23. The District Court dismissed Counts I, II, III, IV, IX, XIV, and XX of Plaintiff's Complaint with prejudice. Feb. 27, 2024 Order (ECF No. 50).

**PLAINTIFF'S ANSWER: Admitted.**

24. The District Court also dismissed Counts XIII, XV, and XVI without prejudice. *Id.*

**PLAINTIFF'S ANSWER: Admitted.**

25. The District Court denied Defendant's Motion with respect to Counts V, VI, VII,

VIII, X, XI, XII, XVII, XVIII, and XIX and the parties proceeded with discovery on those claims. *Id.*

**PLAINTIFF'S ANSWER: Denied. The defendant continued to use discovery time to address her clams of disability discrimination. Doc 136, p. 3. Doc 136-1, Doc 136-2.**

26. The Senior Technician role at InductEV requires at least "8+ years' experience in a test environment for emerging technology." (Schauer Dec. at Ex. 14).

**PLAINTIFF'S ANSWER: Admitted.**

27. It is undisputed that Plaintiff did not possess at least "8+ years' experience in a test environment for emerging technology" at the time she applied for the introduction product technician position. (Schauer Dec. at Ex. 1, 100:7-18; Ex. 14.

**PLAINTIFF'S ANSWER: Admitted.**

28. Plaintiff acknowledged during her deposition that the senior technician role requires 8+ years of experience. (*Id.* at Ex. 1, 71:13-24, 72:13-19).

**PLAINTIFF'S ANSWER: Denied. Plaintiff claimed to recall a requirement of 6-8years during her deposition. Doc 131-5, 71:13-24, 72:13-19**.

29. Plaintiff further acknowledged that she does not possess the requisite 8+ years of experience to qualify for a senior technician role. (*Id.* at 100:7-11).

**PLAINTIFF'S ANSWER: Admitted.**

30. The written comments of multiple evaluators involved in interviewing and the hiring of Plaintiff were very positive regarding several aspects of her education and experience, as well as future at InductEV, but also recognized Plaintiff lacked the

skills and abilities required of a senior technician role. (*Id.* at Ex. 11.)

**PLAINTIFF'S ANSWER: Admitted**

31.  Plaintiff received an Annual Performance Review in which she received no negative comments and acknowledges that she needs to "deepen her hands-on skills." (Schauer Dec. at Ex. 15).

**PLAINTIFF'S ANSWER: Denied. Page 5 of Defendant's Exhibit shows my manager's states goal that I "Integrate better within the team, and read the room for when to wrap up a tangent". Doc 131-19, p. 5.**

32.  Plaintiff did not indicate that her growth plans included promotion in her Annual Performance Review. *Id.*

**PLAINTIFF'S ANSWER: Denied. Plaintiff indicated a desire to be compensated or promoted in proportion to her work within InductEV, under a subsection that she self-titled as "help".Doc 131-19, p.3**

33.  Plaintiff received a review by Seth Wohlgemuth, Plaintiff's supervisor, and in her deposition could not identify anything in that review that she believed reflected animus toward black people or women. (Schauer Dec. at Ex. 1, 191:23- 193:19).

**PLAINTIFF'S ANSWER: Admitted with the following exception: as a technician or senior technician, Seth Wolgemuth was not my supervisor. Doc 131-18.**

34.  Plaintiff did not believe Mr. Wohlgemuth harbored any animus toward her based on gender or race. (*Id.* at 194:14-21).

**PLAINTIFF'S ANSWER: To the extent this paragraph refers to Seth**

**Wolgemuth, it is admitted. To the extent this paragraph refers to John Wolgemuth, it is denied.**

35.   Nor could Plaintiff identify anything in Rob Rosenberger's review that reflected animus toward her based on race or gender. (*Id.* at 187:22-189:16).

<u>**PLAINTIFF'S ANSWER**</u>: **Admitted.**

36.   Plaintiff acknowledged that those who were promoted to senior technician roles possessed more experience than her. (*Id.* at 100:7-23).

<u>**PLAINTIFF'S ANSWER**</u>: **Admitted.**

37.   Plaintiff alleged that black employees such as her and Omar Jackson were criticized as lazy due to race. Compl., ¶ 123.

<u>**PLAINTIFF'S ANSWER**</u>: **Admitted.**

38.   Mr. Jackson was never called lazy or criticized based on race at InductEV. (Schauer Dec. at Ex. 5, 71:9-73:18).

<u>**PLAINTIFF'S ANSWER**</u>: **Denied.**

39.   Plaintiff also alleged that Mr. Jackson was promoted only after controversy surrounding the hiring process for a senior technician, despite possessing 20 years of experience. Compl., ¶ 148.

<u>**PLAINTIFF'S ANSWER**</u>: **Admitted.**

40.   Plaintiff identified Mr. Jackson as a witness with knowledge of the facts relating to her case, explaining that Mr. Jackson was the "first and only promoted black employee in defendant's history, originally denied senior title due to 'employment gap'. Also experienced scrutiny from HR and comments from coworkers. Present

for a deal of criticism [Plaintiff] received from Rob Rosenberg and other coworkers. First/only employee to tell [Plaintiff] of suspected racial differences in pay. Knowledge of [Plaintiff's] work on the UV project. Witness to his own starting and ending pay as technician and senior technician while at MD." Schauer Decl.                     at                     Ex.                     12.

**PLAINTIFF'S ANSWER: Admitted.**

41.    Mr. Jackson had no idea why Plaintiff identified him as a witness with knowledge of the facts relating to her case. (Schauer Dec. at Ex. 5, 54:1-5).

**PLAINTIFF'S ANSWER: Admitted.**

42.    Mr. Jackson testified that he never heard Rob Rosenberger say anything relating to race         at         InductEV.         (*Id.*         at         58:12-14).

**PLAINTIFF'S ANSWER: Admitted.**

43.    Mr. Jackson testified that he had no reason to think that Rob Rosenberger had any racial         animus         toward         him.         (*Id.*         at         58:15-59:1).

**PLAINTIFF'S ANSWER: Admitted.**

44.    Mr. Jackson testified that he is not aware of any racial differences in pay at InductEV.                     (*Id.*                     at                     60:14-16).

**PLAINTIFF'S ANSWER: Admitted.**

45.    Mr. Jackson testified that did not know what Plaintiff meant by "employment gap," stating         "There         was         no         employment         gap."         (*Id.*         at         56:7-16).

**PLAINTIFF'S ANSWER: Admitted.**

46.    Mr. Jackson testified that he did not recall any specific conversations with Plaintiff

regarding differences in pay other than one instance in which he "was speaking out of anger" while describing his pay and role at InductEV in relation to his race. (*Id.* at 47:5-48:5).

**PLAINTIFF'S ANSWER: Admitted.**

47. Mr. Jackson acknowledged that he had twenty years of experience and was promoted and received a pay raise at InductEV due to his extensive experience. (*Id.* at 75:11-6).

**PLAINTIFF'S ANSWER: Denied. An admission is not the same as an acknowledgement of an allegation as a fact. This is for the factfinder.**

48. Mr. Jackson was unaware of any "controversy" surrounding his promotion and disagreed with the allegations in Plaintiff's Complaint that he was promoted only after controversy. (*Id.* at 75:9-20, 76:4-6).

**PLAINTIFF'S ANSWER: Admitted.**

49. Mr. Jackson testified that he never experienced any comments from co- workers that he deemed inappropriate or suggestive of racial animus. (*Id.* at 63:6- 12).

**PLAINTIFF'S ANSWER: Admitted.**

50. Mr. Jackson could not identify a single example where he felt criticized due to race while employed at InductEV. (*Id.* at 72:13-15).

**PLAINTIFF'S ANSWER: Denied. Doc. 137, pp. 64-65, 267-271.**

51. Mr. Jackson could not identify anything that he would describe in his own words as harassment at InductEV. (*Id.* at 73:15-18).

**PLAINTIFF'S ANSWER: Denied. Doc. 137, pp. 64-65, 267-271**

52.   Mr. Jackson testified that Plaintiff's co-workers "thought [Plaintiff] didn't do her
      job."                    (*Id.*                    at                    63:9-16).
      **PLAINTIFF'S ANSWER: Admitted.**

53.   Mr. Jackson testified that he attended a meeting during which Rob Rosenberger
      indicated that he "didn't think [Plaintiff] was getting the work done fast enough"
      and would make his opinion known during meetings. (*Id.* at 57:14-25).
      **PLAINTIFF'S ANSWER: Admitted.**

54.   Mr. Jackson testified that Rob Rosenberger's opinions were made "inside these
      meetings. On the floor, Rob would never say anything to me or Assata, no.
      Everything was said in the meetings that I witnessed." (*Id.* at 57:14-21).
      **PLAINTIFF'S ANSWER: Admitted.**

55.   Mr. Jackson testified that Rob Rosenberger "was a senior technician" and would
      have been the one to know whether Plaintiff was completing work in a timely
      manner.                    (*Id.*                    at                    57:22-58:5).
      **PLAINTIFF'S ANSWER: Admitted.**

56.   Mr. Jackson testified that InductEV "saved [his] life . . . because they gave [him] a
      job when [he] was down, when [his] wife was down. (*Id.* at 33:8-12).
      **PLAINTIFF'S ANSWER: Admitted.**

57.   Mr. Jackson testified that the company "trusted [him] enough to give [him] the key
      to open the shop" and that the "company helped [him]. (*Id.* at 33:13- 17).
      **PLAINTIFF'S ANSWER: Admitted.**

58.   Mr. Jackson testified that he was not aware of any practice of limiting employees

based on race at InductEV. (*Id.* at 77:6-9).

**PLAINTIFF'S ANSWER: Admitted.**

59.   Mr. Jackson did not have a single example where he felt criticized due to race. (*Id.* at 72:13-15).

**PLAINTIFF'S ANSWER: Denied. What Mr. Jackson could recall at the time of deposition does not disprove what knowledge he did or did not have. That is a conclusion for a fact-finder.**

60.   Mr. Jackson did not witness anything he considered to be "pervasive racial harassment." (*Id.* at 70:8-15).

**PLAINTIFF'S ANSWER:  Doc. 137, pp. 64-65, 267-271.**

61.   Mr. Jackson testified that he applied for the role of product introduction technician and was not surprised when he received that role because that was the role he applied for. (*Id.* at 77:10-22).

**PLAINTIFF'S ANSWER: Admitted.**

62.   Mr. Jackson testified that his subsequent promotion to senior product technician was due to him showing the company that he was qualified for that position. (*Id.* at 77:21-78:2).

**PLAINTIFF'S ANSWER: Admitted.**

63.   Mr. Jackson testified that he has no reason to believe that InductEV made decisions based on race. (*Id.* at 82:15-20).

**PLAINTIFF'S ANSWER: Admitted.**

64.   Mr. Jackson had no knowledge of Plaintiff's claim that she was allegedly compared to chocolate ice cream. (*Id.* at 50:13-15, 81:22-23).

**PLAINTIFF'S ANSWER: Denied. What Mr. Jackson could recall at the time of deposition does not disprove what knowledge he did or did not have. That is a conclusion for a fact-finder.**

65. Mr. Jackson had no knowledge of Plaintiff's claim that she was allegedly told she was from the wrong side of the tracks. (*Id.* at 50:18-22).

   **PLAINTIFF'S ANSWER: Denied. What Mr. Jackson could recall at the time of deposition does not disprove what knowledge he did or did not have. That is a conclusion for a fact-finder.**

66. Mr. Jackson testified that Rob Rosenberger, a senior technician, complained that Plaintiff did not complete tasks in a timely manner. (*Id.* at 57:9 to 58:14).

   **PLAINTIFF'S ANSWER: Admitted.**

67. Joren Wendschuh wrote in a 2021 annual performance review dated February 6, 2022 that Plaintiff needed to "grow their soldering and assembly skills," "integrate better within the team," learn to read "the room for when to wrap up a tangent," "work toward providing clear and concise feedback and status updates where needed" and "integrate the new software into their daily routine." (Schauer Decl. at Ex.                    15,                    p.                    4).

   **PLAINTIFF'S ANSWER: Admitted**

68. Plaintiff did not disagree with Mr. Wendschuh, stating that in the 2021 performance review that she was "challenged with learning more about the product and processes and people surrounding its development" and that she was "seeking to    deepen"    her    "hands-on    skills."    (*Id.*    at    pp.    1-2).

**PLAINTIFF'S ANSWER: Denied. Plaintiff did not receive her supervisor's comments until after she submitted her self-review portion. Doc 131-19, p. 6. Exhibit 2 (11/15/2021, performance review process and deadlines).**

69. Mr. Wedschuh stated in his Interview Evaluation Form that Plaintiff "[l]oves to learn" and "[b]rings a unique 'science and engineering' background and knowledge to the job." (Schauer Dec. at Ex. 11, p. 13).

**PLAINTIFF'S ANSWER: Admitted.**

70. Mr. Wedschuh further indicated that Plaintiff was a "bit of a unique person" for the role, and that he would want to classify Plaintiff as a technician, "unless Omar & Seth are Sr.'s [*sic*]." (*Id.*).

**PLAINTIFF'S ANSWER: Admitted.**

71. Mr. Jackson and Seth Wohlgemuth were promoted to senior technician at the same time, despite Mr. Wohlgemuth having been with InductEV longer. (Schauer Dec. at Ex. 5, 46:6-9).

**PLAINTIFF'S ANSWER: Admitted**

72. Omar Jackson testified that Mr. Wohlgemuth had a unique knowledge about the products and InductEV and that Mr. Wohlgemuth earned his promotion. (*Id.* at 101:24-102:4).

**PLAINTIFF'S ANSWER: Admitted**

73. Plaintiff testified that Mr. Wohlgemuth deserved the promotion. (Schauer Dec. at Ex. 1, 115:9-11).

**PLAINTIFF'S ANSWER: Admitted**

74.     Plaintiff identified Maria Tabbutt as the "[o]nly supervising female mechanical
        engineer. Responsible for the Assembly Documents of the 150 and 75kW US and
        EU cabinets. Knows of some of the Quality and Documentation related work
        conducted by me during employment with Defendant. Experienced scrutiny and
        less cooperation from male employees including Bogdan Proca, Rob Rosenberg,
        and men on the QA team. Listened to locker room talk from John Wolgemuth.
        Told during performance evaluations that she could not document her supervision
        of design engineer despite acting as their supervisor without full pay. First/only
        employee to tell me of gender differences in pay. Received weekly meetings with
        HR when they complained about hostile environment caused by new Manager
        which included performance evaluation issue. Witness to her own starting and
        ending pay and related negotiations while working at MD." Schauer Decl. at Ex.
        12.

        **PLAINTIFF'S ANSWER: Admitted**

75.     Ms. Tabbutt had no understanding of Plaintiff's sexual harassment claims.
        (Schauer         Dec.          at          Ex.          6,          86:14-22).

        **PLAINTIFF'S ANSWER: Denied. Exhibit 3 (04/08/2024 M. Tabbut Dep. pp.
        118(ll11)-119)).**

76.     Ms. Tabbutt testified that, "Firsthand, I don't believe I had witnessed anything"
        when asked whether she had witnessed anything at InductEV that she understood
        to    be    animus    toward    Plaintiff    based    on    sex.    (Id.    at    97:16-21).

        **PLAINTIFF'S ANSWER: Admitted**

77.     Ms. Tabbutt further confirmed that she did not "remember witnessing anything"

she understood to be sexual harassment directed toward Plaintiff. (Id. at 97:22-98:2).

**PLAINTIFF'S ANSWER: Admitted**

78. Ms. Tabbutt did not even remember hearing about anything prior to looking at a subpoena relating to this case. (Id. at 98:3-6).

**PLAINTIFF'S ANSWER: Admitted.**

79. When asked whether Ms. Tabbutt saw "anything at InductEV . . . that would help [her] understand Ms. Acey's claim with respect to being harassed on the basis of sex," Ms. Tabbutt responded "No." (Id. at 99:9-13).

**PLAINTIFF'S ANSWER: Admitted**

80. Ms. Tabbutt also had no knowledge of the allegations giving rise to Plaintiff's race-based claims. (Id. at 94:14-96:7).

**PLAINTIFF'S ANSWER: Denied. Exhibit 4 (04/08/2024 M. Tabbut Dep pp. 65-67).**

81. Ms. Tabbutt could not identify anything that "suggested Ms. Acey was subject to a culture [of] harassment on the basis of her gender." (Id. at 142:17-21).

**PLAINTIFF'S ANSWER: Denied. Ms. Tabutt testified to being ignored by the male manager of the QA dept, which supports plaintiff's allegations of a company culture of gendered harassment. Doc 137, pp. 106-109.**

82. Plaintiff alleged in paragraph 175 of her complaint that, "[a]s a woman employee, [she] was subjected to a workplace culture and harassment on the basis of [her] gender." Compl., ¶ 175.

<u>**PLAINTIFF'S ANSWER**</u>**: Admitted.**

83.   Plaintiff alleged in paragraph 176 of her complaint that [t]his harassment included targeted opposition, inappropriate office jokes, and unwanted touching from [h]er colleagues." Compl., ¶ 176.

<u>**PLAINTIFF'S ANSWER**</u>**: Admitted.**

84.   Ms. Tabbutt never witnessed Plaintiff being touched by any colleagues. (Schauer Dec. at Ex. 6, 143:1-3).

<u>**PLAINTIFF'S ANSWER**</u>**: Admitted**

85.   Ms. Tabbutt never witnessed Plaintiff listen to an inappropriate office joke. (Id. at 143:8-10).

<u>**PLAINTIFF'S ANSWER**</u>**: Admitted.**

86.   Ms. Tabbutt had no understanding of what Plaintiff meant by "targeted opposition." (Id. at 143:4-7).

<u>**PLAINTIFF'S ANSWER**</u>**: Admitted.**

87.   Ms. Tabbutt did not remember witnessing anything she considered to be sexual harassment directed toward Plaintiff. (Id. at 142:1-145:17).

<u>**PLAINTIFF'S ANSWER**</u>**: Admitted.**

88.   In fact, Ms. Tabbutt, a female employee, had no understanding of the allegations in paragraphs 175 and 176 of Plaintiff's Complaint. (Id. at 143:12-19).

<u>**PLAINTIFF'S ANSWER**</u>**: Denied. Exhibit 3 (04/08/2024 M. Tabbut Dep. pp. 118(ll11)-119)).**

89.   Plaintiff also alleged that she felt the experiences she faced were due to her gender (Compl., ¶ 12), and further alleged that her suspicions grew when coworker Rob

Rosenberger "muttered 'bitch' under his breath," which Plaintiff understood to be directed toward Ms. Tabbutt. Compl., ¶ 13.

**PLAINTIFF'S ANSWER: Admitted.**

90.  Plaintiff's Complaint acknowledges that Mr. Rosenberger did not use the term "bitch" toward her. See id.

**PLAINTIFF'S ANSWER: Denied. Compl., ¶ 13. Doc 131-6, p.39.**

91.  Ms. Tabbutt testified that no one ever referred to her as a "bitch" during her time at InductEV. (Schauer Dec. at Ex. 6, 131:12-15, 132:19-133:7).

**PLAINTIFF'S ANSWER: Admitted.**

92.  Ms. Tabbutt also testified that when she did hear Mr. Rosenberger use the term "bitch," it was when he was working on difficult projects and would use the term "this thing's a bitch" or "that's a bitch" and that she has used the term in her lifetime and in a similar context. (Id. at 131:21 to 134:22).

**PLAINTIFF'S ANSWER: Admitted**

93.  Ms. Tabbutt testified that Mr. Rosenberger never referred to her as a "bitch." (Id. at 133:5-9).

**PLAINTIFF'S ANSWER: Admitted.**

94.  Daniel Hackman, Plaintiff's coworker who she later married and no longer works at InductEV, could not identify anything he observed suggesting racial animus toward Plaintiff. (Schauer Dec. at Ex. 7, 43:1-15, 69:14-19).

**PLAINTIFF'S ANSWER: Denied. Defendant's counsel asked Mr. Hackman only to identify racial animus (towards me) that he witnessed at InductEV. Doc 131-11, 43:1-24, 69:1-24.**

95.   Mr. Hackman could not identify anything he witnessed that suggesting Plaintiff was discriminated against based on race. (Id. at 36:14-22, 42:8-15).

**PLAINTIFF'S ANSWER: Admitted**

96.   Mr. Hackman could not identify a specific example of anything he witnessed suggesting that Plaintiff was subject to sexual harassment at work. (Id. at 42:16-43:15).

**PLAINTIFF'S ANSWER: Denied. Doc 137, pp. 156-159.**

97.   Mr. Hackman agreed that he did not witness a single instance of racial or sexual animus directed toward Plaintiff during his time at InductEV. Id.

**PLAINTIFF'S ANSWER: Admitted**

98.   None of Plaintiff's witnesses could identify conduct suggesting racial animus toward Plaintiff. (Schauer Dec. at Ex. 1, 132:7-16; Ex. 7, 42:8-15; Ex. 6, 94:14-96:7;       Ex.       5,       38:20-21,       67:6-18).

**PLAINTIFF'S ANSWER: Denied. At minimum, one of my witnesses were able to identify conduct which has been argued in my complaint to suggest racial           animus           towards           me. Exhibit   5   (04/09/2024   D.   Hackman   Dep.   pp-63-66). Exhibit 4 (04/08/2024 M. Tabbut Dep pp. 65-67).**

99.   Rob Rosenberger provided a positive review of Plaintiff in the written notes of her interview, describing her as "very intelligent," and "very enthusiastic and outgoing" with an "excellent technical aptitude." (Schauer Decl. at Ex. 11, pp. 1-2).

**PLAINTIFF'S ANSWER: Admitted**

100. Rob Rosenberger recognized that Plaintiff lacked experience and "might not be happy in a Technician based on her comment that "she wanted to learn as a Technician before moving into an Engineering position." (Id. at p. 1).

**PLAINTIFF'S ANSWER: Admitted**

101. Bruce Mitchell noted that Plaintiff was "still honing and practicing her skills after graduation, possible she was limited on what she was allowed to do from previous employers but doesnt [sic] seem to fully fit the skills for a Sr tech role." (Id. at p. 11).

**PLAINTIFF'S ANSWER: Admitted**

102. Bruce Mitchell also observed that Plaintiff "would need to be trained still on certain technical abilities" and that she "seemed to have little tool knowledge and experience, wiring, cabling stripping and crimping which are needed for a senior tech role." (Id. at p. 12).

**PLAINTIFF'S ANSWER: Admitted**

103. Bruce Mitchell further stated that Plaintiff had a "good engineering [sic] mindset of thinking how and why components work and understanding it" and that she "seems to fit an engineering [sic] position instead of a senior tech role." (Id. at pp. 11-12).

**PLAINTIFF'S ANSWER: Admitted**

104. Ryan Taggart indicated that Plaintiff "struggled with a drill and center punch" and that she "did not know which direction to put the drill in to [sic] drill a hole." (Id.

at                                    p.                                    6).

**PLAINTIFF'S ANSWER: Admitted**

105.   Mr. Taggart also found that Plaintiff lacked "experience with hand tools and will need a lot of time and attention to hone her knowledge into practical experience." (Id. at p. 7).

**PLAINTIFF'S ANSWER: Denied. Taggart's statement is not a finding of fact. Doc 131-15, p.7. Exhibit 6 (04/11/2024 A. Acey Dep pp. 77-80).**

106.   Plaintiff began to think she was suffering discrimination between April 25, 2022 and May 4, 2022 when Ms. Judy Talis, InductEV's Chief Administrative Officer, told Plaintiff she needed to make up time off due to alleged disability by using PTO.       (Schauer       Dec.       at       Ex.       1,       45:20-49:18)

**PLAINTIFF'S ANSWER: Denied. Defendant's allegation relies on my response to their question of when I felt both discrimination and the ability to *pursue/prove* these claims in court. The defendant explicitly asserted this question to be distinguished from (a question of) when I began to feel I was being discriminated against.  Doc 131-5, pp 3-5.**

107.   Judy Talis, InductEV's Chief Administrative Officer provided several positive reviews       of       Plaintiff.       (Schauer       Dec.       at       Ex.       11,       p.       3).

**PLAINTIFF'S ANSWER: Denied. Defendant's production of one review does not prove their conclusion of it as "positive", nor does it evidence the existence of other reviews, positive or otherwise. Doc 131-15, p.3. Exhibit 7 (04/11/2024 A. Acey Dep. pp. 132-138).**

108.   In an April 28, 2021 Interview Evaluation Form, Ms. Talis noted that Plaintiff "has

a very innovative take on her work" and "has always looked beyond the task and thinks out of the box." (Id.).

**PLAINTIFF'S ANSWER: Admitted**

109. Ms. Talis also noted that while Plaintiff "may not have the exact skills we are looking for she is certainly capable with her background o[f] learning them." (Id.).

**PLAINTIFF'S ANSWER: Admitted**

110. Yet Plaintiff testified that most of her allegations of improper treatment based on race and gender focused on Judy Talis. (Schauer Dec. at Ex. 1, 116:12-19).

**PLAINTIFF'S ANSWER: Admitted**

111. Plaintiff testified that Ms. Talis' April 28, 2021 evaluation reflects racial or gender bias. (Id. at 130:24-135:6).

**PLAINTIFF'S ANSWER: Admitted**

112. There is nothing in Plaintiff's April 28, 2021 evaluation form reflecting racial or gender bias. (Schauer Decl. at Ex. 11).

**PLAINTIFF'S ANSWER: Denied. Excerpt of 04/11/2024 A. Acey Dep., pp. 132-138.**

113. Plaintiff testified that the series of messages contained in Doc. 15 (ECF No. 40) captures her belief that she was accused of stealing time at InductEV. (Schauer Dec. at Ex. 2, 226:8-12, 243:21-245:23).

**PLAINTIFF'S ANSWER: Admitted**

114. Plaintiff was not accused of stealing time during her employment. Doc.15 (ECF No. 40) at p. 22, ¶ 14.

**PLAINTIFF'S ANSWER: Denied. Doc 40, section (II)(14).**

115.   Plaintiff missed meetings at InductEV. Id. at p. 16, ¶ 2; id. at p. 17.

**PLAINTIFF'S ANSWER: Denied. Defendant relies on a document where I admit to missing a meeting. This is not an admission of missing meetings in plural. Doc 40, pp 16-17.**

116.   Plaintiff produced no evidence of any "sabotage" by any coworkers.

**PLAINTIFF'S ANSWER: Denied. Doc 137, pp. 45-52, 72-73. Doc 40-2 pp. 1090-1095.**

117.   Plaintiff produced no evidence of derogatory jokes by any coworkers.

**PLAINTIFF'S ANSWER: Denied. Doc 137, pp. 59-61, 211-214. Doc 40-2, pp. 1711-1712, 1715-1718.**

118.   Plaintiff testified that the message: "This is Assata. She's a technician with a Physics degree . . . she'll be doing better things . . ." is evidence of a "derogatory comment[] from [her] coworkers." (Schauer Dec. at Ex. 2, 226:13-18, 230:12-231:10).

**PLAINTIFF'S ANSWER: Admitted.**

119.   Plaintiff further testified that that message bothered her because the message was "making a big deal to a stranger about my role and my degree . . . like I was some commodity, and it made me feel uncomfortable," despite acknowledging that this message was not an attempt to "belittle [her]." (Id. at 231:8-10).

**PLAINTIFF'S ANSWER: Admitted.**

120. Plaintiff produced no evidence to support her allegation that she was told she is from "the wrong side of the tracks."

**PLAINTIFF'S ANSWER: Admitted.**

121. Plaintiff could not remember the details of her allegation that she was compared to chocolate ice cream or dark chocolate. (Schauer Dec. at Ex. 1, 274:4- 15).

**PLAINTIFF'S ANSWER: Denied. 04/11/2024 A. Acey Dep. Excerpts: Doc 137, pp12-13, 16-17(at 273:8-274:10, 291:1-292:20).**

122. Plaintiff testified that the "exact words" were more accurately recounted to [her] boss" but she can't remember his direct quotes right now." Id.

123. Plaintiff recounted the alleged comparison in Doc. 15 (ECF No. 40) at p. 11, ¶ 2.
**PLAINTIFF'S ANSWER: Admitted**

124. Plaintiff produced no other evidence of ever being compared to chocolate ice cream or dark chocolate.

**PLAINTIFF'S ANSWER: Admitted**

125. Plaintiff could not explain her allegation that she was tapped on the shoulder and grazed by a Mike Russel. (Schauer Dec. at Ex. 2, 218:3-219:8).

**PLAINTIFF'S ANSWER: Denied. Plaintiff gave the explanations the Defendant asked for regarding her allegation of Mike Russel tapping her shoulder and grazing her form/body. Doc 131-6, 218:13-24.**

126. Plaintiff testified that Mr. Russel walked past her in a hallway that was roughly six-feet wide. (Id. at 219:9-17).

**PLAINTIFF'S ANSWER: Admitted**

127. Plaintiff testified that Mr. Rosenberger used the word "bitch" in front of her and not toward her. (Id. at 256:16-23).

**PLAINTIFF'S ANSWER: Denied. To the extent defendant construes that I said Rosenberg did not call me a "bitch", this statement is denied. Doc 131-6, p.39.**

128. In or about February 2022, Plaintiff met with Judy Talis, then Human Resource Director, and discussed a number of concerns she had regarding occurrences in the InductEV workplace, none of which involved facially discriminatory or hostile and offensive statements or behaviors. (Id. at 40:18 – 44:18; 45:1-56:14).

**PLAINTIFF'S ANSWER: Admitted**

129. Despite Plaintiff's belief that any work performed outside of her job description was outside of her contract, Plaintiff acknowledged that she was an at-will employee and provided no evidence that she was forced to take on additional labor due to any purported harassment based on race. (Schauer Dec. at Ex. 1, 143:2-144:15).

**PLAINTIFF'S ANSWER: Denied. Doc 137 pp. 335-348, 353-371. Plaintiff's Trial claims ("behavior-non promotion" claims 1-9, "motivations-non promotion" claims 1-14).**

130. On May 16, 2022, Plaintiff left active employment on a non-work-related disability. (Schauer Dec. at Ex. 2, 28:18-23).

**PLAINTIFF'S ANSWER: Admitted**

131.  Plaintiff continues receiving full time disability benefits from InductEV's long term disability insurance provider and testified in she is not making a claim for lost wages.                         (Id.                    at                    26:24-28:17).

**PLAINTIFF'S ANSWER: Denied. Plaintiff testified that she was not making a claim "at that time". Doc 131-6, 28:12-17.**

132.  Plaintiff felt that Judy Talis acted improperly and displayed sex discrimination when she recommended that Plaintiff might want to visit her daughter's gynecologist and "barely stopped herself from asking if [she] was pregnant." (Id. at 251:10                         –                         255:9).

**PLAINTIFF'S ANSWER: Admitted**


Sincerely,

Assata Acey Hackman /s/

Assata Acey (Pro Se)

5121 Brown St,

Philadelphia, PA, 19139

770-231-1017

aceyassata@gmail.com

Date: 09/10/2024

# Exhibits for Plaintiff's Response to doc 131-3

**Exhibit 1 (03/27/2024 J. Acey Dep. 28:16-29:7).**

JACQUELINE ACEY

Page 28

1    she started working with Momentum?

2         A.      No, I don't know.

3         Q.      And it's your testimony today that

4    you have no sense of what those illnesses could

5    be, just that they exist.

6         A.      Yes.  I have no sense of what they

7    could be because her doctors didn't even know what

8    they could be, so she was in the process of

9    finding out what all those illnesses amounted to

10   and the doctor that she has now is helping her to

11   copy and to label the illnesses.

12        Q.      Understood.  Thank you.  After the

13   mediation, did you notice any change in Ms. -- in

14   the Plaintiff's behavior?

15        A.      No.

16        Q.      I think we touched on this earlier,

17   so forgive me if it's duplicative, but did you

18   discuss the details of mediation with Plaintiff

19   after it ended?

20        A.      Just the -- just the information

21   that you read, the first in the first paragraph.

22   That was the meat of it.

23               They had a mediation.  It was

24   agreed that she would get 50,000 dollars and

JACQUELINE ACEY

Page 29

```
1      upon -- and she would resign once the agreement

2      was executed and we never discussed anything

3      further than that.

4                  We thought it was over, but the

5      agreement never came and she was let go before the

6      agreement was executed which was not agreed to and

7      then this started.

8           Q.     Do you remember how did you speak

9      to Plaintiff after mediation?  Was it over the

10     phone?

11          A.     Yes.  It would have to be over the

12     phone.  I wasn't there.

13          Q.     When you say over the phone, what

14     do you mean, like actually orally over the phone

15     or --

16          A.     Orally, over the phone.

17          Q.     I'm assuming you have a cell phone?

18          A.     I do.

19          Q.     Do you text with your cell phone?

20          A.     Yes, I do.

21          Q.     Do you text the Plaintiff?

22          A.     No, not about this.

23          Q.     Have you ever texted the Plaintiff?

24          A.     Yes.
```

# Exhibit 2 (11/15/2021, performance review process and deadlines).

 Gmail

**Assata Acey <aceyassata@gmail.com>**

---

**Fwd: 2021 Performance Review Process Begins!**
1 message

---

**Assata Acey** <Assata.Acey@momentumdynamics.com>                    29 April 2022 at 10:40
To: Assata Acey <aceyassata@gmail.com>


Get Outlook for Android

**Assata Acey | Technician**
**484-320-8222 ext 178**

**Momentum**®
Wireless EV Charging

***Connect***   LinkedIn | Website | Newsletter
***Media***   Taxis - NYTimes | Airport & Transit | Driver Experience

*Confidentiality Notice: The information, and any attachments and/or documents, transmitted by this email is intended for the addressee <u>only</u> and contains information that is confidential, proprietary, privileged, or otherwise protected by law. This notice serves as a confidentiality marking for the purpose of any confidentiality or nondisclosure agreement. Any dissemination, distribution, or copying is prohibited. If you have received this communication in error, please contact the original sender immediately.*

---

**From:** Judy Talis <judy.talis@momentumdynamics.com>
**Sent:** Monday, November 15, 2021 1:26:17 PM
**To:** MD Employees <MDEmployees@momentumdynamics.com>
**Subject:** 2021 Performance Review Process Begins!


Team,


It's that time of year again! The Performance Review process is to ensure all employees have an opportunity to discuss job, career goals and performance. This is an opportunity to step back from the day-to-day tasks to review past year's accomplishments and set clear goals for the future. Our

employees are at the core of Momentum Dynamics, and to be successful we all need to know how we are doing, how to improve as well as speak to accomplishments and how we would like to develop professionally. This process allows employees and their managers to look back on all that

they have accomplished over the past year.


**<u>*All employees that started on or before 10/1/21 are eligible to participate.*</u>**


**PART ONE:  EMPLOYEE SELF EVALUATION**

The process starts with each employee completing their self-evaluation on the 2021 Performance Evaluation Form

- (see attached Performance Form or go to ☐ 2021 Performance Evaluation Form and click on box to left of form then select download).

Page 1: Prepare a summary of accomplishments, challenges, and strengths.

Page 2: Comment on your key career development and goals.

Page 3: Complete all sections under Core Competencies/factors by discussing how you demonstrated or progress made under the Employee Self Evaluation section.

1. ***Send a copy of your form to your manager AND copy Diana or Judy in Human Resources***

***All completed self-evaluations need sent to the employees immediate supervisor by 12/6/21.***

**PART TWO: MANAGER EVALUATION**

Manager will complete the supervisor comments and overall comments **by 1/7/2022 and return to HR for review.**

Meetings will be scheduled to discuss the final review with each employee.

Please feel free to reach out if you have any question or concerns.

**Judith Talis | Chief Administrative Officer**

Momentum Dynamics Corporation
***Fueling the Future of Electric Transportation***

3 Pennsylvania Avenue, Malvern, PA 19355
(M) 610.613.1449

www.momentumdynamics.com

**Disclaimer and Confidentiality Notice:** This email, and any attachments and/or documents linked to this email, are intended for the addressee and may contain information that is confidential, proprietary, privileged, or otherwise protected by law. This notice serves as a confidentiality marking for the purpose of any confidentiality or nondisclosure agreement. Any dissemination, distribution, or copying is prohibited. If you have received this communication in error, please contact the original sender.

**MDPerformanceReviewForm2021.docx**
96K

**Exhibit 3 (04/08/2024 M. Tabbut Dep. pp. 118(ll11)-119)).**

1   immediately.  So, I guess, yeah, that kind of

2   falls under less cooperation.

3        Q.     Okay.  Do you have any

4   understanding of why there would be less

5   cooperation among team members?

6        A.     No.

7        Q.     Do you have an understanding as to

8   why there would be less corporation in your

9   specific instance with your QA team?

10       A.     No.

11       Q.     The next sentence reads:  Listen

12  to locker room talk from John Wolgenmuth.

13       A.     Uh-hmm.  Yes.  Sorry.

14       Q.     Pardon me?

15       A.     I said uh-hmm, but I'm saying yes,

16  I agree with what you're reading.

17       Q.     I understand.  Do you know what

18  Ms. Acey is referring to there?

19       A.     Not a specific thing that we might

20  agree on, but I've -- I don't know.  Definitely

21  heard John talk about things, like, talking about

22  his kids or his wife or, you know, getting alone

23  time, things, that kind of stuff I've heard him

24  say kind of comments that are maybe a little less

25  professional or maybe TMI in some ways.

1          Q.      Okay.

2          A.      I don't know exactly which ones

3    he's referring to, but...

4          Q.      You mentioned earlier, I believe

5    you said we would agree or, I mean, the things

6    you've just described, are those things that you

7    would understand as locker room talk?

8          A.      Maybe, I mean, yeah, I guess

9    locker room talk I think of as, or I guess what

10   people think of as saying things and probably even

11   about women, okay, stuff that they would only want

12   a male coworker to hear and not their female

13   coworkers to hear.

14         Q.      You believe the definition of the

15   locker room talk, as you have just provided, do

16   the things that you mentioned you heard John

17   talking about fall within that definition, talking

18   about his kids?

19         A.      I mean, not to the full extent of

20   that, no, I guess not.

21         Q.      How about the other things you

22   mentioned with respect to John Wolgenmuth?

23         A.      I would say not fully to the

24   definition that I had.

25         Q.      Okay.  So are you aware, based on

# Exhibit 4 (04/08/2024 M. Tabbut Dep pp. 65-67).

Page 65

```
 1    you know, my own life into control and not be laid
 2    off and, you know, kind of determine where I go
 3    next.
 4           Q.      Okay.  Any other main reasons, if
 5    you will?
 6           A.      Those are the biggest ones.
 7           Q.      I just want to jump back a minute.
 8    Forgive me.
 9                   With respect to your conversations
10    with Ms. Acey, I think you said there were -- were
11    there any other conversations you had with
12    Ms. Acey regarding Ms. Talis, other than what
13    you've already testified to?
14           A.      Not that I can remember right now.
15           Q.      Okay.  I think, initially, you had
16    also mentioned Rob Rosenberger?
17           A.      Yeah.
18           Q.      Can you describe -- can you
19    explain your conversations with Mr. Acey with
20    respect to Rob Rosenberger?
21           A.      Yeah, I mean, I think I remember a
22    lot of her discussions, you know, with her about
23    him was just in the way that he treated her and,
24    yeah, I would just say in the way that he treated
25    her.
```

1          Q.      When you say the way Rob treated
2    Ms. Acey, did Ms. Acey tell you that Rob treated
3    her a certain way?
4          A.      She might have.  I don't quite
5    recall, but I know I can say even just witnessing
6    it just in terms of how frustrated he would be in
7    a conversation with her, leaving a conversation,
8    you could see how he was frustrated and, you know,
9    kind of muttering under his breath about something
10   or just saying "Agh".  Yeah, so I could even see
11   it in the way that he was probably treating her.
12         Q.      Okay.  When you say witnessed it
13   and these frustrations Rob had with Ms. Acey, do
14   you have any idea why he was frustrated?
15         A.      I don't know.
16         Q.      No, you don't know as in you have
17   no idea?
18         A.      Yeah, I don't know why he gets
19   frustrated or acts certain ways around people, you
20   know, but I think I could tell that he did not
21   like Assata just by kind of the way he acted
22   towards her and the way he talked to her is not
23   like, you know, you would talk to a coworker,
24   typically.
25         Q.      Can you be a bit more specific?

1    How did he act towards Ms. Acey?

2           A.      Yeah, he would get frustrated,

3    just kind of making like verbal sounds like just

4    "Agh" or just walking away or maybe just mutter

5    something about Assata as he's walking by.

6    Because he was often kind of working right in

7    front of my desk, so I would kind of see a lot of

8    that stuff.

9           Q.      Okay.  But do you know why he

10   would have gotten frustrated with her?

11          A.      No.

12          Q.      And when he muttered things, do

13   you have any idea what he would mutter or why he

14   would mutter it?

15          A.      No, I don't remember.  I think the

16   one thing I do remember is when Assata was in -- I

17   think had to take some time off, like, medically

18   or work from home, I do remember he was always,

19   like, "Where's Assata?  Why isn't she here?  She

20   should be doing that stuff."  I do remember him

21   saying like "What the hell, she's never here,"

22   so...

23          Q.      Would you say that Ms. Acey held a

24   role at InductEV that would require her to be in?

25          A.      I think at the time, I think it

# Exhibit 5 (04/09/2024 D. Hackman Dep. pp-63-66)

DANIEL HACKMAN

Page 63

1    A.    I think her chief complaints stems

2    mostly from the fact that she was not -- or that

3    he was not her supervisor.  That wasn't within his

4    role and responsibilities to -- to be worried

5    about whether or not she is doing her job.

6    Q.    Did Ms. Acey explain to you why she

7    felt that way?

8    A.    She -- I think she ex- -- expressed

9    feeling as though -- I think she expressed feeling

10   as though he would more often question whether she

11   was doing useful work or whether she was getting

12   her work done or questioning what work is she

13   doing more than he would with other coworkers.

14   Q.    Did she ever explain to you why she

15   thought that was the case?

16   A.    I -- I think -- I think the answer is

17   that these were observations that she made in her

18   interactions with Rob and --

19   Q.    Yeah -- sorry.  I didn't mean to cut

20   you off.

21   A.    No, that's okay.

22   Q.    And my question is, specifically, did

23   she ever explain to you, based on those

24   observations, she felt the way she felt?

Page 64

1    A.    I don't know how I can better answer
2  the question.  I -- I feel like I did.  Because
3  she -- she said that she observed a discrepancy in
4  his demeanor around her and his interests in the
5  work she was doing or she was doing work at all,
6  versus the way he -- he was, you know, towards the
7  other people on that team.  She felt that there
8  was a disparity.
9    Q.    Okay.  And my question pertains
10  particularly to the disparity.
11         What about the disparity led her to
12  believe that there were differences in the way
13  that she was being treated versus the way somebody
14  else was being treated?
15         What was that disparity based on
16  specifically?
17         Do you know?
18    A.    Oh, I understand.  I understand.
19         I don't know personally.  She -- she
20  has -- she claims that it is -- that it's largely
21  based on her being a woman, maybe to a lesser
22  extent, or maybe to some extent also that she's --
23  that she's black.  That -- that was the conclusion
24  that she came up.

DANIEL HACKMAN

Page 65

1      Q.     Okay.  Did she explain how she came to
2  that conclusion?
3      A.     I think she did.  I can't -- I can't
4  recall what her argument was, but I believe she
5  did try to explain the reasoning.  I don't
6  remember -- I don't remember the details, though.
7      Q.     When she tried to explain the
8  reasoning to you, do you remember what you
9  thought?
10     A.     Yes.  Yes.  I remember -- I remember
11  initially thinking that -- I remember initially
12  thinking that I couldn't tell one way or the other
13  if this sort of disparate treat- -- disparate
14  treatment was based on race or sex or if it was
15  based on something else.  I remember thinking that
16  I didn't have enough information to judge on my
17  own.
18     Q.     The -- the -- the words "disparate
19  treatment," as you just used them --
20     A.     Okay.
21     Q.     -- again, that's coming from not your
22  observations --
23     A.     Correct.
24     Q.     -- right, but from what Ms. Acey told

DANIEL HACKMAN

Page 66

```
 1   you?
 2        A.      That's right.
 3        Q.      And the conclusions that Ms. Acey told
 4   you with respect to how she felt she were -- she
 5   was being treated; right?
 6        A.      That's right.
 7        Q.      You don't recall any of the specific
 8   details as to why she felt she was being treated a
 9   certain way other than the conclusion and it was
10   because she is black and a woman; correct?
11        A.      I think that's correct, yes.
12        Q.      All right.
13        A.      Yeah, I can't recall specifics.
14        Q.      With respect to Bill Gallagher, who is
15   the last person you identified among the one, two,
16   three, four, five people earlier who you
17   identified as treating Ms. Acey in a particular
18   way that led to her behavioral change, what about
19   Bill Gallagher did Ms. Acey complain to you about?
20        A.      Oh, my.  The only thing that I can
21   remember right now is one time when she did her
22   hair, she said that the following day that Bill
23   approached her and said something to the effect
24   of, oh, so it is a weave.  That's -- that's
```

**Exhibit 6 (04/11/2024 A. Acey Dep pp. 77-80).**

AA-7?
A. AA-7, Page 2.
Q. Paragraph 3.
A. I found it. I found it.
Q. Do you have any reason to disagree with the observation or comment inserted there by Mr. Taggart?
A. Yes.
Q. And what -- what do you disagree with?
A. So I did have experience with hand tools. I mean, I replaced the surface mount in my car, so I had to use some type of hand tools for that.
Q. Did you have hand -- experience with hand tools in an industrial or assembly or I'm not sure what word to describe the workplace there as, but did you have experience with hand tools of a nature that were utilized at InductEV as you came to learn it during your employment?
A. Yes. So with Comcast, we were responsible for constructing our own test labs, sometimes putting together jigs, using

Page 78

1    scrills  -- "scrills" -- using screws and

2    things.  And I mean it was -- it was fun.

3              And at the same time, even with

4    Dupont, I had to use hand tools, because I

5    was constructing circuit boards for these --

6    for these -- what they're called --

7    prototypes to be tested in, so I had to use

8    tools all throughout.

9              But if you're talking about even

10   more specified industrial use, at CTDI, which

11   is a contractor for Comcast, I was over --

12   I -- I mean, there were so many repairs to

13   set top boxes, boxes of that nature, taking

14   out hard drives, putting them back together,

15   reconstructing, you know, cell phone cameras.

16             It just didn't -- I mean, not cell

17   phone cameras.  What was it -- like, those

18   security cameras that Comcast gives -- door

19   bell cameras.  There we go.

20             So, yes, I -- I have extensive

21   experience with hand tools.

22        Q.   So you would disagree with the

23   observations of Mr. Taggart?

24        A.   Yes.

Page 79

1        Q.   Okay.  Do -- do you recall, did you
2    view individually with Mr. Taggart, or, you
3    know, because there's other individuals.
4        A.   Um...
5        Q.   Do you -- do you know the way in
6    which Mr. Taggart, you know, would have been
7    able to interact or did interact or, you
8    know, speak with you to form the comments
9    that are completed on AA-7?
10       A.   So I've participated in a process
11   like this before under Joren.  What we were
12   told is that we each get, like, ten minutes
13   of someone, pick an assessment, have them do
14   it, and judge based off of that assessment if
15   they're ready or -- for the job, or if it --
16   and sometimes, you know, you ran out of time.
17            Ryan was with me by hisself.  He
18   took me to some area in the gray spot, and
19   showed me one of their, like, assembly
20   instructions, and, then, handed me a -- in my
21   words, they're, like, doing weird things --
22   handed me a drill that's supposed to go
23   through metal.
24            And he was just like, "Here have at

Page 80

1    4."

2              There wasn't any context, and he's

3    right, I was very confused.

4        Q.   And, by the way, you do speak

5    quickly, so the person to your right, the

6    court reporter --

7        A.   I'm sorry.

8        Q.   -- would not mind if you slowed

9    down, also.

10             THE WITNESS:  Please tell me

11             if you need me to repeat anything.

12             I'm so sorry.

13             MR. SCHAUER:  Okay.  All

14             right.  I'll try and keep this

15             moving.

16                  -   -   -

17             (Whereupon, Exhibit AA-8,

18             Momentum Wireless Power Interview

19             Evaluation Form, was marked for

20             identification.)

21                  -   -   -

22    BY MR. SCHAUER:

23        Q.   Exhibit -- I'm going to show you a

24    document that's Exhibit AA-8.

# Exhibit 7 (04/11/2024 A. Acey Dep. pp. 132-138).

Page 132

1  discriminatory animus on the part of

2  Ms. Talis towards you?

3      A.   Attorney Schauer, if I can clarify,

4  I actually meant to start, like, here

5  (witness indicating) with the word, "she."

6      Q.   Okay.  That's -- that's fine.

7           "She understands the needs to do

8  her job as asked as well."

9           Tell me how that reflects some kind

10  of gender or animus -- I'm going to -- I'm

11  going to -- I'll use a more general word,

12  improper animus on the part of Ms. Talis?

13      A.   Okay.  For me it -- it connects

14  more to a statement, like, "Don't get ahead

15  of yourself."  It connected more to ideas

16  of -- I guess, condescension.

17           I know historically when people

18  talk about forms of racial expressions with

19  black people, one of them was criticizing

20  them as being, like, "uppity," or "more

21  puffed up than they ought to be."

22           And when emphasized my ability to

23  do my job as asked, it kind of implied a

24  desire to go beyond the job task, or to be --

1    to think that -- it just -- it just felt

2    condescending.  I'll just leave it there.

3         Q.   Do you think that that sentence had

4    nothing to with the sentences that go before

5    it in the comment section of Paragraph 1?

6         A.   I think it's connected in her train

7    of thought, but that's about it.

8         Q.   Well, her train of thought is what

9    this case is pretty much about, isn't it,

10   Ms. Acey?

11             I mean, she's the -- she's the

12   primary focus of your claims of gender and

13   race discrimination and harassment, isn't

14   she?

15        A.   So the first question, "her train

16   of thought," I believe the focus of this

17   Complaint is part of her thoughts, not

18   everything that she thought.

19             And the second one --

20        Q.   Okay.

21        A.   -- you asked if the -- the

22   claims -- the claims are based on -- on her

23   actions and her thoughts, yes.

24        Q.   Okay.  So her train of thought,

1  you're saying this last sentence isn't

2  connected to the prior or -- or the last

3  sentence of Box 1 in Paragraph -- of

4  Exhibit AA-11 -- AA-11, is separate and apart

5  from and reflects, you know, some kind of

6  separate idea or thinking of Ms. Talis?

7       A.   Yes.  Especially since --

8       Q.   Okay.

9       A.   -- the sentence starts with having

10  said that, which tells me that she wants to

11  set aside what she said at the beginning.

12       Q.   Oh, it doesn't mean that

13  incorporating everything else that was said,

14  in addition you understand the need to do

15  your job as asked as well.

16            You -- you don't read it that way,

17  do you?

18       A.   No.  I read it as positive, my

19  qualifications, against -- or my

20  impressions --

21       Q.   Okay.

22       A.   -- of my qualifications against my

23  ability to do the job as asked.

24       Q.   Is that, in part, because you

Page 135

1  believe that Ms. Talis is fundamentally

2  has -- harbors gender or race animus?

3       A.   Yes, at least subconsciously.

4       Q.   Okay.  And this is an example of

5  that, right?

6       A.   Sure, yes.

7       Q.   Okay.  Let's go to, I guess, the

8  next place you have circled is, "She feels

9  the technician role is fundamental to

10 engineering."

11           Do you see that?

12      A.   Yes.

13      Q.   Is that something you said, or

14 something you communicated?  It may not be

15 those exact words --

16      A.   Sure.

17      Q.   -- but is that something that you

18 said?

19      A.   Sure.  Yeah, I communicated

20 something like that.

21      Q.   Okay.  Well, let's -- let's go

22 through that -- let's go through that

23 additional comment from Ms. Talis.

24      A.   Sure.

1      Q.    "Assata is an out of box thinker."

2            Do you think that's a negative

3   comment?

4      A.    No.

5      Q.    It's a positive thing, isn't it?

6      A.    Right.

7      Q.    Okay.  "I of course addressed the

8   fact that she has an engineering degree and

9   did she see this technician role as a way to

10  get into the company."

11           Do you recall her asking if this is

12  a way for you to -- to get into the company?

13     A.    No.

14     Q.    So you're saying that she made that

15  up?

16     A.    I'm saying that she paraphrased it

17  differently.

18     Q.    Well, what is your recollection of

19  what was discussed at this interview that may

20  have led Ms. Talis to say that you -- you

21  know, the -- the idea that you have an

22  engineering degree that, you know, is not --

23  you know, exists, and ask you whether you saw

24  this technician role as a way to get into the

```
1   company.
2           Was there anything discussed that
3   could lead to even that conclusion that you
4   recall?
5       A.   There is something discussed that
6   could lead to that conclusion.
7       Q.   What is that?
8       A.   She kind of gave me the third
9   degree about if they give me a job, how soon
10  I would demand a promotion.
11      Q.   Did she say "demand"?  Is that the
12  word she used?
13      A.   She used the word similar to that
14  connotation.
15      Q.   Did she say --
16      A.   Require.
17      Q.   Did she -- you know, "I demand you
18  tell me when you would want a promotion"?
19      A.   No.
20      Q.   Okay.
21      A.   She was concerned that I would
22  demand a promotion.
23      Q.   Did she say, "I'm concerned that
24  you will demand a promotion"?
```

```
                                      Page 138
 1      A.   She said, "Will you."  "If we do
 2  this, will you" --
 3      Q.   Did she say, "Will you?"  Did she
 4  use the term, "demand" --
 5      A.   No.
 6      Q.   -- to you?
 7      A.   No, she didn't use the term,
 8  "demand."
 9      Q.   Well, what did --
10      A.   I don't know what she said
11  specifically.  I just remember that it was in
12  that connotation of the word, "demand."
13      Q.   Well, could it also have been in
14  the connotation as written here in her
15  evaluation --
16      A.   No.
17      Q.   -- that's not possible, right?
18      A.   No.
19      Q.   Okay.  And, by the way, I mean,
20  InductEV is -- I'll refer to it as a startup
21  company; is that fair to say?
22      A.   Yes.
23      Q.   It hasn't been around.  It's not
24  like Comcast or Dupont.  It hasn't been
```